FILED
2026 SEP 14 AM 11:16
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

---

**ANTONIA BLACKWELL,**

Plaintiff,

v.

**THE PEARL; GREYSTAR REAL ESTATE PARTNERS, LLC; GREYSTAR MANAGEMENT SERVICES, LP; KAIROI MANAGEMENT, LLC; and DOES 1-10,**

Defendants.

**COMPLAINT AND JURY DEMAND**

Civil No. __________

Case: 2:26-cv-00853
Assigned To : Oberg, Daphne A.
Assign. Date : 9/14/2026
Description: Blackwell v. The Pearl et al

---

# INTRODUCTION

1. This case follows a pattern as old as this country: a family is stripped of its home and its future, and then blamed for the loss. This action arises under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act, 42 U.S.C. §§ 3604, 3613, and 3617. Plaintiff Antonia Blackwell, a Black woman, was the only tenant of her race in her apartment building. She paid her rent in full and on time every month of her tenancy. She was evicted anyway, over fees that Defendants' own witness admitted at trial he could not

prove she owed, that Defendants' own records and employees identified as erroneous, and that Defendants ultimately abandoned. She was served a notice to vacate two days after she questioned those fees, and then evicted

2. After Plaintiff filed a race-discrimination complaint with the Utah Antidiscrimination and Labor Division, Defendants refused to accept her tendered rent, sued her for the resulting nonpayment, and obtained a judgment for treble damages on the very rent they had refused. One day after responding to her civil-rights complaint, Defendants offered in writing to rescind the eviction, waive all fees, permit her to remain, and provide a positive reference, expressly conditioned on her dismissal of her discrimination complaint. She declined. She was evicted in April 2023, and she and her minor son have been consistently without stable housing for years.

3. A White tenant who disputed the same fees was given a meeting, a lease renewal, and no notice to vacate. Plaintiff, who disputed the same fees, was evicted.

4. The fee addendum Defendants used to justify the charges they evicted Plaintiff over, and under which they obtained a judgment for three times her rent, is unsigned. The lease itself was produced only as a partial 14-of-40-page scan of a paper printout, not the complete authenticated instrument, and no witness with personal knowledge of its formation ever authenticated it. Plaintiff told Defendants in writing, before any litigation, that she never signed the addendum, and testified it was the first time she had seen the document. She was nonetheless held to its terms, evicted on it by summary judgment without any trial on whether she had ever agreed to it, and made to pay treble damages under it.

5. What happened to Plaintiff was accomplished through a method that requires no proof. A landlord charges fees it cannot prove the tenant owes, on an agreement no one signed, and when the tenant refuses to pay, serves a notice to vacate, refuses her tendered rent to manufacture a default, offers to erase the matter if she abandons her civil rights complaint, and, when she refuses, evicts her and collects three times the rent it declined to accept, plus attorney fees, plus her appeal bond. Every step of that method was sustained by the Utah courts, including the state's highest, and the decision approving it was entered by unpublished order, so it sets no precedent and cannot be found or cited by the next tenant. The result is a rule of law that can be applied to one tenant and withheld from another with no public record of the difference. When the tenant from whom the law's protection is withheld is the only Black tenant in her building, while a White tenant who disputed the same fees kept his home, that selective application of the law is the precise injury that 42 U.S.C. §§ 1981 and 1982, the Civil Rights Act of 1866, were enacted to remedy: the denial to a person of color of the same right to make and enforce contracts, and to hold property, that white citizens enjoy.

6. No court has ever adjudicated Plaintiff's claims under 42 U.S.C. §§ 1981 and 1982. Those claims were expressly preserved and have never been analyzed by any tribunal in any prior proceeding. Plaintiff exhausted every avenue in the State of Utah, a HUD-funded state enforcement agency and three levels of state court, and none applied federal fair housing law to the conduct alleged. This action is the first proceeding in which her federal civil rights claims will be decided on the merits.

7. This is an action for damages against private parties for their own unlawful conduct. Plaintiff does not ask this Court to review, reverse, vacate, or set aside any judgment or order of any state court. The state-court judgment stands, and Plaintiff has satisfied and continues to satisfy it. Plaintiff seeks money damages for what Defendants did to her, that they charged her fees their own witness admitted at trial they could not prove she owed, refused her rent to manufacture a default, conditioned her housing on the surrender of her race discrimination complaint, and terminated her tenancy because of her race and in retaliation for her assertion of her civil rights. That conduct was complete before any court ruled, and it is independently unlawful regardless of the outcome of the state eviction case. Where Plaintiff refers to the state proceedings, she does so to describe the history, to establish that her federal claims were never decided, and to measure the financial consequences of Defendants' conduct, not to seek review of any state ruling.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(4) (civil rights).

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Salt Lake County, Utah, and Defendants conduct business in this District.

10. This Court has supplemental jurisdiction over any related state-law claims under 28 U.S.C. § 1367.

This Court has personal jurisdiction over Defendants. Each Defendant owns, operates, or managed real property in Utah, transacted business in Utah, and committed the acts alleged in this Complaint in Utah. Defendants invoked the jurisdiction of Utah's courts by suing Plaintiff there.

11. This Court has authority to award the relief Plaintiff seeks. The statutes under which Plaintiff sues authorize an award of damages for their violation: 42 U.S.C. § 1981 and 42 U.S.C. § 1982 provide a private right of action for compensatory and punitive damages, and 42 U.S.C. § 3613(c) authorizes actual and punitive damages, injunctive relief, and attorney fees for violations of the Fair Housing Act. Plaintiff seeks money damages against private Defendants for their own unlawful conduct. She does not ask this Court to review, reverse, vacate, or set aside any judgment or order of any state court, and the existence of the prior state proceedings does not deprive this Court of jurisdiction. The United States Supreme Court has held that a federal court is not stripped of jurisdiction simply because a party litigates in federal court a matter previously litigated in state court; so long as the plaintiff presents an independent claim, "there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 293 (2005). The Tenth Circuit has applied this rule to civil-rights plaintiffs who lost in state court, holding that "[w]hen the state-court judgment is not itself at issue, the doctrine does not prohibit federal suits regarding the same subject matter, or even the same claims, as those presented in the state-court action." Bolden v. City of Topeka, 441 F.3d 1129, 1139 (10th Cir. 2006). And on facts closely resembling this case, the Tenth Circuit held that a

plaintiff alleging a manufactured default may proceed in federal court for damages because she "need not set aside, or challenge in any way," the state decision, and "can prove her claims without any reference to the state-court proceedings." Mayotte v. U.S. Bank Nat'l Ass'n, 880 F.3d 1169, 1174-75 (10th Cir. 2018). Whether the prior state proceedings have any preclusive effect on Plaintiff's claims is a question of preclusion, not jurisdiction, and is addressed below.

# PARTIES

13. Plaintiff Antonia Blackwell is a Black woman and a citizen of the United States. She resided at The Pearl apartments in Salt Lake County, Utah, from approximately March 2022 until April 29, 2023.

    Plaintiff's minor son, a multiracial child, referred to herein by his initials T.J., resided with Plaintiff at The Pearl throughout her tenancy and was evicted with her. He has a diagnosed disability, which Plaintiff disclosed to Defendants in writing on March 15, 2023. He was enrolled in kindergarten at the time of the eviction in April 2023 and is now missing his fourth year of school. Plaintiff brings this action in her own name and on her own behalf; she pleads the harm to her son as an element of her own damages, described below, and does not assert separate claims on his behalf in this Complaint.

14. Defendant The Pearl is the entity that owned and/or operated the residential apartment property at 4647 West South Jordan Parkway, South Jordan, Utah, where Plaintiff resided, and that brought the unlawful detainer action against Plaintiff, styled as The Pearl sued Plaintiff in The Pearl v. Blackwell, Civil No. 230401251, Third District Court,

Salt Lake County, Utah.

15.Defendant The Pearl is the landlord entity that brought the unlawful detainer action against Plaintiff and obtained the judgment at issue, styled as it sued Plaintiff in The Pearl v. Blackwell, Civil No. 230401251. The owner entity of the property, named as a Defendant herein, is the entity that held title to and owned the property at 4647 West South Jordan Parkway, South Jordan, Utah during the relevant period. The property was developed by CW Urban, and the owner entity may operate under or be affiliated with that or a successor name.

16. Defendants Greystar Real Estate Partners, LLC and Greystar Management Services, LP (collectively "Greystar") managed the property from the inception of Plaintiff's tenancy through on or about March 8, 2023. Greystar is the largest apartment management company in the United States. Greystar charged the fees at issue, assessed and reinstated the late fees the state agency found to be an unauthorized "glitch," issued the notices to vacate, refused Plaintiff's tendered rent, communicated the April 4, 2023 offer conditioning her housing on dismissal of her discrimination complaint, and initiated the conduct that led to the eviction. The acts alleged in this Complaint that occurred on or before March 8, 2023 were Greystar's.

17. Defendant Kairoi Management, LLC ("Kairoi"), a Texas limited liability company headquartered in San Antonio, Texas, with registered agent C T Corporation System, assumed management of the property on or about March 8, 2023, the same day Plaintiff filed her race discrimination complaint with the Utah Antidiscrimination and Labor

Division, and managed the property thereafter, including during the period when the eviction was prosecuted and Plaintiff was removed from the property on April 29, 2023. Kairoi continued the course of conduct Greystar began. Kairoi's own property manager, Brennan McIff, testified under oath that after Kairoi took over management, Kairoi "decided to continue to deny [Plaintiff's] lease renewal," citing "a delinquent payment," meaning the same disputed and undocumented fees. (Trial Tr. 170, 174.) Asked what policy he followed in choosing not to renew the lease of a tenant who was disputing fees, McIff answered that the basis was "[t]he lease agreement itself and fair housing." (Trial Tr. 176.) The "lease agreement" he referred to is the same lease that was never authenticated by any witness with personal knowledge and was produced only as 14 pages of a 40-page document, together with the unsigned Utility and Services Addendum that created the disputed fees. More significantly, McIff identified "fair housing" as a basis for the nonrenewal at trial. Fair housing law protects a tenant; it is not a ground for denying her a lease renewal. A landlord's statement that it denied a renewal on the basis of "fair housing" describes a decision made in response to the tenant's fair housing activity, which is retaliation. McIff thus articulated, as his own stated reason, the very conduct § 3617 prohibits: taking adverse action against a tenant in connection with her exercise of fair housing rights. McIff further admitted that he did not contact any of Plaintiff's references to verify her payment history, though that is the ordinary practice when a tenant seeks to renew or to rent elsewhere. (Trial Tr. 178.) When Plaintiff sought to remain in her home through June 30, 2023, Kairoi, through McIff, denied the renewal and proceeded with the nonrenewal Greystar had initiated, which produced the holdover

status on which the unlawful detainer and treble-damages judgment rested. Kairoi also declined Plaintiff a positive reference and participated in her removal. The UALD determination names both Greystar and Kairoi as respondents.

18. The Pearl, the owner entity, Greystar, and Kairoi acted in concert and as agents or principals of one another with respect to the conduct alleged, and each is liable for the discriminatory and retaliatory course of conduct directed at Plaintiff's tenancy. Their eviction action against Plaintiff was prosecuted throughout by the same counsel, the Law Offices of Kirk A. Cullimore, now operating as Titan Legal.

19. Does 1 through 10 are persons or entities whose identities and roles are not presently known to Plaintiff and who participated in the conduct alleged. Plaintiff will amend to name them when identified.

# RELATED PROCEEDINGS AND CITATION CONVENTIONS

21. The conduct alleged in this Complaint was the subject of the following prior proceedings, none of which adjudicated the claims asserted here:

a. **The Pearl v. Blackwell**, Civil No. 230401251, Third Judicial District Court, Salt Lake County, State of Utah (West Jordan Department), the Honorable James R. Gardner. Summary judgment on the eviction claim entered April 2, 2024; findings, conclusions, and judgment on

counterclaims entered January 22, 2025. A motion for attorney fees (Docket No. 241) and a motion to forfeit appeal bond (Docket No. 242) remain pending.

b. **The Pearl v. Blackwell**, No. 20250324-CA, Utah Court of Appeals. Decision entered by order May 5, 2026 (not designated for publication; no precedential effect under Utah R. App. P. 30(e)); rehearing denied June 3, 2026.

c. **The Pearl v. Blackwell**, No. 20260871-SC, Utah Supreme Court. Petition for certiorari denied August 24, 2026.

d. **Blackwell v. The Pearl / Greystar**, Utah Antidiscrimination and Labor Division Case No. 23H0033, dual-filed with the U.S. Department of Housing and Urban Development. Determination issued on or about September 1, 2023.

22. Citations in this Complaint use the following conventions. "R." refers to the appellate record in Utah Court of Appeals No. 20250324-CA, by page number. "Trial Tr." refers to the transcript of the December 13, 2024 bench trial in Civil No. 230401251, by page and line. "MSJ Hrg. Tr." refers to the transcript of the March 13, 2024 summary judgment hearing in Civil No. 230401251. "Def. Tr. Ex." refers to Plaintiff's trial exhibits (designated as defendant's exhibits in the state proceeding, where Plaintiff was the defendant) admitted at the December 13, 2024 trial. "Order" refers to the Utah Court of Appeals' memorandum decision of May 5, 2026, by page and footnote. "Counterclaim" refers to Plaintiff's Answer and Counterclaim filed April 13, 2023 in Civil No. 230401251. "Appellee's Brief" refers to the brief filed by The Pearl in Utah Court of

Appeals No. 20250324-CA, by page number. "Opposition" refers to Plaintiff's Opposition to Motion for Attorney Fees and Motion to Forfeit Bond, filed July 8, 2026 in Civil No. 230401251. "Reply" refers to The Pearl's Reply Memorandum in Support of Motion for Attorney Fees and Motion to Forfeit Bond, filed August 27, 2026 in Civil No. 230401251. "UALD Determination" or "Determination" refers to the written determination in UALD Case No. 23H0033, by page number.

23. Every document cited in this Complaint is part of the record of the proceedings identified in the preceding paragraph, all of which are public and identified by case number. Plaintiff possesses complete copies of each and will produce any of them in discovery or upon the Court's request. No exhibits are attached at this stage.

# FACTUAL ALLEGATIONS

## A. Plaintiff's tenancy and perfect payment record

24. Plaintiff and her minor son began renting an apartment at The Pearl in or about March 2022. Plaintiff is a single mother; her son has special needs.

25. Plaintiff's disclosed monthly obligation was $2,690, consisting of $2,550 in rent and $140 in disclosed fees.

26. Plaintiff paid the full disclosed amount, on time, every month of her tenancy. She never missed a rent payment.

27. The Utah Antidiscrimination and Labor Division ("UALD"), after investigation, described Plaintiff as "an ideal tenant in good standing that has always paid her rent on time." (UALD Determination, Case No. 23H0033, at 3.)
28. Plaintiff was the only Black tenant in her building. The Utah Antidiscrimination and Labor Division accepted this in its determination, noting that Plaintiff "was the only Black tenant residing at Respondent Pearl Property, and thus all other tenants were not of Complainant's race," and Defendants did not dispute it. (UALD Determination, Case No. 23H0033, at 17.) The building was approximately half vacant, with roughly twenty vacant units.
29. Defendants were aware that Plaintiff is Black.

**B. Defendants charged undisclosed fees and repeatedly acknowledged they were erroneous**

30. Beginning in or about July 2022, Defendants charged Plaintiff fees that had not been disclosed at the outset of the tenancy. No such fees had been charged in March, April, May, or June 2022.
31. Plaintiff objected. Defendants' accounting personnel removed the fees. This pattern repeated.
32. Community manager Stephanie Page confirmed to UALD that "in July, August, September, and October 2022, she removed Complainant's late fees and explained to Complainant that Respondent charged her a late fee because of a 'glitch' in the system." Regional manager Perry confirmed that Defendants' policy was to charge a late fee only

once a past-due balance reached a threshold, that Plaintiff's balance in those months did not meet it, and that "the 'system' charging a late fee was a 'glitch.'" (UALD Determination at 7.) Defendants thus repeatedly assessed late fees of $255 against Plaintiff that their own policy did not authorize, removed them when she objected, and then reinstated them.

33. Stephanie Page, the community manager who signed Plaintiff's lease, wrote to Plaintiff in September 2022: "This has been fixed, it was a setting issue. I apologize for the inconvenience." (Def. Tr. Ex. F; R. 605.)

34. Defendants submitted their other tenants' ledgers to UALD. Those ledgers "show that other tenants also received late fees including some tenants with a $0 balance, and Respondents reversed those tenants' late fees also." (UALD Determination at 7.)

35. Rutherford told UALD that he placed pay-or-vacate notices on "three to four other tenants' doors in December 2022, and in total placed ten to twelve notices to pay or vacate on tenants' doors during his time managing" the property, and that "he does not remember the race of those tenants." (UALD Determination at 8.) Other tenants therefore carried past-due balances and received notices. Rutherford also stated that he "did not non-renew any other tenant's lease" during his tenure. (UALD Determination at 9.) Plaintiff was the only tenant whose lease was not renewed.

36. The determination elsewhere states that Plaintiff "was the only tenant of Respondent Pearl Property to maintain a past due balance." (UALD Determination at 13.) That statement cannot be reconciled with Rutherford's own account that he issued ten to twelve pay-or-vacate notices to other tenants for past-due balances. Nor can it be

reconciled with Plaintiff's own ledger as UALD itself recorded it: on November 29, 2022, after Defendants' regional manager issued a $500 credit, Plaintiff's account showed a credit balance of $173.57. (UALD Determination at 7.) A tenant carrying a credit on the landlord's own books in December is not a tenant who "maintain[ed] a past due balance." The past-due balance that later appeared was created by Defendants' reinstatement in January 2023 of the same late fees their manager had been removing as a "glitch," and their regional manager had confirmed were unauthorized under Defendants' own threshold policy, for the four preceding months.

37. Defendants' property manager Jackson Rutherford testified at trial: "I've talked to a lot of residents that have had those issues." (Trial Tr. 111:5-6.)

38. In November 2022, Defendants' regional manager issued Plaintiff a $500 credit, leaving her ledger at a credit balance of $173.57. As of the end of November 2022, Defendants owed Plaintiff money on their own books. (R. 239; UALD Determination at 7.)

39. On December 6, 2022, Defendants issued a pay-or-vacate notice to Plaintiff, a tenant who carried a credit balance on Defendants' own books. (R. 95 ¶ 34; R. 532 ¶ 20; R. 239.) By Defendants' own later account, when a balance went unpaid in December 2022, Defendants "chose to not file for eviction." (R. 532 ¶¶ 28-29.) No discrimination complaint existed at that time.

40. Plaintiff never received that December 6, 2022 notice. Rutherford testified at trial that he "affixed it to her door, after knocking, with tape." Plaintiff objected on the record: "I never received it. I'd like to see proof that this was affixed to my door, because I never received this notice and my first time seeing this document." (Trial Tr. 115-117.)

Defendants' counsel acknowledged that the notice "was not one of the" planned exhibits and that he "wasn't planning on introducing it." (Trial Tr. 116.) Defendants offered no proof of posting beyond Rutherford's word. Plaintiff also pointed out on the record that the notice was issued "the same month I received that $500 credit," and asked why, if she owed the amount claimed, the credit had not been applied to it. (Trial Tr. 116.) The December 6 notice, which UALD later treated as evidence that Plaintiff "maintain[ed] a past due balance," was thus a document Plaintiff never saw, issued in a month in which Defendants' own books showed her in credit, and introduced at trial only after Plaintiff questioned its existence.

41. The reversal was abrupt and total. In November, Plaintiff's account stood at a $173.57 credit; Defendants owed her. Weeks later, in January 2023, Defendants reinstated the previously removed fees, the same late fees their manager had called a "glitch" and removed month after month, and asserted that Plaintiff now owed approximately $800, including a $255 late fee for each of several months. Plaintiff discovered this on January 28, 2023, when she logged into the online portal to pay her February rent and found she was "being charged $800.00 in addition to her rent." (UALD Determination at 7.) A tenant who was owed money at the end of November was, within weeks and without any change in her payment history, presented with an $800 balance built from fees Defendants had themselves repeatedly reversed.

42. This reversal occurred during the same days in which Plaintiff was seeking maintenance she was not promptly receiving. On January 3, 2023, Plaintiff submitted a work order reporting that her furnace was shutting off after heating; Defendants did not complete the

repair until January 10. (UALD Determination at 8.) On January 4, 2023, Plaintiff requested snow removal. (Id.) In the same window, on January 4, 2023, Defendants added a $255 late fee that brought Plaintiff's asserted balance to $854.42. (Id.) When Plaintiff logged into the portal on January 28, 2023 to pay her February rent, she found roughly $800 in reinstated fees rather than any resolution of the conditions she had reported. When she questioned the fees, she received a notice to vacate rather than a conversation. Plaintiff does not plead the maintenance delays as independent discrimination claims. She pleads them as context: in the same days Defendants reinstated fees their own manager had called a "glitch," Plaintiff's furnace was malfunctioning in winter and her account was being loaded with late charges, and Defendants' response to her objection was a notice on her door.

### C. The comparator: a White tenant who questioned the same fees kept his home

43. Adam Shelton, a White tenant of the same property, disputed the same category of fees.
44. Mr. Shelton received an in-person meeting, a lease renewal, and no notice to vacate. (Trial Tr. 200-201; R. 1019, 1022, 1109.)
45. Defendants have admitted the comparison. In their appellate brief they stated that "Mr. Shelton came down to the office and had a conversation with The Pearl's witness about whether he owed the same fees that Ms. Blackwell had disputed," and that "after such discussion, Mr. Shelton paid those fees." (Appellee's Brief at 32; R. 1021-22.) Defendants' own account thus establishes that a White tenant who disputed the identical fees was given a conversation, and that his payment followed that conversation. Plaintiff

was given no conversation. She was given a notice on her door two days after she raised the same dispute. Defendants' asserted distinction, that he paid and she did not, arises only after the point at which the two tenants had already been treated differently.

46. Plaintiff, who disputed the same fees, received a notice to vacate on her door two days after she raised her objection, with no meeting, no telephone call, and no discussion.

47. Rutherford admitted at trial that he had processed many evictions and that no other tenant had ever been evicted for questioning fees. (Trial Tr. 68:6-14.)

48. Asked under oath whether posting the notice to vacate on Plaintiff under those circumstances was ethical, Defendants' own property manager, Rutherford, testified: "I would not consider that action ethical." (Trial Tr. 66:24.) The person who carried out the eviction, testifying under oath in the landlord's own case, conceded that the action taken against Plaintiff was not ethical. He further admitted that no other tenant had ever been evicted for questioning fees (Trial Tr. 68:6-13), and that he had spoken with "a lot of residents that have had those issues" (Trial Tr. 111:5-6), meaning other tenants raised the same fee disputes and were not evicted for them. Plaintiff, the only Black tenant, was.

49. Plaintiff stated the disparity on the trial record: "he was able to go and ask questions on the fees and was not kicked out, as a young, white male. I am a middle-aged Black woman and was kicked out for asking." (Trial Tr. 164:13-17.)

## D. The fees were unsupported and Defendants abandoned them

50. The two categories of disputed charges were each unprovable, in two different ways, established by two different sources. The late fees were found by the state agency to be

an unauthorized billing error that Defendants' own policy did not permit. The pest control and utility charges were charges Defendants' own witness admitted, under oath at trial, they could not prove: he had no documentation that the services were performed, could not prove they were performed at Plaintiff's unit, and agreed that a landlord cannot charge a tenant for services not rendered. Neither category of charge was one Defendants could prove Plaintiff owed.

51. As to the late fees, the Utah Antidiscrimination and Labor Division found, based on Defendants' regional manager's own statement, that "Complainant had a past due balance, but the amount past due did not require the charging of a late fee in July, August, September, or October 2022; thus, the 'system' charging a late fee was a 'glitch.'" (UALD Determination at 7.) Defendants' community manager confirmed she removed the late fees each month and attributed them to a "glitch." (Id.) Defendants' own tenant ledgers "show that other tenants also received late fees including some tenants with a $0 balance, and Respondents reversed those tenants' late fees also." (Id.) After Defendants issued Plaintiff a $500 credit in November 2022, her ledger showed a credit balance of $173.57. (Id.)

52. As to the pest control and utility charges, Rutherford admitted he had no documentation for the charges. He testified that he had no documentation of pest control services, could not prove the services were performed at Plaintiff's unit, and agreed that a landlord cannot charge a tenant for services not rendered. (Trial Tr. 80:13-15; Trial Tr. 80-81.)

Defendants had no documentation substantiating the charges they assessed against Plaintiff's account.

53. He could not prove pest control was provided to Plaintiff's apartment. (Trial Tr. 81:6-10.)

54. He agreed that a landlord cannot charge tenants for services not rendered, and that he himself would not pay for services not rendered. (Trial Tr. 81:12-20.)

55. Defendants abandoned the fees in the state-court litigation. Counsel stated on the record: "We're not pursuing that." (R. 304-05; MSJ Hrg. Tr. 8:16-9:2; R. 1163-121.)

## E. The document Defendants used to evict Plaintiff was unsigned and incomplete

56. The lease copy Defendants filed with their eviction complaint was a partial, unauthenticated scan: 14 pages of what a RENTCafe eSignature page represented to be a 40-page signed document, produced as a scan of a paper printout rather than the native digital file. (R. 6-19.)

57. Defendants' verified complaint did not identify those 14 pages as the rental agreement; it stated only that "This action is based on a residential rental agreement." (R. 5 ¶ 4.)

58. The "Utility and Services Addendum" is unsigned. (R. 15.) That addendum is not a peripheral document. It is the sole instrument that purports to create the fees and surcharges Plaintiff disputed, and those fees are what Defendants swore, under oath, were the reason for the eviction. On April 3, 2023, Defendants' counsel represented to the state civil rights agency, under penalty of perjury, that the notice to vacate was served "because of unpaid utilities billed pursuant to the lease agreement between the parties." (R. 621.)

The unsigned addendum is the only source of any obligation to pay those utility charges. If it is unsigned and unauthenticated, there was no proven agreement to pay the charges, and therefore no proven basis for the reason Defendants gave under oath for the eviction.

59.At trial, Defendants could not prove the charges the addendum purported to authorize. Their witness admitted he had no documentation that the billed pest control services were performed, could not prove they were performed at Plaintiff's unit, and agreed a landlord cannot charge a tenant for services not rendered. (Trial Tr. 80-81.) The state agency separately found the late fees were an unauthorized "glitch." (UALD Determination at 7.) The reason Defendants swore justified the eviction, unpaid charges owed under the lease, thus rested on an unsigned addendum they could not authenticate and charges they could not substantiate.

60.Plaintiff disputed the addendum in writing at the time, and under oath at trial. On January 30, 2023, the day the notice to vacate was posted, she wrote to Defendants: "I never signed the utility addendum and it was received . . . two to three months after [I moved in]. I did not sign it, so if someone else did, it's forgery. If you guys are saying I signed one, I know 100 percent I did not." That email was read into the trial record. (Trial Tr. 107:8-13.) Plaintiff's position that she never signed the fee addendum was therefore stated to Defendants contemporaneously, before any litigation, and was never contradicted by any witness with personal knowledge.

61. Defendants produced no witness with personal knowledge of the lease's formation. The affiant was not employed when the lease was signed. (R. 314-16.) Defendants did not call Stephanie Page, the community manager who signed the lease, who was their only percipient witness on formation. (R. 236; R. 640-55.)

62. Defendants produced four different ledgers for Plaintiff's account over the course of the litigation. The ledgers were materially inconsistent with one another, reflecting different charges and different balances for the same account, and Defendants' witness could not reconcile the four versions, testifying "I'm not sure" and "I was not involved in this." (Trial Tr. 85, 135, 142-143.) A landlord that cannot produce a single, consistent account of what a tenant owes, but instead offers four conflicting ledgers that its own witness cannot explain, has not established that the tenant owed anything.

63. On information and belief, the charges Defendants assessed against Plaintiff included fees for amenities that did not exist or had not been provided. Plaintiff was billed for a fitness facility that was never built during her tenancy, and for a smart-home technology package that was not installed in her unit until several months into her tenancy. A tenant cannot lawfully be charged for the use of amenities that do not yet exist. These charges, like the pest control, trash, and miscellaneous fees described above, were part of the body of charges Defendants could not prove Plaintiff owed and later abandoned. Plaintiff will establish the specifics of these charges through the ledgers, fee schedules, and account records in discovery.

64. Defendants charged Plaintiff for pest control that was performed property-wide rather than at her unit, and charged duplicate trash fees for which their witness admitted he had

no proof. (Trial Tr. 99-100; Trial Tr. 132-134.) Defendants also assessed miscellaneous fees against Plaintiff's account, and the fees charged varied from month to month with no consistent basis tied to any service actually provided to her unit. A charge that changes in amount and composition from one month to the next, that bills a tenant for services performed elsewhere on the property, and that a landlord's own witness cannot substantiate, is not a charge the landlord can prove the tenant owed.

65. The lease was submitted as a scan of pages cut apart and reassembled, rather than as the electronic record. Greystar, the largest apartment manager in the country, signs its tenants electronically, and those systems generate a complete digital original with a signing timestamp identifying who signed what and when. That record, which would have resolved the authentication question in a single page, was never produced.

66. Plaintiff has been held to the terms of, and has had a judgment for treble damages entered against her under, an unsigned fee addendum and an unauthenticated partial lease copy. The Utility and Services Addendum that created the charges she was evicted over bears no signature, and the lease itself was produced only as a partial 14-of-40-page scan that no witness with personal knowledge ever authenticated. A tenant was dispossessed of her home, and made to pay three times her rent, on the strength of an unsigned addendum and an incomplete, unauthenticated lease copy, to enforce charges the landlord swore justified the eviction but could not prove.

**F. The retaliation sequence**

67. On January 28, 2023, Plaintiff emailed Rutherford disputing the fees on her account. (Def. Tr. Ex. A.)

68. On January 30, 2023, two days later, Defendants posted a three-day notice to vacate on Plaintiff's door for nonpayment of the disputed fees. (Def. Tr. Ex. C; R. 20.)

69. Defendants have since characterized that notice differently. In their appellate brief they stated that "[e]ven though The Pearl was entitled to charge these amounts, and could have proceeded with eviction for nonpayment under Utah Code 78B-6-802(1)(c), they elected not to do so," and that they instead "elected to serve Ms. Blackwell with a notice to vacate on 1/30/2023 . . . pursuant to Utah Code 78B-6-802(1)(b)(i)." (Appellee's Brief at 12-13.) Section 78B-6-802(1)(b)(i) is the provision for terminating a periodic tenancy by notice; it does not require any default. By Defendants' own account, therefore, they chose not to pursue eviction for nonpayment, and instead exercised a discretionary decision to end Plaintiff's tenancy. The only question is why they exercised that discretion on January 30, 2023, the day Plaintiff alleged discrimination, and not before.

70. Plaintiff immediately offered to pay any legitimately owed rent. Defendants refused. Plaintiff responded that she would file a discrimination complaint. (R. 20; R. 182; R. 241-56.) Defendants' reply directed her to their lawyers regarding "the case you plan on bringing." (R. 183.)

71. In the weeks that followed, Plaintiff sought a rental reference from Defendants in order to secure new housing. Defendants did not provide one. On April 4, 2023, Defendants offered to "provide a positive reference" as one of the terms of a proposal expressly conditioned on Plaintiff dismissing her discrimination complaint. (Def. Tr. Ex. G; R.

602-03.) Defendants thus treated a rental reference as a benefit to be exchanged for withdrawal of a civil rights complaint.

72.On March 8, 2023, Plaintiff filed a race-discrimination complaint with UALD, Case No. 23H0033. (R. 233-57.) UALD is a HUD Fair Housing Assistance Program agency, and the complaint was dual-filed with HUD.

73. In March 2023, Plaintiff wrote to Defendants requesting to remain through June 30, 2023, stating "I will continue to pay the $2690 in rent," and asked for a response by March 28. Defendants did not respond. (Def. Tr. Ex. G.)

74. On March 31, 2023, having received no response, Plaintiff emailed Defendants' agent Brennan McIff: "Since I haven't heard back regarding my tenancy, and still do not have a guarantee of a positive reference, I am assuming it is ok to pay the rent today for the month of April for $2690." Defendants did not respond. Plaintiff then went in person to Defendants' office and spoke with McIff. Defendants refused to engage. (Def. Tr. Ex. G; R. 603; R. 242; R. 1083; R. 1086-87.) That email is contemporaneous documentary evidence of Defendants' conduct, written by Plaintiff in real time and before any litigation. In her own words, it records that Defendants had left her without an answer on whether she could keep her home and without the reference she needed to obtain another, and that she was attempting to pay her rent anyway. Plaintiff did not withhold her rent. Defendants withheld the responses that would have let her either stay or leave, and then refused the rent she tried to pay.

75. Defendants refused the tender. (MSJ Hrg. Tr. 37:9-20; R. 1193.)

76. On April 3, 2023, Defendants' counsel told UALD under penalty of perjury that the notice to vacate was served "because of unpaid utilities billed pursuant to the lease agreement." (R. 621.)

77. On April 4, 2023, one day later, Defendants' agent Trevor Adkins communicated a settlement proposal to Plaintiff's then-acting attorney, who relayed it to Plaintiff in writing the same day. The written communication states, in relevant part:

"Trevor called me in a last attempt to resolve the matter. They have the paperwork drafted and will file the eviction tomorrow after 4:00 p.m. Here's the latest offer:

1. Dismiss all fees and costs to date, although they said there may be more in April, May, and June (i.e., they claim there are about $24 per month in addition to the rent and regular fees). He claims these fees are assessed to all tenants.
2. They would allow you to stay through June, with you paying regular rent, fees, and those noted in #1.
3. They will not file an eviction, which would harm your rental history. Instead, they will provide a positive reference.
4. You will move out by June 30, 2023. This is in return for you dismissing your Discrimination Claim."

(Def. Tr. Ex. G; R. 602-03; R. 640-41; R. 243.)

78. Defendants' own offer thus contains three admissions: that the fees at issue were "assessed to all tenants," confirming Plaintiff was not uniquely delinquent; that Defendants understood an eviction "would harm [Plaintiff's] rental history," confirming knowledge of the consequence they then inflicted; and that every benefit offered, including continued housing, was expressly conditioned on dismissal of the discrimination complaint.

79. Defendants' management separately told Plaintiff they would "drop everything" if she withdrew her discrimination complaint. (R. 233 at 11; Trial Tr. 200-201; R. 1111-12; R. 1196.)

80. The April 4 offer was not a return to the status quo. By the time it arrived, Plaintiff had already incurred substantial attorney's fees defending against the eviction Defendants had manufactured by refusing her rent. The offer did not restore what Plaintiff had lost; it asked her to absorb those costs, vacate by June 30, and additionally surrender her discrimination complaint, all in exchange for keeping housing she was already entitled to keep and had attempted to pay for. The "waiver" of fees Defendants themselves had created, conditioned on dismissal of a civil-rights complaint, was not a concession but a further demand.

81. Plaintiff declined to trade her civil-rights complaint for her housing.

82. On April 10, 2023, ten days after Plaintiff attempted to pay April rent, Defendants sued Plaintiff for unlawful detainer, citing "unpaid rent," meaning the rent Plaintiff had tendered and Defendants had refused, and seeking treble damages on it. (R. 1-2.)

83. Defendants' counsel later admitted on the record that the refusal was a deliberate litigation strategy: the offer to pay "was when the case was still pending, and we didn't want to take a settlement agreement for a payment that would have voided our [unlawful detainer claim], essentially." (MSJ Hrg. Tr. 37:9-20; R. 1193.)

84. Rutherford confirmed he would have been willing not to proceed with the eviction had Plaintiff paid the outstanding balance. (R. 652 ¶ 40.)

## G. The default was manufactured, and the sequence was deliberate

85. In January 2023, before Plaintiff raised discrimination, Defendants were willing to work with her. Rutherford wrote that he was "willing to forgo eviction proceedings and allow you to pay your outstanding charges for previous months over the next month," and offered to waive January's late fee. (UALD Determination at 9.) That willingness ended on January 30, 2023, the day Plaintiff alleged discrimination and stated she would file a complaint.

86. On March 15, 2023, Plaintiff wrote to Defendants requesting to remain through June 30, 2023 so that her son, who has a diagnosed disability, could finish the school year. Defendants replied that "the non-renewal is still in standing and we are still going to proceed with the non-renewal and for a move out date of 3/31/23." (UALD Determination at 10.) The request to stay through June was refused.

87.On March 31, 2023, the last day before April rent came due, Plaintiff emailed Defendants' agent McIff and then went in person to their office to pay April rent of

$2,690. Defendants did not respond to the email and refused to engage in person. (UALD Determination at 10; R. 1083; R. 1086-87.) UALD confirmed that Defendants "did not respond to her email until April 4, 2023, when it sent her a settlement offer." (Determination at 10.)

88. Defendants' silence was itself a component of the trap. Plaintiff sought a definite answer about her tenancy, whether she could remain, on what terms, and whether she would receive the rental reference she needed to secure another home, in time to arrange an orderly departure if the answer was no. Defendants did not respond to her March 15 request by the date she asked, did not respond to her March 31 payment attempt, and did not engage when she came to the office in person. Defendants' first response came on April 4, 2023, and it was not an answer but a demand: they would let her stay and give her a reference only if she dismissed her discrimination complaint. By withholding any response until April 4, Defendants deprived Plaintiff of the ability to leave on her own terms before the holdover period accrued, while the treble-damages clock ran against her. A tenant cannot arrange to vacate, or to rent elsewhere, when her landlord will neither accept her rent, nor tell her whether she may stay, nor provide the reference a new landlord will require. Defendants' refusal to respond was not neglect; it kept Plaintiff in a holdover posture she could not escape, so that the eviction and the treble judgment could proceed.

89. Defendants allowed April 1, 2023 to pass without accepting the tendered rent, so that a nonpayment default and holdover would exist on paper. Defendants' counsel later admitted this was the purpose: they "didn't want to take a settlement agreement for a

payment that would have voided our [unlawful detainer claim]." (MSJ Hrg. Tr. 37:9-20; R. 1193.) Defendants' own property manager confirmed they would not have proceeded with the eviction had Plaintiff paid. (R. 652 ¶ 40.)

90. Defendants have admitted that payment would have preserved the tenancy. In their appellate brief they stated that "Ms. Blackwell could have remained under a new lease agreement if she had just paid the balance owing." (Appellee's Brief at 32; R. 1012.) Plaintiff attempted to pay. Defendants refused the payment, and their counsel admitted the refusal was deliberate. Defendants' position is therefore that Plaintiff could have kept her home by paying, and that they would not let her pay.

91. On April 3, 2023, Defendants' counsel submitted a sworn position statement to UALD asserting the eviction was for "unpaid utilities billed pursuant to the lease agreement." (R. 621.) On April 4, 2023, Defendants offered to let Plaintiff remain through June 30, 2023, the precise relief they had refused on March 15, together with waiver of all fees and a positive reference, on the sole condition that she dismiss her discrimination complaint. (Def. Tr. Ex. G; R. 602-03.) The offer stated that Defendants "have the paperwork drafted and will file the eviction tomorrow after 4:00 p.m."

92.The sequence establishes that Defendants: (i) refused Plaintiff's request to stay when she had no default; (ii) refused her rent so that a default would form; (iii) waited until the default existed; and (iv) then offered her the same stay they had refused, now priced at her civil rights complaint. What Defendants were selling on April 4 was the default they had created on March 31 and April 1. The only consideration they sought was withdrawal

of the complaint. Plaintiff declined, and on April 10, 2023, Defendants sued her for the rent they had refused to accept, and later recovered three times it.

93. The treble-damages judgment did not arise from any ordinary nonpayment. It was the product of a sequence Defendants controlled at every step, and it is worth setting out how the number came to be.

94. Under Utah's unlawful detainer statute, Utah Code Ann. § 78B-6-811, a holdover tenant is liable for damages, and the court may treble them. Those damages accrue for each day the tenant remains in possession after the notice period expires. The practical effect is a meter: once a notice to vacate is in place and the tenant has not left, every additional day in the unit multiplies the eventual exposure by three.

95. Defendants set that meter running, and then made sure Plaintiff could not stop it. First, they refused to accept Plaintiff's tendered April rent. Plaintiff tried to pay, by email on March 31, 2023 and in person, and Defendants did not respond to her payment attempt until April 4, 2023, and then only with a settlement offer rather than acceptance of the rent. Their counsel later admitted the refusal was deliberate, to preserve the unlawful detainer claim: accepting the payment "would have voided" it. A tenant who tenders rent and is refused cannot cure the default; the meter keeps running because the landlord will not let her stop it.

96. Second, Defendants held Plaintiff's ability to secure her next home hostage. In the ordinary course, a prospective landlord contacts the applicant's current landlord for a reference before renting to her. Plaintiff needed a positive reference from Defendants to obtain replacement housing. Defendants offered a positive reference only as one term of

the April 4, 2023 proposal, expressly conditioned on Plaintiff dismissing her race discrimination complaint. Defendants thus placed Plaintiff in an impossible position: they were removing her from her home while withholding, as a bargaining chip for her civil rights complaint, the one thing she needed to find another. She could not stay, because they were evicting her, and she could not easily leave for a new rental, because the reference a new landlord would seek was being conditioned on her silence.

97. Third, Defendants' own delay in the parallel administrative process compounded the trap. Plaintiff had filed her discrimination complaint with the Utah Antidiscrimination and Labor Division on March 8, 2023. Defendants' response to the agency was due and was submitted late, on April 3, 2023, one day before the April 4 settlement offer and six days before they filed the eviction. The sworn position statement Defendants filed with the agency that day asserted the eviction was for "unpaid utilities billed pursuant to the lease agreement," the very charges they could not prove and later abandoned. Defendants timed their sworn agency filing and their eviction filing within days of each other, ensuring that the discrimination complaint and the eviction moved in lockstep.

98. The result of this sequence is the judgment. Defendants refused Plaintiff's rent so a default would exist, kept the treble meter running by refusing to let her cure, conditioned the reference she needed to leave on abandonment of her complaint, and then sued. The judgment of $7,395 represents April 2023 rent of $85 per day for 29 days, trebled. It is not compensation for rent Plaintiff withheld. It is a charge for the 29 days it took Plaintiff to decline to trade her civil rights complaint for her housing, on rent Defendants themselves refused to accept.

99. The refused tender defeats the premise of the judgment. Plaintiff repeatedly attempted to pay her April 2023 rent of $2,690: in writing on March 15, 2023, again by email on March 31, 2023, and in person at Defendants' office. Defendants did not respond to or accept any of these tenders, and instead, on April 4, 2023, offered acceptance only in exchange for dismissal of her discrimination complaint. Ten days after her payment attempt, Defendants sued for "unpaid rent," meaning the rent she had tried to pay. As Plaintiff's counsel argued on appeal, a non-breaching party may recover only damages its counterparty's breach proximately caused; where the claimed injury was caused by the plaintiff's own conduct rather than the defendant's, there is no causation. The holdover status and the treble damages Defendants recovered were caused not by any failure of Plaintiff to pay, but by Defendants' own refusal to accept her payment. Plaintiff pleads this because it exposes the judgment for what it was: not compensation for a loss Plaintiff caused, but a penalty Defendants manufactured by refusing the very payment that would have prevented it, in order to preserve an eviction they had already decided to pursue for reasons of race and retaliation.

100. Plaintiff was forced out on April 29, 2023.

## H. How the state judgment was obtained

101. Defendants moved for summary judgment on the eviction claim on October 11, 2023. Their moving papers did not attach a signed lease or an authenticated addendum, and their supporting declaration did not state that Plaintiff had agreed to the fee addendum or

that the document filed with the complaint was the actual lease. (R. 314.) They provided no ledger or itemization supporting the $883.59 in fees claimed. (R. 2 ¶ 9; R. 348.) Plaintiff,
102 by then proceeding pro se because she could no longer afford her trial counsel's fees of thousands of dollars per week after the eviction left her homeless, opposed the motion on the ground that she never agreed to the fees. (R. 320-37.) The district court granted summary judgment on April 2, 2024, treating Defendants' factual allegations as admitted because Plaintiff, then pro se, had not formatted her opposing statement of facts in the manner required by Utah R. Civ. P. 56. (R. 348.) The court did not examine whether Defendants' own papers established the elements of their claim. Under Utah law, a party moving for summary judgment on its own claim must establish each element with admissible evidence regardless of the adequacy of the opposition, Salo v. Tyler, 2018 UT 7, ¶ 24, and a motion supported by facially insufficient evidence cannot be granted by default. Pepperwood Homeowners Ass'n v. Mitchell, 2015 UT App 137, ¶¶ 8-11. Defendants' moving papers attached no signed lease, no authenticated addendum, and a declaration that never stated the document filed with the complaint was the actual lease. (R. 314.)

Plaintiff was thus evicted, and lost possession of her home, on summary judgment, without any trial on whether the lease terms she was accused of breaching had ever been proven, on the basis of a pro se formatting deficiency rather than any finding that Defendants had carried their burden. The possessory judgment that put Plaintiff and her son on the street was entered without the factfinding a summary proceeding is supposed to provide, against a party who had no lawyer, on an unsigned fee addendum and an unauthenticated partial lease.

103. Plaintiff's counterclaims proceeded to a bench trial on December 13, 2024. Before trial, the court excluded the April 4, 2023 offer under Utah Rule of Evidence 408 as a settlement communication. At trial, Defendants' two witnesses acknowledged they knew nothing about the lease signing or the origin of the fees but assumed the file documents were accurate. No witness for Defendants could verify that Plaintiff had agreed to the fee addendum. Plaintiff testified: "I never signed the utility addendum." (Trial Tr. 107:8-14.)

104. The trial was conducted remotely, and the court ordered Plaintiff's camera turned off during her testimony. The court then found Plaintiff not credible. Plaintiff was the only witness who was present when the lease and addendum were purportedly signed; Defendants' witnesses admitted they were not employed at the time and had no personal knowledge of the signing. The court thus disbelieved the only witness with firsthand knowledge of the disputed document, a witness it could not see, and credited the testimony of witnesses who admitted they had none. A credibility determination made against the sole percipient witness, whom the factfinder was not permitted to observe, cannot supply the proof of a signed agreement that Defendants never produced. As Plaintiff's appellate counsel put it, "No credibility finding can supply a signature where none exists."

105. The Utah Court of Appeals affirmed that credibility determination on the ground that the trial judge had the benefit of "viewing the witnesses firsthand, to assess their demeanor." (Order at 3.) But the trial judge did not view Plaintiff. Credibility deference rests on the factfinder's unique ability to observe demeanor and hear tone of voice

together. As the United States Supreme Court has explained, "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). That rationale is conjunctive: demeanor and tone together justify deference. Where the factfinder has only audio and not demeanor, the reason for deference disappears, because an appellate court reviewing the same audio transcript "would be in the same position as the trial judge." Here the trial judge had only audio. He ordered Plaintiff's camera off and saw only a blank screen while she testified, and the official transcript of the proceedings contains dozens of "unintelligible" designations. The Court of Appeals thus deferred to a demeanor-based credibility finding that was never based on demeanor, and in doing so placed itself in the identical position as the trial court, reviewing the same record without the observational advantage that alone justifies deference. The affirmance rested on an observational premise that did not exist.

106. The standard the panel applied to affirm was articulated in Staszkiewicz v. Thomas, 2024 UT App 183, an opinion authored by a member of the same panel that decided Plaintiff's appeal. The Court of Appeals panel in Plaintiff's case consisted of Judges Orme, Mortensen, and Oliver, and Judge Oliver both authored Staszkiewicz and sat on Plaintiff's panel. Staszkiewicz states that credibility deference is owed because "trial courts have the benefit of viewing the witnesses firsthand, to assess their demeanor," 2024 UT App 183, ¶ 19, language that by its own terms conditions the deference on the trial court's opportunity to view the witness and observe demeanor. In Plaintiff's case the trial court had no such opportunity as to Plaintiff, because it ordered her camera off and

could not see her. The panel nonetheless applied Staszkiewicz's demeanor-deference standard to affirm the credibility finding against her. The rule the panel invoked, on its own stated terms, did not reach a witness whose demeanor the trial court could not observe.

107. On January 22, 2025, the court entered findings, conclusions, and a final judgment for Defendants on all counts, in the total amount of $7,395. The findings rested in part on a determination that Plaintiff was not a "qualified" tenant and had not engaged in protected activity because she had refused to pay the disputed fees. (R. 643-44; R. 648; R. 650-80.) The findings did not mention Plaintiff's security deposit counterclaim at all.

108. The judgment was never served on Plaintiff as Utah R. Civ. P. 58A and 5(b) require. Electronic notice was not sent, due to a clerical error noting she was not emailed, compounded by her homelessness affecting mail service. Plaintiff learned of the judgment only after it had been entered and enforcement had begun. She moved pro se to vacate under Rule 60(b) within sixteen days of discovering it, citing lack of notice and due process. (R. 685-89.) The court denied the motion, reasoning that she eventually learned of the judgment anyway. (R. 839.)

109As Plaintiff's appellate counsel argued, a judgment entered without the notice due process requires is void. Under Utah law, "a judgment may be void if entered in a manner inconsistent with due process," including "a lack of notice that deprives a party of a meaningful chance to act." Migliore v. Livingston Fin., L.L.C., 2015 UT 9, ¶ 25, 347 P.3d 394; Judson v. Wheeler RV Las Vegas, 2012 UT 6, ¶ 18. The lack of notice here was not harmless: prejudice is inherent when a party is deprived of the opportunity to file

post-trial motions or a timely appeal, and Plaintiff was forced to file a protective appeal under Utah R. App. P. 4(b) to preserve any review at all. The district court's contrary reasoning, that Plaintiff eventually learned of the judgment, applied the wrong legal standard. The result is that the judgment that dispossessed Plaintiff of her home was entered without the notice the Constitution requires, and no court has ever corrected that defect or reached its merits. A person deprived of her home by a judgment entered without lawful notice, who was then denied relief from that defect under the wrong standard, did not receive the process she was due, and did not have the full and fair opportunity to litigate that would give the judgment preclusive effect.

110. On appeal, the Utah Court of Appeals did not decide whether the judgment was void for lack of notice. It held the issue "unpreserved" because Plaintiff's pro se motion "consisted of little more than a handful of bullet points" without "factual or legal analysis," reasoning that pro se litigants "will be held to the same standard of knowledge and practice as any qualified member of the bar." It applied the same reasoning to Plaintiff's security deposit claim, holding it "never squarely presented to the district court" and therefore unpreserved. No court has ever decided whether the judgment was validly entered, or whether Plaintiff is owed her deposit.

111. The determination that the void-judgment issue was unpreserved is contradicted by the record, which can be verified from the state-court docket. Plaintiff raised the lack-of-notice, void-judgment issue not once but twice: in a motion to vacate filed February 7, 2025, and again in a second Rule 60(b) motion filed May 19, 2025, filed expressly to set aside the judgment as void for lack of notice. The Court of Appeals

acknowledged the second motion in a footnote but still held the issue unpreserved. A due process argument raised in two separate motions, and identified as void-judgment and lack-of-notice in both, was presented to the district court with sufficient specificity for it to rule, and the district court did rule, denying relief. The federal record of Plaintiff's diligence, and the state-court docket entries reflecting both motions, are available to confirm that the issue Plaintiff was told she failed to preserve was in fact raised, twice, and decided against her.

112. The consequence is that the threshold question whether Plaintiff was ever lawfully notified of the judgment against her, a due process question, was resolved against her not on its merits but on the ground that her pro se filing lacked the analytical rigor expected of a licensed attorney. Plaintiff was pro se not by choice but it is extremely difficult to find a civil rights/fair housing attorney in Utah; her trial attorney charged up to thousands of dollars per week, and the eviction had rendered her homeless and forced her to spend her limited resources on temporary housing. The dispossession she challenges is what stripped her of the means to defend against it. The opposing party was a law firm that describes itself as filing more evictions than any other in the state, and that had previously been reversed for the same evidentiary failure at issue in Plaintiff's case. See Pepperwood Homeowners Ass'n v. Mitchell, 2015 UT App 137. Plaintiff does not contend that the pro se standard is improper as a general matter. She pleads these facts because the application of that standard here, to foreclose review of whether the judgment was even validly entered, is among the reasons she was denied the full and fair opportunity to litigate that preclusion requires. A party held to the licensed-attorney

standard while unrepresented, homeless, and opposed by the state's highest-volume eviction firm, on a judgment that was never served on her, did not receive the kind of adjudication to which preclusive effect attaches.

## I. Continuing harm and ongoing enforcement

113. Defendants obtained a judgment of $7,395, representing April rent at $85 per day for 29 days, trebled.

114Defendants have enforced that judgment against Plaintiff and have collected on it. Defendants have garnished approximately $4,000 from Plaintiff's wages and other funds. Plaintiff is homeless and without steady income, and the garnishment has taken money she needed for basic subsistence for herself and her child.

115Defendants presently seek $15,330 in attorney fees and move to forfeit the appeal bond posted on Plaintiff's behalf. (Docket Nos. 241, 242.) Both motions are fully briefed. Defendants filed their reply on August 27, 2026 and requested a ruling.

116. Plaintiff's counsel opposed the fee motion on the ground, among others, that Defendants had not allocated their claimed fees between the eviction claim and the defense of Plaintiff's federal fair housing counterclaim. The opposition explained that the appeal "presented two independent questions: whether The Pearl met its summary-judgment burden on the unlawful detainer claim, and whether the district court applied the correct legal standard to Ms. Blackwell's fair-housing retaliation counterclaim under 42 U.S.C. § 3617"; that "[t]he lease's fee clause and Utah Code Ann. § 78B-6-811 authorize fees for the unlawful detainer claim" but "[n]either provides a basis for

recovering fees The Pearl incurred in defending against a federal fair-housing counterclaim"; and that under Utah law a fee applicant must allocate among claims, and a court "can 'deny fees altogether for failure to allocate.'" (Opposition at 7-8, quoting Foote v. Clark, 962 P.2d 52, 55 (Utah 1998); Valcarce v. Fitzgerald, 961 P.2d 305, 318 (Utah 1998); Burdick v. Hornor Townsend & Kent, Inc., 2015 UT 8, ¶ 59.) "The Pearl made no attempt to allocate." (Id. at 8.)

117. Defendants' reply did not allocate. It asserted instead that the Court of Appeals had remanded for "The Pearl's reasonable appellate attorney fees" without parsing, and that "the lease agreement provides for an award of attorney fees too." On that basis Defendants "reaffirm[ed] [their] request for the entry of [their] full attorney fees incurred on appeal." (Reply at 2.) In the same reply, Defendants conceded a $105 arithmetic error in their sworn fee affidavit, conceded four time entries were misdated, and, as to whether their $350 hourly rate was reasonable, stated only that they "will defer to the Court." (Id. at 1-2.)

118. Defendants' reply is significant to this action in three respects.

a. Defendants seek to recover from Plaintiff the fees they incurred defending against her federal fair housing claim. Imposing on a tenant the cost of the landlord's defense against her civil rights claim, where no statute authorizes it and no court has found the claim frivolous, is a further act of retaliation for the assertion of fair housing rights, and a further instance of the practice alleged throughout this Complaint: that asserting a right against these Defendants results in a bill.

b. The only authority Defendants assert for recovering fair-housing-defense fees is "the lease agreement." That is the lease produced as a partial 14-of-40-page scan and the fee addendum that is unsigned, whose fee addendum is unsigned, and which no witness with personal knowledge ever authenticated. Defendants' reply is therefore a post-judgment assertion, in a court filing, that the unsigned instrument remains the operative contract under which they are entitled to collect from Plaintiff. Defendants continue to enforce, and to seek new recoveries under, a document Plaintiff never signed.

c. Defendants cite no statutory basis for fair-housing-defense fees. The only conceivable one, 42 U.S.C. § 3613(c)(2), permits fees to a prevailing party in the court's discretion, and under the standard governing prevailing defendants in civil rights actions, Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421-22 (1978), a defendant may recover only where the plaintiff's claim was "frivolous, unreasonable, or groundless." No court has so found. The state civil rights agency found Plaintiff established a prima facie case of retaliation. The trial judge found the case presented "serious issues on the merits that warrant appellate review." The Court of Appeals declined to reach the retaliation claim. A claim that a government agency found prima facie meritorious, that the trial judge found serious, and that no court rejected on the merits is not frivolous. Defendants' attempt to recover fees for defending it, without invoking the statute or meeting its standard, confirms that the request is not a fee-shifting claim at all. It is a penalty for having asserted the right.

119. Plaintiff and her minor son have been consistently without stable housing for years.

120. The eviction record continues to impair Plaintiff's ability to obtain housing.

121. Defendants have profited, and continue to profit, from the conduct alleged in this Complaint. The judgment of $7,395 is three times the rent Defendants deliberately refused to accept; their refusal converted a tender into a default and the default into a treble recovery. The $15,330 they now seek in fees is more than double that judgment, and by their own account a substantial portion of it was incurred defending against Plaintiff's assertion of her fair housing rights. The appeal bond they seek to forfeit $4,037.62 was posted so that Plaintiff could exercise her right to appeal. At every stage, Defendants' response to Plaintiff's assertion of a civil right has been to increase the amount she owes them: the notice to vacate after she questioned the fees, the refused rent after she filed her complaint, the treble judgment after she declined to withdraw it, the fee motion after she appealed, and the bond forfeiture after she petitioned for review. The financial consequence of asserting fair housing rights against these Defendants, as executed in this case, is that the tenant is billed for having done so, and the landlord collects.

122. That structure is not incidental to the retaliation; it is the retaliation's mechanism and its reward. A landlord that can refuse rent, recover three times the refused amount, and then recover its attorney fees for defending the tenant's civil rights claim has been paid for retaliating. Defendants' pending motions seek to complete that payment. Plaintiff pleads these facts as evidence of the continuing course of retaliatory conduct, as the measure of her financial injury, and as the reason punitive damages are warranted: conduct that is profitable will be repeated unless it is made costly.

## J. Defendants' stated reason for the eviction is pretextual

123. Defendants have given shifting and irreconcilable accounts of why Plaintiff was evicted.

124. Each of the admissions set forth in this Complaint, that Defendants' counsel refused Plaintiff's rent deliberately because accepting it "would have voided" the unlawful detainer claim; that Defendants' manager considered posting the notice to vacate on Plaintiff "not ethical"; that no other tenant had been evicted for questioning fees; that Defendants had no documentation for the services charged; that Defendants abandoned the fees because the dispute over them "would preclude summary judgment"; and that Kairoi's manager identified "fair housing" as a basis for the nonrenewal, was elicited from Defendants' own witnesses at trial, under oath, by Plaintiff appearing pro se and without the assistance of counsel. Plaintiff, unrepresented and homeless, obtained from Defendants' own witnesses the sworn concessions that establish the pretextual and retaliatory character of the eviction. That Defendants' case unraveled in this manner, through the testimony of their own agents, even against an unrepresented tenant who had no lawyer to examine them, confirms both the strength of Plaintiff's claims and the weakness of the position Defendants nonetheless prevailed upon in the state courts.

125. Defendants have also given three different explanations for why they removed the disputed charges from Plaintiff's account during her tenancy. Their community manager told UALD it was a "glitch." (Determination at 7.) Their regional manager told UALD the late fees were not authorized under Defendants' own threshold policy. (Id.) Their appellate brief described the removals as "a one-time courtesy." (Appellee's Brief at 12.)

A charge that is simultaneously a system error, a policy violation, and a courtesy is not a charge the landlord itself understood to be owed.

126. On April 3, 2023, Defendants swore to UALD that the notice to vacate issued "because of unpaid utilities billed pursuant to the lease agreement." (R. 621.)

127. One day later, Defendants offered to waive those same fees entirely if Plaintiff dismissed her discrimination complaint. (Def. Tr. Ex. G; R. 602-03.)

128. Defendants then abandoned the fees in the litigation: "We're not pursuing that." (R. 304-05; MSJ Hrg. Tr. 8:16-9:2.)

129. Defendants have admitted, in their own appellate brief, why they abandoned the fees. They stated that they "abandoned [their first] motion for summary judgment upon acknowledgement that the dispute regarding the fees would preclude summary judgment." (Appellee's Brief at 12; R. 654.) That is an admission that the fees were genuinely disputed, that there existed a real factual dispute about whether Plaintiff owed them sufficient to defeat summary judgment. Defendants cannot reconcile that admission with the district court's later finding, on which the eviction rested, that Plaintiff was "not qualified" to rent because she owed those same fees. By Defendants' own account, whether Plaintiff owed the fees was a disputed question they chose to drop rather than litigate. A landlord that abandons a fee claim because it concedes the claim is too disputed to resolve on summary judgment cannot simultaneously maintain that the tenant indisputably owed those fees and was properly evicted for not paying them.

130. Defendants' own manager had already put in writing that the fees were "a setting issue" that "has been fixed." (Def. Tr. Ex. F; R. 605.)

131. At oral argument before the Utah Court of Appeals on February 19, 2026, Defendants' counsel made the following concessions on the record. Asked by the panel whether "at both stages the fact of the fees didn't matter really anymore because the Pearl had decided not to pursue a collection of those," counsel answered: "Correct. And that's true of both the summary judgment stage and at trial. Correct." Counsel stated that the disputed fees "really speak[] to the Pearl's breach of contract claim rather than the unlawful detainer claim," and that "the leasing agents said, hey, we want to keep a happy tenant here. We're willing to just waive those as a courtesy." Counsel further conceded that the "qualified to rent" criterion on which the trial court rejected Plaintiff's fair housing claims "is not established by the Fair Housing Act, it's not established by the court, that's a criteria that's established by the landlord."

132. In the same argument, counsel asserted that the fee finding "is important . . . to the discrimination complaints." Defendants' own position is therefore that the fees were immaterial to the eviction and dispositive against Plaintiff's civil rights claims. Those positions cannot both be true. If the fees did not matter to the eviction, they cannot supply a legitimate nondiscriminatory reason for it.

133. A fee Defendants swore was the reason for eviction, then offered to waive, then abandoned, then could not prove, had already called an error, and conceded on appeal "didn't matter" to the eviction, cannot be the true reason for the eviction. The true reason was Plaintiff's race and her assertion of her civil rights.

134. On May 12, 2025, the same trial judge who had entered judgment against Plaintiff signed an order finding that "Ms. Blackwell has established that the case presents serious

issues on the merits that warrant appellate review." (May 12, 2025 Order at 4.) The order identified those issues as including, but not limited to, whether the record demonstrated that "witnesses for The Pearl made '[f]alse [s]tatements in [c]ourt,'" whether Plaintiff "provided prima facie evidence of discriminatory treatment under the Utah and/or Federal Fair Housing Acts," and whether the court had "denied Ms. Blackwell's motions based on technical grounds rather than substantive merits." (Id.) The court granted a stay of enforcement, finding that Plaintiff's homelessness with her minor son constituted an "extraordinary circumstance." (Id.)

135. The May 12, 2025 order is significant because it is the trial judge's own assessment, after entering judgment, that the case raised serious questions going to the honesty of Defendants' witnesses and the sufficiency of Plaintiff's discrimination evidence. A judgment that the rendering judge himself characterized as presenting unresolved "serious issues on the merits," including possible false testimony by the prevailing party's witnesses, is not the product of the kind of settled, fully and fairly litigated adjudication to which preclusive effect ordinarily attaches.

## K. Defendants' conduct reflects a broader pattern

136. Greystar is the largest apartment manager in the United States.

137. In January 2025, the Federal Trade Commission and the State of Colorado sued Greystar for concealing mandatory fees from tenants. Utah is named in that federal complaint seven times. The action settled in December 2025 for $24 million. FTC and State of Colorado v. Greystar Real Estate Partners, No. 1:25-cv-165 (D. Colo.).

138. In July 2026, the national watchdog organization Housing Rights Initiative filed complaints alleging more than 100 fair-housing violations by Greystar properties across six states and the District of Columbia.

139. The fee practices the FTC found deceptive are the same category of fees Defendants charged Plaintiff and used as the asserted basis for her eviction.

140. The same method was used against Plaintiff a second time, at a different property, through the same law firm and the same form of lease. After her eviction from The Pearl, Plaintiff entered into a lease at a second rental property. That property used the same Cullimore-drafted lease form and was represented by the same law firm that had prosecuted her eviction. During that second tenancy, the landlord began adding additional fees partway through the lease term, never provided Plaintiff an itemized bill for the charges, and assessed amounts at its discretion. Plaintiff paid the charges. At the end of her lease term, the landlord refused to renew her lease. Plaintiff pleads this not as a claim against the Defendants in this action for the acts of a different landlord, but as evidence that the method described in this Complaint is a repeatable one, propagated through a common law firm and a common lease instrument, and used against the same tenant twice. It is the reason Plaintiff and her son have been consistently without stable housing since September 2024: the same practice that took her first home was used to deny her a second.

141. Defendants' counsel had specific prior notice that the method used to obtain summary judgment against Plaintiff was improper, having been reversed for the same practice not once but twice. In Pepperwood Homeowners Ass'n v. Mitchell, 2015 UT App 137, 351

P.3d 844, the same law firm moved for summary judgment to collect amounts allegedly due under a governing instrument, supported the motion with a ledger and an agent's affidavit, and never produced the instrument itself. The Utah Court of Appeals reversed, holding that because there was "no evidence of an instrument obligating [the defendant] to pay," the motion "failed to demonstrate its entitlement to judgment as a matter of law," and it did so even though the defendant had not opposed the motion and the issue was unpreserved. Id. ¶¶ 10-11.

142. Three years later, the same firm was reversed again by the Utah Supreme Court on a closely related summary-judgment burden principle. In Gonzalez v. Cullimore, 2018 UT 9, 417 P.3d 129, the Law Offices of Kirk A. Cullimore obtained summary judgment supported by a client's ledger and an affidavit from one of its attorneys stating he had verified the debt on that ledger. The Utah Supreme Court reversed. It held that Cullimore, as the moving party, "bore the initial burden of showing that it did not engage in an act prohibited by the FDCPA," and that the district court had erred by never determining whether Cullimore met that initial burden. Id. ¶¶ 5, 33. And as to the firm's attempt to defend on the ground that its attorney had checked the ledger, the Court held that a bare affidavit was insufficient: "Because Cullimore bears the burden of proving its affirmative defense on summary judgment, and Cullimore failed to carry this burden, we cannot affirm the district court's dismissal." Id. ¶ 37 & n.67. In both respects, the Court held that this firm's ledger-and-affidavit submission did not satisfy its summary-judgment burden.

143. In this case, years after both decisions, the same firm obtained summary judgment against Plaintiff on a ledger and a declaration, without an authenticated lease and without the signed fee addendum on which the eviction rested. A firm twice reversed, once by the Court of Appeals and once by the Utah Supreme Court, for obtaining summary judgment on a ledger and an affidavit without the underlying instrument, and which repeats that practice against a pro se tenant who had lost her counsel and her home, acts with knowledge that the practice is improper. That knowledge supports the inference of intent and the award of punitive damages.

Plaintiff's counsel described the method to the Utah Supreme Court in the petition for certiorari: "If a tenant forfeits fair-housing protection whenever the disputed fees are later found owed, the playbook writes itself: refuse the tender, price the eviction at the complaint, and collect treble rent when the tenant will not sell her claim." The Utah Supreme Court denied review without addressing it. The sequence in this case is that playbook executed in full: undocumented fees assessed; a notice to vacate two days after the tenant questioned them; rent refused after she filed a discrimination complaint; the eviction offered for withdrawal of the complaint; suit filed when she declined; treble damages collected on the refused rent; and attorney fees and the appeal bond now sought on top. Each step survived every level of review in Utah. Defendants' counsel operates as the highest-volume eviction firm in the state, representing over a thousand properties and supplying its landlord clients with lease forms and addendums. The method demonstrated in this case is available to be repeated against any tenant in the state who asserts a fair housing right, and the appellate decision approving it was entered by order rather than opinion. Under Utah R. App. P. 30(e), an order "will not stand as precedent," and under Rule 30(f)(1) an order is

transmitted only to the parties and the lower court, not published on the courts' website. It may be cited only by a party who already possesses a copy. Utah R. App. P. 30(g). A future tenant or attorney who does not already have the decision has no means of finding it.

144. Reduced to its elements, the method this case validates is the following: A landlord may charge a tenant whatever fees it chooses. It need not document those fees, prove the services behind them, or produce a signed agreement authorizing them. When the tenant disputes the fees or refuses to pay them, the landlord serves a notice to vacate. If the tenant asserts a fair housing right, the landlord refuses her tendered rent so that a nonpayment default forms, offers to make the matter disappear if she abandons her civil rights complaint, and, when she refuses, evicts her and collects treble the rent it declined to accept, plus attorney fees, plus her appeal bond. At no point in that sequence is the landlord required to prove that the fees were owed, that a contract was signed, or that the tenant did anything other than assert her rights. That is not a hypothetical description. It is what happened to Plaintiff, step for step.

145. What makes the method a usable one, rather than an overreach a court would correct, is that every level of the Utah judiciary sustained it. The district court entered summary judgment for the landlord on an unsigned, unauthenticated document without requiring proof of the agreement, and entered a treble-damages judgment on rent the landlord had refused. The Utah Court of Appeals affirmed, declining to reach the retaliation issue, treating the federal fair housing claims as unclear, and resting on the same unproven fees. The Utah Supreme Court denied review. At no stage did any court require the landlord to prove the fees, produce a signed agreement, or justify refusing the tenant's rent, and no

court addressed the written offer trading the tenant's housing for her civil rights complaint. The method works precisely because the courts, including the state's highest, left every step of it undisturbed. A landlord contemplating the same conduct against the next tenant now has the assurance that it has been done and sustained through every level of review.

146. Because the method requires no proof, no signature, and no legitimate basis, and because it is profitable at every stage, it will be used again. A practice that costs the landlord nothing to invoke and pays it treble damages, fees, and a forfeited bond will be repeated against the next tenant who questions a charge or asserts a right, particularly a tenant who, like most, cannot afford counsel and cannot litigate the matter through four levels of review. Plaintiff pleads this not as speculation but as the reason the conduct is both a continuing violation and a proper subject of punitive damages: conduct that is profitable and repeatable will continue unless it is made costly.

## L. A state investigative agency examined this conduct and its written findings support Plaintiff

147. Before this litigation, Plaintiff filed a race-discrimination and retaliation complaint with the Utah Antidiscrimination and Labor Division ("UALD"), Case No. 23H0033. UALD is a Fair Housing Assistance Program agency operating under a cooperative agreement with the U.S. Department of Housing and Urban Development, and the complaint was dual-filed with HUD.

148. UALD conducted an investigation, obtained Defendants' records including the ledgers of other tenants, and issued a written Determination containing, among others, the following findings:

a. that Plaintiff was "an ideal tenant in good standing that has always paid her rent on time" (Determination at 3); b. that Plaintiff was the only Black tenant at the property and "all other tenants were not of Complainant's race" (Determination at 17); c. that Defendants' community manager removed Plaintiff's late fees in July, August, September, and October 2022 and attributed them to a "glitch," and that Defendants' regional manager confirmed those late fees were not authorized under Defendants' own threshold policy (Determination at 7); d. that Defendants' other tenants' ledgers "show that other tenants also received late fees including some tenants with a $0 balance, and Respondents reversed those tenants' late fees also" (Determination at 7); e. that Defendants issued ten to twelve pay-or-vacate notices to other tenants for past-due balances, and did not non-renew any other tenant's lease (Determination at 8-9); f. that Plaintiff engaged in protected activity on January 30, 2023, when she complained of discrimination, and on March 8, 2023, when she filed her complaint (Determination at 18); g. that Defendants subjected Plaintiff to materially adverse actions on January 30, 2023, when they non-renewed her lease, and on April 10, 2023, when they filed the eviction (Determination at 18-19); and h. that Plaintiff established a causal connection between her March 8, 2023 complaint and the April 10, 2023 eviction through temporal proximity, and thereby "establishes the third element of a claim of retaliation, and her prima facie case" (Determination at 20).

149. The Determination's ultimate "no cause" conclusion is a legal disposition by a state administrative agency. It is not a conciliation agreement, was not the product of any adjudicative hearing on the merits, and does not bind this Court. Plaintiff does not seek review of that disposition, and this action is not brought against UALD or HUD.

150. Plaintiff pleads the Determination's factual findings because they are the product of an investigation by a government agency legally authorized to conduct it, and because they corroborate, from a source independent of Plaintiff, the central facts alleged in this Complaint: that Plaintiff always paid her rent, that the charges assessed against her were Defendants' own billing errors, that other tenants were assessed the same erroneous charges, and that the evidence of retaliation was sufficient to establish a prima facie case.

151. Plaintiff anticipates that Defendants will rely on the "no cause" disposition as though it were a finding that no discrimination or retaliation occurred. It is not, for the following reasons.

152First, as a matter of statute, the disposition has no bearing on this action. The Fair Housing Act provides that an aggrieved person "may commence a civil action under this subsection whether or not a complaint has been filed under section 3610(a) of this title and without regard to the status of any such complaint." 42 U.S.C. § 3613(a)(2). A "no cause" determination is an administrative screening decision that the agency will not itself prosecute the matter. It is not an adjudication, it was reached without a hearing, without testimony, without cross-examination, and without the trial record that later developed, and Congress expressly preserved the right to sue regardless of it.

153. Second, the disposition contradicts the investigation beneath it. The same document that concludes "no cause" finds that Plaintiff was an ideal tenant who always paid on time; that she was the only Black tenant; that the late fees assessed against her were unauthorized under Defendants' own policy and were removed as a "glitch"; that other tenants received the same erroneous fees and had them reversed; that Defendants issued ten to twelve pay-or-vacate notices to other tenants but non-renewed only Plaintiff; and that Plaintiff established a prima facie case of retaliation. An agency conclusion at odds with the agency's own findings is entitled to no weight as a conclusion. The findings are what the investigator found. The conclusion is what the agency decided to do about it.

154. Third, the reasoning by which the agency reached "no cause" replicates the same error the state courts later made, and that error is the subject of this action. The Determination found a prima facie case of retaliation and then accepted as Defendants' "legitimate, non-retaliatory reason" that Plaintiff "did not vacate" after the January 30, 2023 non-renewal. (Determination at 20.) But the January 30 non-renewal was issued the same day Plaintiff alleged discrimination, and the reason she "did not vacate" was that she was attempting to pay her rent and remain, and Defendants refused her rent so that a default would exist. The "legitimate reason" the agency accepted is the retaliation itself, described from the landlord's side. Likewise, the agency declined to treat Plaintiff's January 28, 2023 fee dispute as protected activity because she did not use the word "discrimination" in it (Determination at 18), applying a rule that a tenant's good-faith opposition to a practice she reasonably believed unlawful is unprotected unless she labels it. That is the same merits-first reasoning, that the tenant's protection depends on whether

she was right about the fees, that the Utah courts applied and that this Complaint challenges.

155. Fourth, the "no cause" label has already done harm it was never designed to do. It was carried into the state court proceeding and treated as though it resolved the discrimination question against Plaintiff, when the investigation underneath it had found the opposite on every factual point that mattered. Plaintiff pleads the Determination in full precisely so that this Court has the findings and not only the label.

156. Finally, the Determination's factual findings are admissible under Fed. R. Evid. 803(8)(A)(iii) as factual findings from a legally authorized investigation. Its legal conclusion is not a factual finding and is not offered by Plaintiff for its truth. Should Defendants offer the "no cause" conclusion as evidence that no violation occurred, Plaintiff will object under Fed. R. Evid. 403 on the ground that a conclusion contradicted by its own supporting findings would mislead the factfinder.

## M. No prior adjudication of the Civil Rights Act of 1866 claims, and no court ever weighed the April 4 offer

157. Before trial on Plaintiff's counterclaims in the state proceeding, the district court excluded the April 4, 2023 written offer from evidence in a pretrial ruling under Utah Rule of Evidence 408, treating it as an inadmissible settlement communication. The most direct evidence of coercion and retaliation in the case was therefore never weighed by any factfinder. That ruling misconceived the nature of the evidence. Rule 408 excludes

offers to compromise a disputed claim when offered to prove liability on that claim. The April 4 offer was not offered to prove Plaintiff's liability on any claim; it was itself the unlawful act, the coercion that § 3617 prohibits. A statement that constitutes the violation is not rendered inadmissible by a rule designed to protect candid settlement of ordinary disputes. Excluding the coercive offer as a settlement communication meant that the single piece of evidence establishing the § 3617 violation was removed from the case before any court could weigh it.

158. The Utah Court of Appeals stated that it "need not reach" the retaliation issue. (Order at3 n.3.) The Utah Supreme Court denied review without opinion. No court at any level analyzed the April 4 offer under 42 U.S.C. § 3617 or any other provision of federal law.

159. The Court of Appeals entered its decision by order rather than by opinion. Under Utah R. App. P. 30(e), "[a]n order will not stand as precedent." Under Rule 30(f)(1), an order is transmitted only to the parties and the lower court; only opinions and per curiam decisions are published on the courts' website under Rule 30(f)(2). Under Rule 30(g), such a decision may be cited only where the citing party supplies copies to the court and all parties. The practical consequence is that the decision affirming the judgment against Plaintiff establishes no rule of law, is not publicly available, and can be located and cited only by someone who already has it. Whatever the state courts decided about the enforceability of an unsigned lease, the protected-activity standard, or the treatment of the

April 4 offer, they decided in a form that binds no one, guides no future court, and cannot be found by the next tenant to whom the same method is applied.

The consequence is that settled law can be applied to one tenant and not another with no record that it happened. Salo and Pepperwood remain the published law of Utah. A landlord who moves for summary judgment without the instrument it sues on is, under that published law, not entitled to judgment. That rule was applied for the defendant in Pepperwood, against the same law firm. It was not applied for Plaintiff. The decision declining to apply it was entered in a form that no one outside this case can see. Two tenants in the same position can therefore receive opposite results under the same published rule, and the second will never know the first existed. That is not a system in which a rule of law is uniformly applied. It is one in which the benefit of the rule is extended case by case, in a form that leaves no trail.

Published precedent serves three functions that an unpublished order cannot. It gives notice, so that a party knows what rule will govern her before she acts. It permits correction, because a published departure from settled law can be identified, criticized, distinguished, and reversed. And it enforces uniformity, because a court that must publish its reasoning must apply the same rule to the next litigant or explain why not. An order that stands as no precedent and is transmitted only to the parties performs none of those functions. The rule it departs from remains on the books, so the next tenant reads Salo and Pepperwood and reasonably believes she is protected. The departure is invisible, so she cannot learn that the protection was withheld from someone in her position. And because nothing was published, no court is ever required to reconcile the two outcomes.

The question that posture raises is who the law actually protects. A rule that is applied to one person and withheld from another, with no public record of the difference, is not a rule that governs everyone equally. It is a rule that can be extended or withheld at the decisionmaker's discretion, case by case, without accountability. If Salo and Pepperwood, which require a landlord to prove the agreement it sues on, are applied for one tenant and not for another, and the second outcome is never made public, then the protection those rules provide is not a right anyone can rely on. It is a benefit that may or may not be given. And when the tenant to whom it is not given is the only Black tenant in her building, while a White tenant who raised the same fees kept his home, the selective application of the law is not a neutral irregularity. It is the precise harm that 42 U.S.C. §§ 1981 and 1982 exist to remedy: the denial to a person of color of the "same right" to make and enforce contracts and to hold property that white citizens enjoy.

The ability to apply the law to some and not to others is the ability to decide who the law is for. The Civil Rights Act of 1866 was enacted to take that ability away, by guaranteeing that the same legal rights extend to all persons regardless of race. Plaintiff pleads this not to ask this Court to review any state decision, but because it is the core of her federal claim: she was denied the equal benefit of laws that protected others, and the mechanism of unrecorded, discretionary application is how that denial was carried out and concealed. A judgment produced in that form is also entitled to no presumption that the losing party had a full and fair opportunity to invoke the law that governed her case.

Plaintiff's counsel raised precisely this concern to the Utah Supreme Court, in the petition for certiorari, and the Court denied review without addressing it. Counsel argued: "The unpublished

posture makes review more important, not less. The order below 'will not stand as precedent,' Utah R. App. P. 30(e), so the reading of Salo it adopts will never surface in the reporters. It will simply be repeated, one unpublished order at a time, on a docket where few tenants can petition at all." Counsel further explained that "[t]he risk is acute on the high-volume eviction docket, where tenants frequently appear without counsel and cannot file technically perfect oppositions," and that Plaintiff's case "is precisely the Pepperwood posture, and it has now produced the same judgment twice." The Court declined the invitation to reach it. The deviation from settled law, and the mechanism that keeps that deviation invisible, were thus placed squarely before the state's highest court, which left both undisturbed.

160. Plaintiff pursued every avenue available to her in the State of Utah, and none reached the merits of her federal fair housing claims. She contacted HUD's Office of Fair Housing and Equal Opportunity by telephone on February 10, 2023, eleven days after the notice to vacate was posted and before she lost her home; no formal complaint was drafted from that contact. She filed with UALD, the HUD-funded state enforcement agency, whose investigation found she had established a prima facie case of retaliation and which then issued a "no cause" determination. She litigated her counterclaims pro se at trial, where the central retaliation evidence was excluded before it could be weighed. She appealed with pro bono counsel to the Utah Court of Appeals, which stated it "need not reach" the retaliation issue and was "not entirely clear" whether her federal claims were before it, and which designated its decision unpublished. She petitioned for rehearing, which was denied. She petitioned the Utah Supreme Court, which denied review in one sentence.

161. At no point in that sequence did any Utah agency or court apply 42 U.S.C. § 3617 to the April 4, 2023 offer, apply 42 U.S.C. § 1981 or § 1982 to any of the conduct alleged, or adjudicate whether Plaintiff's federal rights had been violated. The federal questions were raised at every level and reached at none. This Court is the first forum in which they will be decided.

162. Plaintiff's answer and counterclaim in the state proceeding, filed April 13, 2023 by counsel Plaintiff was later unable to afford, pleaded a single formal claim for relief, negligent misrepresentation. Discrimination and retaliation were alleged as facts within that pleading. No claim under 42 U.S.C. § 1981 or § 1982 was pleaded. No claim under the Fair Housing Act was pleaded as a separate count. The Utah Court of Appeals later observed that it was "not entirely clear" whether Plaintiff's federal fair housing claims had been properly before it. (Order at 2 n.2.)

163.The claims asserted in this action are not barred by the state judgment. Under 28 U.S.C. § 1738 this Court gives the state judgment the preclusive effect Utah would give it, and looks first to Utah preclusion law. Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 380-83 (1985). Preclusion is subject to the federal requirement that it may not attach unless the party against whom it is asserted had a full and fair opportunity to litigate the claim, Kremer v. Chemical Constr. Corp., 456 U.S. 461, 480-81 (1982); Allen v. McCurry, 449 U.S. 90, 95 (1980); and Utah preclusion law, consistent with Marrese and the Restatement it endorses, does not bar a claim where the party "was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts," Restatement (Second) of

Judgments § 26(1)(c). Plaintiff could not have obtained § 1981 or § 1982 damages in the summary possessory proceeding. Allen v. McCurry, 449 U.S. 90, 95, 101 (1980); Kremer v. Chemical Constr. Corp., 456 U.S. 461, 480-81 (1982). Utah's claim preclusion test asks whether the parties are the same, whether the claim was presented or could and should have been raised in the first action, and whether the first action resulted in a final judgment on the merits. Mack v. Utah State Dep't of Commerce, 2009 UT 47, ¶ 29. A claim "could and should have been raised" only if it arises from the same transaction and could have been brought in the first forum; Utah expressly recognizes that "[a] claim is not the same claim, in terms of claim preclusion, if it could not have been brought in the first action," including where "[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts." Id. ¶¶ 30, 32 (quoting Restatement (Second) of Judgments § 26(1)(c)). The claims here are not barred, for at least the following reasons:

a. The claims asserted here were never pleaded as such, never adjudicated, and never decided. The state appellate court expressly disclaimed clarity as to whether even the federal claims that were raised had been before it (Order at 2 n.2), declined to reach the retaliation issue (Order at 3 n.3), and designated its decision unpublished. Plaintiff's counsel identified precisely this preclusion problem in the petition for rehearing and asked the court to resolve it. Counsel argued that the appellate court's footnote-2 ambiguity "cannot work only one way": if the federal claims were before the court, its failure to engage them was reversible error, and if they were not before the court, "then they were never fully and fairly adjudicated and cannot serve as a bar to

subsequent federal proceedings on principles of claim preclusion." The court was thus expressly warned that its disposition could not simultaneously avoid the federal claims and preclude them, and it declined to clarify. b. Plaintiff further made an on-the-record request, in the state proceeding itself, that no preclusive effect attach. Her petition for rehearing "request[ed] that this Court's Order not be construed as a final adjudication on the merits of claims arising under 42 U.S.C. §§ 3604, 3613, and 3617 in any federal proceeding," and "expressly preserve[d] her claims under 42 U.S.C. § 1982, the Civil Rights Act of 1866, which has never been analyzed by any court in these proceedings." A party who reserves her federal claims on the record, and asks the rendering court to confirm its judgment is not a merits adjudication of them, has not had those claims "fully and fairly" litigated for preclusion purposes. c. In any event, no preclusion can attach to conduct that postdates the state judgment. Defendants' 2026 motions for attorney fees and bond forfeiture, their August 27, 2026 reply asserting entitlement to fees for defending the fair housing claim under the unsigned lease, and their continuing enforcement of the judgment are acts that had not occurred when the state judgment was entered on January 22, 2025 and could not have been raised in any prior proceeding. Claims based on those acts are timely and unprecluded regardless of any effect the state judgment may have on earlier conduct. d. The state action was a summary unlawful detainer proceeding under Utah Code Ann. § 78B-6-801 et seq., an expedited possessory remedy with a three-day answer period and its own restricted disclosure rules, Utah R. Civ. P. 26.03, not designed to adjudicate a tenant's federal civil rights claims, and one in which possession was awarded on summary judgment without trial. A judgment in a summary possessory proceeding is given limited preclusive effect precisely because the proceeding is confined to the question of possession. It precludes a later

claim only where the specific issue was fully and fairly litigated in the summary action; where it was not, no preclusion attaches. Vella v. Hudgins, 20 Cal. 3d 251, 255-58 (1977) (unlawful detainer judgment "usually has very limited res judicata effect" and did not bar a subsequent action where the record of the summary proceeding was "virtually barren" as to the issue), distinguishing Wood v. Herson, 39 Cal. App. 3d 737 (1974) (preclusion applied only where the parties had "fully and extensively litigated" the issue in the unlawful detainer action, an "uncommon" circumstance in a summary proceeding). A possessory judgment does not bar a tenant's separate action for damages arising from a wrongful or discriminatory eviction. Here, the federal claims were not litigated in the possessory proceeding at all: the central evidence was excluded before trial, and the appellate court declined to reach the retaliation issue and treated the federal claims as not clearly before it. This is the Vella situation, not the Wood situation. e. The claims asserted here were not compulsory counterclaims in the summary unlawful detainer proceeding and their omission does not bar them. Under Utah R. Civ. P. 13(a), a counterclaim is compulsory only if it arises from the transaction that is the subject matter of the opposing claim; the subject matter of an unlawful detainer action is the right to immediate possession, and a landlord who proceeds on a pay-or-quit notice recovers possession and is not required to litigate collateral claims, which may be brought separately. Plaintiff's claims for race discrimination and retaliation damages did not bear on the right of possession, were permissive at most, and their omission does not preclude them. f. Nor should the state judgment receive preclusive effect where Defendants procured it by manufacturing the very default on which it rests. Defendants refused Plaintiff's tendered rent for the purpose of creating a nonpayment default, as their counsel admitted, then obtained a judgment on that default. Preclusion presupposes that the party

to be bound had a full and fair opportunity to litigate; a party that engineers the predicate for a summary judgment through its own deliberate conduct cannot invoke the resulting judgment to foreclose claims arising from that same conduct. g. Plaintiff did not have a full and fair opportunity to litigate her federal claims in the state proceeding. She was forced to proceed pro se at summary judgment and trial because she could no longer afford her trial counsel, who charged thousands of dollars per week, after the eviction rendered her homeless and diverted her limited resources to temporary housing. The central evidence of retaliation, the April 4 offer, was excluded before trial and never weighed. The credibility finding on which the judgment rested was made against the only witness with firsthand knowledge of the disputed document, by a judge who had ordered her camera off and did not observe her testimony, and was then affirmed on appeal under a demeanor-deference standard that, by its own terms, did not reach a witness the trial court could not see. The judgment was entered without the notice required by Utah R. Civ. P. 58A and 5(b), and enforcement began before Plaintiff knew it existed. And Plaintiff's appeal was decided by a panel two of whose three members, Judges Oliver and Orme, were the subjects of a formal judicial misconduct complaint Plaintiff had filed with the Utah Judicial Conduct Commission on June 9, 2025; through counsel, Plaintiff moved to recuse those judges by an Emergency Motion to Continue Oral Argument and for Recusal filed February 18, 2026, the day before argument, panel assignments not having been disclosed in the notice of oral argument. The panel did not recuse, and Judge Oliver signed the decision affirming the judgment against Plaintiff. Plaintiff does not allege that any of these features, standing alone, would independently establish the absence of a full and fair opportunity. She alleges that in combination, a pro se litigant rendered counsel-less by the eviction itself, whose dispositive

evidence was excluded, whose credibility was rejected sight unseen and affirmed on a premise that did not exist, whose judgment was entered without lawful notice, and whose appeal was heard over an unresolved recusal objection by judges she had reported for misconduct, did not receive the kind of full and fair adjudication to which preclusive effect attaches. h. Plaintiff was the defendant in the state action. Any preclusive effect on her unasserted claims arises, if at all, under the compulsory counterclaim rule, Utah R. Civ. P. 13(a), which accepts from its operation any claim that "at the time the action was commenced" was "the subject of another pending action." Plaintiff's race discrimination and retaliation complaint was pending before UALD and HUD when the state action was filed on April 10, 2023. i. The state courts resolved the case without applying the governing Utah law that Plaintiff's counsel placed squarely before them, and did so in a decision designated unpublished. Plaintiff's counsel argued at every level that under Salo v. Tyler, 2018 UT 7, ¶ 24, a party moving for summary judgment on its own claim must establish each element with admissible evidence, and that under Pepperwood Homeowners Ass'n v. Mitchell, 2015 UT App 137, ¶¶ 8-11, a motion supported by a ledger and affidavit but no instrument cannot be granted even absent opposition. The Court of Appeals did not distinguish those authorities, did not hold they had been satisfied, and did not explain why they did not apply. It affirmed on the ground that the fees were "simply not an 'essential element'" of the eviction claim (Order at 2), while simultaneously treating the same fees as the dispositive nondiscriminatory rationale defeating Plaintiff's civil rights claims (Order at 3 n.3). Plaintiff's counsel identified that contradiction in the petition for rehearing, stating that the two holdings "cannot stand together," and in the petition for certiorari. Neither court addressed it. Plaintiff does not ask this Court to correct any of that. She pleads it because a judgment reached without

engaging the controlling law the party invoked, resting on an internal contradiction the courts declined to resolve, and then entered by order so that it stands as no precedent and is not published, does not reflect the full and fair adjudication that preclusion requires.

164. No court in any prior proceeding has analyzed, adjudicated, or decided any claim under 42 U.S.C. § 1981 or § 1982.

165. Plaintiff expressly preserved her claims under 42 U.S.C. § 1982 and the Civil Rights Act of 1866 in her Petition for Rehearing filed in the Utah Court of Appeals, which stated that those claims had "never been analyzed by any court in these proceedings."

166. The Utah Court of Appeals stated that the record was "not entirely clear" whether the discrimination and retaliation counterclaims were brought under the federal Fair Housing Act. (Order at 2 n.2.)

167. Plaintiff expressly requested that the state appellate disposition not be construed as an adjudication on the merits of her federal civil-rights claims.

## N. This action does not seek review of the state judgment

168. Plaintiff does not ask this Court to review, reverse, vacate, or modify any judgment or order of the Utah courts. She does not contend that the state courts erred in a manner this Court should correct. The state judgment stands, and Plaintiff has satisfied and will continue to satisfy it as the law requires.

169. This action seeks damages for Defendants' own conduct: charging fees their own witness admitted at trial they could not prove Plaintiff owed, serving a notice to vacate two days after a Black tenant questioned those fees while a White tenant who did the

same was given a meeting and a renewal, refusing her rent to manufacture a default, offering her housing in exchange for surrender of a civil rights complaint, and terminating her tenancy. Those acts were complete before any state court ruled on anything. The injuries they caused, loss of housing, homelessness, loss of income, damage to Plaintiff's rental history, and emotional distress, flow from Defendants' conduct, not from any judicial decision. That the same facts were later the subject of state litigation does not convert a claim for damages against a private party into an appeal. Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 293 (2005) (Rooker-Feldman does not bar an independent claim merely because it "denies a legal conclusion that a state court has reached in a case to which he was a party"; whether such a claim may proceed is a question of preclusion, not jurisdiction).

170. The Rooker-Feldman doctrine does not deprive this Court of jurisdiction. The doctrine is narrow. It is confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil, 544 U.S. at 284. The Tenth Circuit applies the doctrine "by asking whether the state-court judgment caused, actually and proximately, the injury for which the federal-court plaintiff seeks redress," and does not bar "claims that would be identical even had there been no state-court judgment; that is, claims that do not rest on any allegation concerning the state-court proceedings or judgment." Mo's Express, LLC v. Sopkin, 441 F.3d 1229, 1237 (10th Cir. 2006). The bar applies only where "the relief

sought in the federal action would . . . reverse or undo the relief granted by the state court." Id.

171. Plaintiff's injuries were caused by Defendants' conduct, not by any state-court judgment. Defendants charged and reinstated undocumented fees, refused Plaintiff's tendered rent, conditioned her housing on abandonment of her civil rights complaint, and terminated her tenancy because of her race and in retaliation, before and independent of any judicial ruling. Plaintiff's § 1981 and § 1982 claims would be identical had there been no state-court judgment at all; they rest on Defendants' acts, not on any error by any court. The damages Plaintiff seeks would not reverse or undo the state judgment, and this Court can award them without reexamining or rejecting that judgment. Rooker-Feldman therefore does not apply, and any preclusive effect of the state judgment is a question of preclusion, not jurisdiction, addressed above.

172. Courts have recognized that a tenant's independent federal claims survive a state eviction judgment. A federal damages claim for independent wrongs that does not require rejecting the state judgment may proceed; only a claim whose success depends on the invalidity of the state judgment is barred. Behr v. Campbell, 8 F.4th 1206, 1210 (11th Cir. 2021); see Mayotte v. U.S. Bank Nat'l Ass'n, 880 F.3d 1169, 1174-75 (10th Cir. 2018). The Tenth Circuit has squarely held that Rooker-Feldman does not bar an independent federal claim, including a § 1981 claim, brought by a plaintiff who litigated related matters in state court. In Bolden v. City of Topeka, 441 F.3d 1129 (10th Cir. 2006), the plaintiff brought federal claims under 42 U.S.C. §§ 1981, 1983, and 1985 arising from the same property dispute that had been the subject of state-court proceedings, and the

district court dismissed several of those claims under Rooker-Feldman. The Tenth Circuit reversed, holding: "When the state-court judgment is not itself at issue, the doctrine does not prohibit federal suits regarding the same subject matter, or even the same claims, as those presented in the state-court action. The doctrine that governs litigation of the same subject matter or the same issues is res judicata." Id. at 1139. The court explained that where "the allegations underlying [the plaintiff's] federal-court claims are identical to what they would have been had there been no state-court proceeding," and no claim "rests on allegations that the state-court proceedings or judgment violated federal law, or that the judgment itself inflicted an injury," Rooker-Feldman does not apply and any bar is a matter of preclusion. Id. at 1145. That is precisely Plaintiff's situation: her § 1981 and § 1982 claims arise from Defendants' conduct, would be identical had there been no state proceeding, and do not rest on any allegation that the state judgment injured her or violated federal law.

173. The Tenth Circuit reaffirmed this rule on facts closely resembling Plaintiff's in Mayotte v. U.S. Bank National Ass'n, 880 F.3d 1169 (10th Cir. 2018). There, a borrower alleged that her lender told her she had to miss payments to obtain a loan modification, then placed her in default rather than modifying the loan, and pursued a state foreclosure. She brought federal claims for damages. The Tenth Circuit held that Rooker-Feldman did not bar her suit: "to proceed on her federal-court claims for damages . . . [she] need not set aside, or challenge in any way, the [state] decision. All the facts she alleges in the Complaint to obtain such relief preexisted the [state] proceedings. She can prove her claims without any reference to the state-court proceedings." Id. at 1174-75. The court

further held that this result does not depend on timing: "[e]ven if the federal suit had been brought after judgment was entered in the state litigation, the federal suit would not be barred by Rooker-Feldman unless an element of the claim [was] that the state court wrongfully entered its judgment." Id. at 1174 (internal quotation marks omitted). As in Mayotte, Plaintiff's claims arise from a manufactured default, all the operative facts preexisted the state judgment, she can prove her claims without reference to the state proceedings, and no element of her claim is that the state court wrongfully entered its judgment. Rooker-Feldman does not bar this suit. Plaintiff's claims are of the same character as those the Tenth Circuit allowed to proceed in Bolden. She does not seek the return of her home or the undoing of the eviction; she seeks damages for Defendants' independent violations of her federal civil rights, which the state possession proceeding had no power to adjudicate and which this Court can redress without disturbing the state judgment.

174. To the extent Plaintiff pleads the amount of the state judgment, garnishment, or the pending fee and bond motions, she does so as evidence of the continuing course of retaliatory conduct and as a measure of the financial consequences of Defendants' discrimination, not as a request that this Court set aside any of those amounts.

# CLAIMS FOR RELIEF

### COUNT I

**Violation of 42 U.S.C. § 1981 (Civil Rights Act of 1866): Interference with the Right to Make and Enforce Contracts**

175. Plaintiff incorporates all preceding paragraphs.

176. Section 1981 guarantees to all persons within the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b).

177. To state a claim under § 1981, a plaintiff must allege that (1) she is a member of a protected class; (2) the defendant intended to discriminate against her on the basis of race; and (3) the discrimination interfered with a protected activity as defined in § 1981, here the making, performance, enforcement, and termination of a contract and the enjoyment of its benefits, privileges, terms, and conditions. Cruz v. Farmers Ins. Exch., 42 F.4th 1205, 1210 (10th Cir. 2022); Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1101-02 (10th Cir. 2001). Section 1981 reaches private conduct. Runyon v. McCrary, 427 U.S. 160 (1976). Each element is pleaded below with supporting facts.

178. Plaintiff is a member of a racial minority. She is Black. (UALD Determination at 17; R. 233 at 2.)

179. Plaintiff had a contractual relationship with Defendants: her residential tenancy, a contract Defendants approved and under which she performed by paying $2,690 on time every month through March 2023. (R. 240-42; R. 530; R. 602; R. 1029.)

180. Defendants intentionally interfered with Plaintiff's right to the performance, enjoyment, benefits, privileges, terms, and conditions of that contractual relationship on the basis of her race, including by:

a. charging her fees that Defendants' own records and personnel identified as erroneous; b. issuing a notice to vacate two days after she questioned those fees, without meeting or discussion, while affording a similarly situated White tenant a meeting, a renewal, and no notice; c. refusing to accept her tendered rent in order to manufacture a default; d. terminating her tenancy; and e. conditioning the continuation of her tenancy on the surrender of her race-discrimination complaint.

181. Defendants further interfered with Plaintiff's contractual rights by enforcing against her, and obtaining a treble-damages judgment under, purported contractual terms in a document she never signed and that Defendants never authenticated. Section 1981 guarantees the same right to make and enforce contracts as is enjoyed by white citizens. Holding a Black tenant to unsigned terms she never agreed to, while a White tenant who disputed the same terms was given a meeting and a renewal, is interference with the right to make and enforce contracts on the basis of race.

182. Defendants treated a similarly situated White tenant, Adam Shelton, more favorably in identical circumstances.

183. Section 1981 guarantees the "same right" to make and enforce contracts "as is enjoyed by white citizens." The statute is, by its terms, addressed to the existence of two classes of persons, one of whom receives the benefit of the law and one of whom does

not. That is what the record here shows in a single building. A White tenant who disputed the fees was given a conversation and a renewal. The only Black tenant, who disputed the same fees, was given a notice on her door in two days, had her rent refused, was offered her home back for the price of her civil rights complaint, and was evicted on an unsigned fee addendum and an unauthenticated partial lease. The published law of Utah, had it been applied, would have required Defendants to prove the lease they sued on. It was applied for the defendant in Pepperwood. It was not applied for Plaintiff. The right to have the same rules applied is the right § 1981 protects, and Plaintiff did not receive it.

184. Defendants' intent to discriminate on the basis of race is pleaded through: (i) direct evidence, the April 4, 2023 written offer conditioning her housing on withdrawal of her race discrimination complaint; (ii) comparator evidence, the more favorable treatment of a White tenant who engaged in the same conduct; (iii) Defendants' knowledge of Plaintiff's race, established by in-person meetings with management in November 2022 and by her January 30, 2023 written allegation of race discrimination, both before the adverse actions that followed (Counterclaim ¶¶ 8, 10; R. 20; R. 182); (iv) the fact that Plaintiff was the only Black tenant and the only tenant not renewed, among ten to twelve tenants who received pay-or-vacate notices (UALD Determination at 8-9, 17); (v) the shifting and pretextual explanations for the eviction; and (vi) the temporal sequence of adverse actions following each assertion of her rights.

185. But for Plaintiff's race, Defendants would not have terminated her tenancy and would not have interfered with her contractual rights as they did.

186. Section 1981 also prohibits retaliation against a person for asserting rights protected by the statute. CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008). CBOCS rests on Sullivan v. Little Hunting Park, Inc., 396 U.S. 229 (1969), in which the Supreme Court held that § 1982 reaches retaliation against a person who protested racial discrimination in connection with a lease, and on the settled rule that §§ 1981 and 1982 are construed alike. CBOCS, 553 U.S. at 447-48; Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 176 (2005). Defendants retaliated against Plaintiff for opposing race discrimination in her tenancy and for filing a race discrimination complaint.

187. The April 4, 2023 written offer, conditioning Plaintiff's continued tenancy on dismissal of her race discrimination complaint, is direct evidence that Defendants' interference with Plaintiff's contractual rights was because of, and in retaliation for, her assertion of rights protected by § 1981. The offer is a statement by Defendants' agent, admissible against Defendants, and it proves discriminatory motive without inference. The Tenth Circuit has held that such direct evidence of racial motive in the termination of a contract precludes summary judgment on a § 1981 claim and takes the case outside the McDonnell Douglas framework. Cruz v. Farmers Insurance Exchange, 42 F.4th 1205, 1210, 1215-16 (10th Cir. 2022); Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985). Under Comcast Corp. v. National Ass'n of African American-Owned Media, 589 U.S. 327 (2020), a § 1981 plaintiff must plead but-for causation. Plaintiff so pleads: but for her race and her race discrimination complaint, Defendants would not have refused her rent, offered to trade her housing for her complaint, or terminated her tenancy.

Defendants' own written offer establishes that the complaint was the operative cause, because withdrawing the complaint was the stated price of keeping the home.

188. As a direct and proximate result, Plaintiff has suffered loss of housing, homelessness, financial loss including the treble judgment, garnishment, fees and bond forfeiture, damage to her credit and rental record, and severe emotional distress.

189. This claim is timely. Plaintiff's § 1981 claims arise from Defendants' conduct in the performance, modification, and termination of her tenancy and in retaliation for her assertion of § 1981 rights, all of which is conduct made actionable by the Civil Rights Act of 1991. Such claims are governed by the four-year limitations period of 28 U.S.C. § 1658. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004). In the alternative, to the extent any claim borrows a state limitations period, federal courts borrow the forum state's "general or residual statute for personal injury actions." Owens v. Okure, 488 U.S. 235, 249-50 (1989); Wilson v. Garcia, 471 U.S. 261 (1985). In Utah that is the four-year residual statute for "relief not otherwise provided for by law," Utah Code Ann. § 78B-2-307(3) (formerly § 78-12-25(3)), which the Tenth Circuit has applied to federal civil rights claims and has held cannot be displaced by a state enactment purporting to shorten the period for such claims. Arnold v. Duchesne County, 26 F.3d 982, 985, 987-89 (10th Cir. 1994); Mismash v. Murray City, 730 F.2d 1366 (10th Cir. 1984). Under either period, this action, filed within four years of the April 29, 2023 eviction, is timely as to every act alleged. Defendants' 2026 motions for attorney fees and bond forfeiture are additionally discrete acts within any limitations period.

**COUNT II**

**Violation of 42 U.S.C. § 1982 (Civil Rights Act of 1866): Equal Rights in Property**

190. Plaintiff incorporates all preceding paragraphs.

191. Section 1982 provides that all citizens "shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property."

192. To state a claim under § 1982, a plaintiff must allege that (1) she is a member of a racial minority; (2) the defendant intended to discriminate against her on the basis of race; and (3) the discrimination concerned one of the property rights enumerated in the statute, here the right to lease and hold real property. See Hampton, 247 F.3d at 1101-02 (§ 1981 and § 1982 claims analyzed under the same framework); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 420-22 (1968). Each element is pleaded: Plaintiff is Black; Defendants' discriminatory intent is established by the facts set forth in paragraph 184, incorporated here; and the discrimination concerned Plaintiff's leasehold, which Defendants terminated, and her ability to lease other property, which the resulting eviction record impairs.

193. Section 1982 reaches private as well as public actors. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436-37 (1968); Memphis v. Greene, 451 U.S. 100 (1981). It protects the right to lease, and it does so "against the actions of third parties, as well as against the actions of the immediate lessor." Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237 (1969). It therefore reaches Greystar, which managed the property and executed the conduct alleged, as well as the owner. A narrow construction of § 1982 "would be quite

inconsistent with the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866." Id.

Section 1982 prohibits retaliation against a person for opposing racial discrimination in connection with a lease. In Sullivan, a lessor protested an association's refusal, on racial grounds, to approve the assignment of a membership share to his Black tenant, and was expelled. The Supreme Court held: "If that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities protected by § 1982. Such a sanction would give impetus to the perpetuation of racial restrictions on property." 396 U.S. at 237. See Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 176 (2005) (Sullivan recognized that retaliation claims are encompassed by § 1982). Plaintiff was punished, by a sanction backed by a state court judgment, for opposing racial discrimination in her own tenancy and for filing a race discrimination complaint. That is the conduct Sullivan holds § 1982 forbids.

Section 1982 is an independent remedy that the Fair Housing Act did not displace. The Supreme Court held in Sullivan that the Fair Housing Act "in no way impaired the sanction of § 1982," 396 U.S. at 237-38, and rejected the argument that a plaintiff must proceed under the newer statute rather than the 1866 Act, id. at 240. Damages for violation of § 1982 are recoverable, governed by federal standards under 42 U.S.C. § 1988, and this Court has jurisdiction over such claims under 28 U.S.C. § 1343(4). Id. at 238-40. Discriminatory eviction and refusal to renew a lease are actionable under § 1982. See Smith v. Sol D. Adler Realty Co., 436 F.2d 344 (7th Cir. 1970); Walker v. Pointer, 304 F. Supp. 56 (N.D. Tex. 1969).

194. Defendants denied Plaintiff the same right to lease and hold real property as is enjoyed by white citizens, on the basis of her race, through the conduct described above.

195. A similarly situated White tenant who engaged in the same conduct, questioning the same fees, retained his leasehold; Plaintiff did not.

196. Section 1982 guarantees the "same right" to lease and hold real property "as is enjoyed by white citizens." A White tenant in Plaintiff's building held his leasehold through the same dispute. Plaintiff lost hers. The difference in outcome was not produced by a difference in conduct; both tenants questioned the same fees. It was produced by a difference in how Defendants responded to that conduct, and Defendants' response to Plaintiff was to end her tenancy the day she raised discrimination and to refuse the rent that would have preserved it. The right to hold property on the same terms as white citizens is the right § 1982 protects, and Plaintiff did not receive it.

197. Plaintiff's leasehold was terminated, and a judgment entered against her, on the basis of purported lease terms in an unsigned fee addendum and a partial 14-of-40-page lease copy that no witness with personal knowledge of its formation ever authenticated. Depriving a Black citizen of her leasehold on the strength of an unsigned, unauthenticated document, on terms not enforced against a White tenant who disputed them, denies her the same right to lease and hold real property as is enjoyed by white citizens.

198. As a direct and proximate result, Plaintiff has suffered the injuries described above.

199. This claim is timely. Section 1982 contains no limitations period of its own. Federal courts borrow the forum state's general or residual personal-injury statute, Owens v. Okure, 488 U.S. 235, 249-50 (1989), which in Utah is the four-year residual statute, Utah Code Ann. § 78B-2-307(3) (formerly § 78-12-25(3)). Arnold v. Duchesne County, 26 F.3d 982, 985, 988 (10th Cir. 1994) (applying the four-year residual statute to federal civil rights claims and observing that actions under other sections of the Civil Rights Acts are covered by the same residual statute); Mismash v. Murray City, 730 F.2d 1366 (10th Cir. 1984). This action is filed within four years of the April 29, 2023 eviction and of every subsequent act alleged.

## COUNT III

**Violation of the Fair Housing Act, 42 U.S.C. § 3604: Discrimination in the Terms, Conditions, and Privileges of Rental**

200. Plaintiff incorporates all preceding paragraphs.

201. Defendants discriminated against Plaintiffs in the terms, conditions, and privileges of their rental, and in the provision of services and facilities in connection therewith, because of race, in violation of 42 U.S.C. § 3604(b), including by:

a. assessing fees against her that Defendants' own records identified as erroneous; b. serving a pay-or-vacate notice while she carried a credit balance; c. serving a notice to vacate two days after she questioned the fees, while affording a White tenant who questioned the same fees a

meeting and a renewal; d. refusing to provide her a rental reference; e. refusing to accept her tendered rent; f. declining to renew her lease; and g. evicting her.

202Plaintiff was "qualified" to rent. Qualification turns on the landlord's general rental criteria at the outset of the tenancy. Defendants approved her tenancy, and she paid the full disclosed rent of $2,690 on time every month through March 2023. (R. 240-42; R. 530; R. 602; R. 1029.) A tenant does not become "unqualified" by disputing charges she reasonably believes were not part of her agreement, particularly where the landlord itself later abandoned those charges.

203. Defendants were on notice that a minor child resided in the unit. On March 15, 2023, Plaintiff wrote to Defendants requesting to remain through June 30, 2023 so that her son could finish the school year, and disclosed his disability. Defendants refused, insisting on a mid-school-year move-out, and three weeks later offered the identical June 30 stay in exchange for dismissal of the discrimination complaint. The displacement of Plaintiff's household, including her disabled child, in the middle of the school year is part of the injury Plaintiff suffered from Defendants' conduct.

204. This action is timely under 42 U.S.C. § 3613(a)(1)(A), which runs from "the occurrence or the termination of an alleged discriminatory housing practice . . . whichever occurs last," and § 3613(a)(1)(B), which excludes from the limitations period "any time during which an administrative proceeding under this subchapter was pending."

205. Plaintiff's administrative complaint was pending before UALD, and dual-filed with HUD, from March 8, 2023 through at least September 1, 2023. That period is excluded

from the computation. Plaintiff further alleges that the HUD component of the dual-filed complaint was never formally closed, and that HUD FHEO Region VIII corresponded with Plaintiff regarding it in August and September 2026.

206. Defendants' discriminatory and retaliatory practice did not terminate with the eviction. It has continued without interruption through the filing of this action, including through: enforcement of the judgment by garnishment; a motion filed in 2026 seeking $15,330 in attorney fees, a substantial portion of which Defendants seek for defending against Plaintiff's fair housing counterclaim, on the asserted authority of the fee clause in the unsigned lease; and a motion filed in 2026 to forfeit the bond Plaintiff was required to post to appeal. Defendants filed their reply in support of those motions on August 27, 2026. Each of these acts is a further exercise of the same retaliatory course of conduct: penalizing Plaintiff financially for having asserted fair housing rights. Where a plaintiff challenges "not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [the statutory period] of the last asserted occurrence of that practice." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-147 (1982). The last asserted occurrence was August 27, 2026.

207. In the further alternative, the limitations period on Plaintiff's Fair Housing Act claims is equitably tolled. Plaintiff pursued her rights with diligence at every stage: she contacted HUD's Office of Fair Housing and Equal Opportunity on February 10, 2023, eleven days after the notice to vacate and before she lost her home, and no formal complaint was drafted from that contact; she filed with UALD on March 8, 2023; she

asserted discrimination and retaliation in her state-court answer and counterclaim; she litigated her claims through trial, appeal, rehearing, and certiorari;. Extraordinary circumstances stood in her way: she was forced to proceed pro se at summary judgment and trial when she could no longer afford counsel after the eviction rendered her homeless; she was rendered homeless by the eviction itself and has remained so; the state court's January 22, 2025 judgment was never served on her as Utah R. Civ. P. 58A requires, so that she did not learn of it until enforcement had begun; and the federal agency she first contacted did not act on her report. A litigant who did everything the system asked of her, in the order it asked, while homeless, should not be deprived of a federal remedy because the institutions she went to did not act within the period the statute allots.

208Plaintiff's Fair Housing Act claims are pleaded in the alternative to her claims under 42 U.S.C. §§ 1981 and 1982, and are independently supported by the same facts. To the extent any Fair Housing Act claim is found untimely or barred, Plaintiff's claims under §§ 1981 and 1982, which carry a four-year limitations period and were never pleaded or adjudicated in any prior proceeding, are unaffected.

209. The § 3617 claim in particular was never adjudicated in the state proceeding. The April 4, 2023 offer was excluded before trial. The Utah Court of Appeals stated it "need not reach" the retaliation issue. (Order at 3 n.3.) An issue that was never reached was neither actually litigated nor necessarily decided, and no preclusion attaches to it.

210. No conciliation agreement was reached. The UALD no-cause determination is not a conciliation agreement.

## COUNT IV

**Violation of the Fair Housing Act, 42 U.S.C. § 3617: Coercion, Intimidation, Threats, and Interference**

211. Plaintiff incorporates all preceding paragraphs.

212. Section 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected" by the Fair Housing Act.

213. Filing a race-discrimination complaint with UALD, a HUD Fair Housing Assistance Program agency, is protected activity. HUD's implementing regulations expressly prohibit "[r]etaliating against any person because that person has made a complaint . . . in a proceeding under the Fair Housing Act," 24 C.F.R. § 100.400(c)(5), and prohibit retaliation for reporting discrimination, 24 C.F.R. § 100.400(c)(6).

214. Whether activity is protected does not depend on whether the complainant ultimately prevails on the underlying grievance. It depends on the good-faith act of opposing a practice the complainant reasonably believed was discriminatory. Wyatt v. City of Boston, 35 F.3d 13, 15 (1st Cir. 1994); Brower v. Runyon, 178 F.3d 1002, 1006 (8th Cir. 1999); Hertz v. Luzenac America, Inc., 370 F.3d 1014 (10th Cir. 2004); Crumpacker v. Kansas Dep't of Human Resources, 338 F.3d 1163, 1171 (10th Cir. 2003). "[T]he challenged activity cannot defeat Plaintiffs' prima facie case." Treece v. Perrier Condominium Owners Ass'n, 593 F. Supp. A court in this District has applied these principles directly. In Arnal v. Aspen View Condominium Ass'n, 245 F. Supp. 3d 1261

(D. Colo. 2017), the court held that "[a] violation of Section 3617 may be shown even absent other violations of the FHA," id. at 1188, and denied summary judgment on the plaintiff's retaliation claim, finding that "a reasonable jury could conclude that the imposition of [] fines constitute coercion, intimidation, threats or interference." The same principles apply here: Plaintiff's § 3617 claim does not depend on her prevailing on any underlying discrimination claim, and Defendants' imposition of charges, refusal of rent, and pursuit of fees against Plaintiff for having asserted her fair housing rights supports her claim of retaliation. 3d 422, 440 (E.D. La. 2022).

215. Plaintiff opposed the fees in good faith and with reasonable belief that they were being discriminatorily enforced against her as the only Black tenant, a belief corroborated by Defendants' own subsequent admissions that the fees were a billing "glitch," that they could not be documented, and that a White tenant who disputed them was not evicted.

216. Defendants' April 4, 2023 written offer, conditioning the rescission of the eviction, the waiver of all fees, continued occupancy, and a positive reference on Plaintiff's dismissal of her discrimination complaint, constitutes coercion and interference under § 3617 on its face.

217. The April 4 offer is direct evidence of a § 3617 violation. The condition is stated in terms: housing "in return for you dismissing your Discrimination Claim." No inference is required. Where a plaintiff presents direct evidence, the McDonnell Douglas burden-shifting framework does not apply. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985). Plaintiff pleads this claim on direct evidence and, in the alternative, under the circumstantial framework.

218. An offer that conditions continued housing on abandonment of a pending fair housing complaint is not merely evidence about a violation. It is the violation. Section 3617 prohibits the conditioning itself, whether or not the tenant accepts. Requiring dismissal of a race discrimination complaint as a condition of continued housing is retaliation per se: it establishes, by its own terms, that the complaint was the reason for the adverse action. See Stackhouse v. DeSitter, 620 F. Supp. 208, 210-12 (N.D. Ill. 1985) (§ 3617 prohibits coercion "on account of the person's having exercised" fair housing rights); United States v. Hinesville Housing Authority, No. 4:23-cv-00288-LGW-CLR (S.D. Ga. Sept. 29, 2023) (consent order; retaliation where tenant received non-renewal notice within five days of landlord learning of HUD complaint).

219. The temporal sequence independently establishes retaliation: notice to vacate two days after Plaintiff's fee objection; refusal of tendered rent after her discrimination complaint; the conditional offer one day after Defendants' sworn statement to the agency; and suit filed six days after Plaintiff declined the offer. Protected conduct closely followed by adverse action supports an inference of retaliatory motive, and a period of roughly six weeks between the two may by itself establish causation. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). UALD applied that standard and found causation between Plaintiff's March 8, 2023 complaint and the April 10, 2023 eviction. (Determination at 20.)

220. Section 3617 does not require that the coercion succeed, and does not require a separate eviction action. It prohibits the conditioning itself.

221. Defendants further interfered with and retaliated against Plaintiff by issuing the notice to vacate two days after her fee objection, by refusing her tendered rent, and by prosecuting an eviction and treble-damages claim premised on the default their refusal created.

222. Defendants' retaliation did not end with the eviction and has continued into the present. Defendants have garnished Plaintiff's wages in enforcement of the judgment, and in 2026 moved for $15,330 in attorney fees, a substantial portion of which they seek for defending against Plaintiff's fair housing counterclaim, and moved to forfeit the bond Plaintiff was required to post to appeal. Seeking to impose on Plaintiff the cost of Defendants' defense against her own fair housing claim, where no statute authorizes it and no court has found her claim frivolous, is itself a further act of coercion and interference under § 3617. Each of these acts is a continuation of the same retaliatory course of conduct: penalizing Plaintiff financially for having asserted her fair housing rights. The most recent of these acts, Defendants' reply in support of the fee and bond motions, was filed on August 27, 2026.

223. The state courts applied the wrong legal standard to Plaintiff's fair housing claims. Because Plaintiff's claims under 42 U.S.C. §§ 3604(b) and 3617 proceed on circumstantial proof, they are governed by the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Under that framework, the plaintiff bears a minimal burden to make a prima facie showing; if she does, the burden shifts to the defendant to articulate, not prove, a legitimate, non-discriminatory and non-retaliatory reason; and the burden then returns to the plaintiff to show pretext. Id. As

the Supreme Court explained in St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-11 (1993), the plaintiff's prima facie burden is minimal, and once the defendant offers a reason, the factfinder decides intent, including whether disbelief of the proffered reason, together with the prima facie case, permits an inference of unlawful motive. Properly applied, that framework required the court to credit Plaintiff's prima facie showing and then test Defendants' stated justification for pretext, rather than collapsing the prima facie inquiry into the merits. The state court did the opposite: it required Plaintiff to prove her entire case at the prima facie stage, faulting her for not establishing that she was "qualified" because she disputed fees, when qualification focuses on the landlord's objective rental criteria and the plaintiff's burden at the prima facie stage is minimal. By collapsing step one into the ultimate merits, the court never reached steps two and three, never required Defendants to articulate a legitimate reason subject to pretext analysis, and never tested the abundant evidence of pretext in this case.

224. No court has analyzed the April 4, 2023 offer under 42 U.S.C. § 3617.

225. The state investigative agency that examined this conduct found that Plaintiff established a prima facie case of retaliation. Applying the Tenth Circuit standard of O'Neal v. Ferguson Construction Co., 237 F.3d 1248, 1253 (10th Cir. 2001), the agency found that Plaintiff engaged in protected activity when she filed her discrimination complaint on March 8, 2023, that Defendants subjected her to a materially adverse action approximately five weeks later when they initiated eviction proceedings on April 10, 2023, and that the temporal proximity demonstrated a causal connection. The agency concluded, in its own words, that "Complainant has demonstrated a causal connection

between her engaging in a protected activity on March 8, 2023, and Respondent subjecting her to an adverse action on April 10, 2023, through temporal proximity," and that "Complainant establishes the third element of a claim of retaliation, and her prima facie case." (UALD Determination at 20.) That the agency nonetheless issued a "no cause" disposition does not diminish the finding: a government investigator, applying the governing federal standard, found Plaintiff had made a prima facie showing of retaliation on the same facts alleged here.

## COUNT V

**Wrongful Retention of Security Deposit, Utah Code Ann. §§ 57-17-3, 57-17-5 (Supplemental Jurisdiction)**

226. Plaintiff incorporates all preceding paragraphs.

227. Plaintiff paid Defendants a $500 security deposit at the commencement of her tenancy.

228. Utah Code Ann. § 57-17-3 requires a landlord, within 30 days after the tenant vacates, to deliver to the tenant the balance of any deposit and prepaid rent, and, if any deductions are made, a written notice itemizing each deduction.

229. Defendants never returned Plaintiff's $500 deposit and never provided the statutorily required itemized accounting. At oral argument before the Utah Court of Appeals, Defendants' counsel admitted what became of it: "we did credit the security deposit to the judgment after the judgment was issued by the court. We just counted it as a payment for the judgment." When the panel asked whether that was "reflected in the record

anywhere," counsel answered: "No, it's not reflected in the record." Defendants thus applied Plaintiff's deposit to satisfy their own judgment against her, without the itemized notice § 57-17-3 requires, without her consent, and without any entry in the record. The Court of Appeals said nothing about the deposit in its decision.

230. Plaintiff raised this claim in her answer and counterclaim in the state proceeding (R. 26) and testified to it at trial (R. 926). The state court's written findings did not mention the claim. On appeal, the Utah Court of Appeals held the claim "unpreserved," stating it "was only ever raised in passing" and "was never squarely presented to the district court." No court has ever adjudicated it on the merits. A claim that the state appellate court itself characterized as never squarely presented, and that no court decided, was not actually litigated and is not barred by issue preclusion; and a procedural default on a claim never reached does not constitute a judgment on the merits for claim preclusion purposes.

231. Utah Code Ann. § 57-17-5 provides statutory penalties for wrongful withholding. Plaintiff seeks return of the deposit, statutory penalties, and attorney fees as provided by statute.

## COUNT VI

### Damages

232. Plaintiff incorporates all preceding paragraphs.

233. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered the following injuries, in amounts to be proven at trial:

a. **The treble judgment.** A judgment of $7,395 was entered against Plaintiff, representing April 2023 rent at $85 per day for 29 days, multiplied by three, for a month in which Defendants refused to accept her rent.

b. **Amounts collected through garnishment,** which Defendants have taken from Plaintiff's wages and other funds in enforcement of that judgment.

c. **Amounts Defendants continue to pursue,** including $15,330 in attorney fees and forfeiture of the $4,037.62 appeal bond Plaintiff was required to post.

d. **The disputed fees,** which Defendants charged, removed, reinstated, and later abandoned.

e. **Loss of housing and the costs of displacement,** including moving, storage, temporary lodging, and increased housing costs.

f. **The loss of stable housing.** Plaintiff and her minor son have been consistently without stable housing since September 2024.

g. **LossofincomeandimpairmentofPlaintiff's ability to maintain employment,** resulting from the instability the eviction caused.

h. **Damage to Plaintiff's credit and rental history.** The eviction record continues to impair Plaintiff's ability to obtain housing and will continue to do so for years.

i. **Emotional distress,** including the distress of losing her home, of being displaced with a minor child with special needs, and of being told she could keep her home only if she surrendered her civil rights complaint.

234. Part of the harm Defendants inflicted on Plaintiff is the harm to her minor son, which she has borne and continues to bear as his mother: the loss of their home while he was in kindergarten; his removal from his school and community in the middle of the school year; the years of instability since, during which he is now missing his fourth year of school and has fallen behind his peers socially and developmentally; and the distress of raising a child in homelessness at an age when stability is foundational. Plaintiff pleads this as an element of her own damages. Plaintiff does not in this Complaint assert separate claims on her son's behalf, and reserves the right to seek leave to add such claims through counsel.

235. The cumulative character of Defendants' conduct establishes that it was not negligent orinadvertent but deliberate and in conscious disregard of Plaintiff's rights. Defendants charged Plaintiff fees their own manager called a "glitch" and could not prove; credited her account to a positive balance and then, weeks later, demanded roughly $800; served her with an eviction notice their own manager admitted under oath was not ethical; refused her rent so that a default would form, as their counsel admitted was deliberate; offered to erase the entire matter if she would surrender her civil rights complaint; sued her for the very rent they refused and collected three times it; took her security deposit and applied it to their own judgment without the notice the law requires; garnished her

wages while she and her child were homeless; and now seek attorney fees more than double the judgment and forfeiture of her appeal bond. Each of these acts was directed at a tenant who had done nothing but pay her rent and question fees that other tenants questioned without consequence, and who was the only Black tenant in the building and the only tenant whose lease was not renewed. A landlord's own agent conceded the central action was unethical, a state agency found a prima facie case of retaliation, and the trial judge found the case raised serious questions including whether the landlord's witnesses testified falsely. Conduct of this character, sustained across years and directed ata person the law expressly protects, is the kind for which punitive damages exist.

236Defendants' conduct was intentional, willful, malicious, and undertaken in gross disregard of Plaintiff's federally protected rights, warranting punitive damages. Punitive damages are available under 42 U.S.C. §§ 1981 and 1982 for conduct that is "malicious, willful, and in gross disregard of [the plaintiff's] rights," and § 1981 imposes no statutory cap on such damages. Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1115-17 (10th Cir. 2001). Where, as here, the economic loss understates the gravity of the conduct, a substantial ratio of punitive to compensatory damages is appropriate, because the injury is primarily personal and the conduct particularly egregious. Id. at 1116-17. Defendants refused Plaintiff's rent to manufacture a default, conditioned her housing on surrender of a civil rights complaint, enforced against her an instrument no one authenticated, and applied her security deposit to their own judgment off the record. That conduct warrants punitive damages sufficient to deter its repetition against other tenants.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment that Defendants violated 42 U.S.C. §§ 1981, 1982, 3604, and 3617, and Utah Code Ann. § 57-17-3;

B. Award compensatory damages in an amount to be proven at trial, including damages for loss of housing, homelessness, out-of-pocket losses, damage to credit and rental history, and emotional distress;

C. Award punitive damages;

D. Award declaratory relief stating that Defendants' conduct violated Plaintiff's federal civil rights;

E. Award costs, and attorney fees under 42 U.S.C. § 1988 and 42 U.S.C. § 3613(c)(2) in the event Plaintiff obtains counsel;

F. Award pre- and post-judgment interest; and

G. Grant such other relief as the Court deems just.

# JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

---

DATED: September 14, 2026

/s/ Antonia Blackwell

Antonia Blackwell Plaintiff, Pro Se

Phone: (385) 334-6113

Email: kranberry99@yahoo.com

---

# VERIFICATION

I, Antonia Blackwell, declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, that I am the Plaintiff in this action, that I have read the foregoing Complaint, and that the factual allegations contained in it are true and correct to the best of my knowledge, information, and belief.

Executed on September 14, 2026.

/s/ Antonia Blackwell

Antonia Blackwell