FILED
2026 NOV 17
CLERK
U.S. DISTRICT COURT

Antonia Blackwell
No mailing address (homeless). Please contact by email or telephone.
Phone: (385) 334-6113
Email: kranberry99@yahoo.com
Plaintiff, Pro Se

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| ANTONIA BLACKWELL,<br><br>Plaintiff,<br><br>v.<br><br>THE PEARL; VP CW PEARL PROPERTY, LP, also known as VP CW PEARL, LP; GREYSTAR REAL ESTATE PARTNERS, LLC; GREYSTAR MANAGEMENT SERVICES, LLC, formerly GREYSTAR MANAGEMENT SERVICES, LP; GREP SOUTHWEST, LLC, doing business as GREYSTAR PROPERTY MANAGEMENT; KAIROI MANAGEMENT, LLC; and DOES 1–10,<br><br>Defendants. | **FIRST AMENDED COMPLAINT AND JURY DEMAND**<br><br>**JURY DEMANDED**<br><br>Case No. 2:26-cv-00853-DAO<br><br>Magistrate Judge Daphne A. Oberg |

## INTRODUCTION

**1.** The lease Defendants filed to evict Plaintiff Antonia Blackwell was fourteen pages of a forty-page document: an electronically signed contract that, as Plaintiff's appellate counsel put it, "came to be printed out, pages cut out, and scanned in a copy machine for production in court," its margins "partially cut-off," and "parsed into a little over a dozen pages." (R. 6–19; Appellant's Opening Br. 24, 35.) It was produced in the summary-judgment record only as that partial 14-of-40-page scan of a paper printout, not the complete instrument, and no witness

with personal knowledge of its formation ever authenticated it. (R. 5 ¶ 4; R. 314–15.) The fee addendum that created the charges Defendants cited as the reason for ending Plaintiff's tenancy is unsigned; its signature lines are blank. (R. 15.) Plaintiff did not sign it, and she told Defendants so in writing, before any litigation. She was nonetheless held to its terms, served a notice to vacate over charges only that addendum could create, and, after the eviction claim was decided against her on summary judgment without a trial, made to pay treble damages on a holdover that existed only because Defendants refused her rent.

**2.** This case follows a pattern as old as this country: a family is stripped of its home and its future, and then blamed for the loss. This action arises under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act, 42 U.S.C. §§ 3604, 3613, and 3617. Plaintiff Antonia Blackwell, a Black woman, was the only tenant of her race in her apartment building. She paid her rent in full and on time every month of her tenancy through March 2023, and tendered April's rent, which Defendants refused. She was evicted anyway, over fees for services Defendants' own witness could not show at trial had been provided to her unit, that Defendants' own employees had described as a "glitch" and a "setting issue," and that Defendants ultimately abandoned. She was served a notice to vacate two days after she questioned those fees, and then evicted.

**3.** Plaintiff's payment arrived every month. Most of the balance Defendants called a default was late fees, charged under a lease clause for late rent, to a tenant who never paid rent late; Defendants' own ledgers, reviewed by the Utah Antidiscrimination and Labor Division, show it. (UALD Determination at 6–8, 10.) Two months before the notice to vacate, Defendants' own ledger showed her in credit, by $173.57, after a $500 credit from their regional manager; five weeks later the same ledger showed her owing $854.42. (UALD Determination at 7–8.) The undisclosed fees that supplied the "nonpayment" were ones Defendants abandoned in court and never proved. (Findings ¶ 12 n.2; ¶ 29 n.7.)

**4.** So how was the default manufactured? Defendants refused her rent, sued for the rent they refused, and were awarded it three times over. (MSJ Hrg. Tr. 38:9–15; see Section G below.)

**5.** After Plaintiff filed a race-discrimination complaint with the Utah Antidiscrimination and Labor Division, Defendants refused to accept her tendered rent, sued her for the resulting holdover, and obtained a judgment for treble damages measured by the very rent they had refused. One day after responding to her civil-rights complaint, Defendants' counsel conveyed an offer, which Plaintiff's then-attorney relayed to her in writing the same day, to forgo the eviction, waive all fees, permit her to remain, and provide a positive reference, expressly conditioned on her dismissal of her discrimination complaint. She declined. Six days later Defendants sued to evict her. She could not stay, because her rent was refused and her request to remain was not granted, and she could not leave, because she had no reference. The balance, by Defendants' own offer, was negotiable: the offer itself proposed to "[d]ismiss all fees and costs to date." The one term that did not move was the dismissal of her discrimination complaint. A landlord may settle a discrimination claim. What it may not do is make the tenant's housing the price of the claim. The order of events is itself the method: the undisclosed fees put a choice to her, pay charges she had never agreed to or be in "default," and the default Defendants then sued on was the one they had built. The notice to vacate came before her agency complaint; the refused rent, the conditioned offer, and the eviction suit all came after it. The Fair Housing Act makes it "unlawful to coerce, intimidate, threaten, or interfere with any person . . . on account of his having exercised or enjoyed . . . any right granted or protected by" the Act. 42 U.S.C. § 3617. She was evicted in April 2023, and she and her minor son have been consistently without stable housing for years.

**6.** A White tenant who disputed the same fees was given a meeting, a lease renewal, and no notice to vacate. Plaintiff, who disputed the same fees, was evicted. Defendants' own

manager testified that he had "talked to a lot of residents that have had those issues," and that no one among the "[m]any" eviction notices he had processed had been "kicked out for asking questions." (Trial Tr. 68:6–12; 111:5–8.) The other residents who asked the same questions were not evicted; the only Black tenant was.

**7.** What happened to Plaintiff was accomplished through a method that requires no proof. A landlord charges fees it cannot document, under an addendum no one signed, and when the tenant disputes them, serves a notice to vacate, refuses her tendered rent so that a default forms, offers to erase the matter if she abandons her civil rights complaint, and, when she refuses, evicts her, is awarded three times the rent it declined to accept and garnishes her wages to collect it, seeks its attorney fees, and seeks her appeal bond. Every step of that method was left undisturbed by the Utah courts; the Court of Appeals affirmed by an unpublished order that "will not stand as precedent," Utah R. App. P. 30(e) (quoted in Ct. App. Order at 1), and the Utah Supreme Court declined review. The result is a rule of law that can be applied to one tenant and withheld from another with no public record of the difference. When the tenant from whom the law's protection is withheld is the only Black tenant in her building, while a White tenant who disputed the same fees kept his home, that selective application of the law is the precise injury that 42 U.S.C. §§ 1981 and 1982, the Civil Rights Act of 1866, were enacted to remedy: the denial to a person of color of the same right to make and enforce contracts, and to hold property, that white citizens enjoy.

**8.** Defendants have never explained how a tenant who paid every month was in default; why they refused the rent they then sued for; how charges they dropped in court remained the reason she had to leave; why a White tenant who disputed the same fees was given a meeting and a renewal while she was given a notice to vacate; or why her housing, her fees, and her reference were all available to her on one condition, that she dismiss her discrimination complaint. The fees are of the kind the Federal Trade Commission and the State

of Colorado later sued Greystar entities over, charging "mandatory hidden fees," in an action resolved by a stipulated order in which the defendants "neither admit nor deny" the allegations. (See Section K below.)

**9.** The harm did not end with the eviction. Plaintiff's son, who was in kindergarten when they were put out, is now missing his fourth year of school. Plaintiff, who holds two master's degrees, has been unable to maintain employment in her field. Defendants now seek, in attorney fees, more than double a judgment that already includes the rent trebled, and the forfeiture of her appeal bond. (Docket Nos. 241, 242.) The lease Defendants sued on, the one no witness with knowledge of its signing ever authenticated, adds, for any obligation assigned to a collection agency or attorney, "a collection fee of forty percent (40%) of the debt/obligation assigned," with interest "at the rate of twenty-four percent (24%) per annum compounded daily until paid." (Pl. Tr. Ex. A at 5 (reproduced in the addendum to Appellant's Opening Br.); R. 314–15. The same clause appears at page 5 of the lease Defendants produced to UALD in April 2023.) Her $500 security deposit was never accounted for. The record told every decisionmaker that a mother and her child were without a home and that the judgment they were ordered to pay was what made it "impossible to secure even temporary housing." (May 12, 2025 Order at 4; Trial Tr. 185:23–25.) An eviction, a trebled judgment, and a fee award to come on top of it, against a tenant with no income, are not a record anyone rents to.

**10.** No court has ever adjudicated Plaintiff's claims under 42 U.S.C. §§ 1981 and 1982. Plaintiff expressly preserved her § 1982 claim in the state appellate court, and neither statute was analyzed by any tribunal in any prior proceeding. (Pet. for Reh'g 15.) Plaintiff pursued every avenue in the State of Utah: a HUD-funded state enforcement agency and three levels of state court. The state trial court addressed fair housing discrimination and retaliation only as to the January 30, 2023 notice to vacate. No tribunal applied 42 U.S.C. § 3617 to Defendants' April 4, 2023 offer conditioning her housing on withdrawal of her discrimination complaint,

or decided whether Defendants retaliated against her for filing that complaint. That document was before the state agency, the trial court, and the Court of Appeals. The agency called a settlement offer "a routine part of the litigation process" and accepted Defendants' explanation that Plaintiff had not moved out by the date in the notice; the trial court received it as an exhibit and wrote findings that do not mention it; the Court of Appeals had it on rehearing and did not mention it. (UALD Determination at 11 n.3, 18; Trial Tr. 172:6–14, 203:5–8; Findings ¶¶ 33–43; Pet. for Reh'g 12–14.) Each accepted a different reason for the eviction. None asked the question the document itself poses: can a landlord tell a tenant that she may stay in her home only if she drops her discrimination complaint? That is the question this action presents. This action is the first proceeding in which those claims will be decided on the merits.

**11.** This is an action for damages, and for limited injunctive relief directed to Defendants' future conduct, against private parties for their own unlawful conduct. Plaintiff does not ask this Court to review, reverse, vacate, or set aside any judgment or order of any state court. The state-court judgment stands, and Plaintiff has satisfied and continues to satisfy it. Plaintiff seeks money damages for what Defendants did to her: that they charged her fees for services their own witness could not show at trial had been provided to her unit, refused her rent so that a default would form, conditioned her housing on the surrender of her race discrimination complaint, and terminated her tenancy because of her race and in retaliation for her assertion of her civil rights. That conduct was complete before any court ruled, and it is independently unlawful regardless of the outcome of the state eviction case. Where Plaintiff refers to the state proceedings, she does so to describe the history, to establish that her federal claims were never decided, and to measure the financial consequences of Defendants' conduct, not to seek review of any state ruling.

## JURISDICTION AND VENUE

**12.** This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(4) (civil rights).

**13.** Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Salt Lake County, Utah, and Defendants conduct business in this District.

**14.** This Court has supplemental jurisdiction over any related state-law claims under 28 U.S.C. § 1367.

**15.** This Court has personal jurisdiction over Defendants. Each Defendant owns, operates, or managed real property in Utah, transacted business in Utah, and committed the acts alleged in this Complaint in Utah. Defendants invoked the jurisdiction of Utah's courts by suing Plaintiff there.

**16.** This Court has authority to award the relief Plaintiff seeks. The statutes under which Plaintiff sues authorize an award of damages for their violation: 42 U.S.C. § 1981 and 42 U.S.C. § 1982 provide a private right of action for compensatory and punitive damages, and 42 U.S.C. § 3613(c) authorizes actual and punitive damages, injunctive relief, and attorney fees for violations of the Fair Housing Act. Plaintiff seeks money damages against private Defendants for their own unlawful conduct. She does not ask this Court to review, reverse, vacate, or set aside any judgment or order of any state court, and the existence of the prior state proceedings does not deprive this Court of jurisdiction. The United States Supreme Court has held that a federal court is not stripped of jurisdiction simply because a party litigates in federal court a matter previously litigated in state court; so long as the plaintiff presents an independent claim, "there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 293 (2005). The Tenth Circuit has applied this rule to civil-

rights plaintiffs who lost in state court, holding that "[w]hen the state-court judgment is not itself at issue, the doctrine does not prohibit federal suits regarding the same subject matter, or even the same claims, as those presented in the state-court action." Bolden v. City of Topeka, 441 F.3d 1129, 1139 (10th Cir. 2006). And on facts closely resembling this case, the Tenth Circuit held that a plaintiff alleging a manufactured default may proceed in federal court for damages because she "need not set aside, or challenge in any way," the state decision, and "can prove her claims without any reference to the state-court proceedings." Mayotte v. U.S. Bank Nat'l Ass'n, 880 F.3d 1169, 1176 (10th Cir. 2018). Whether the prior state proceedings have any preclusive effect on Plaintiff's claims is a question of preclusion, not jurisdiction, and is addressed below.

## PARTIES

**17.** Plaintiff Antonia Blackwell is a Black woman and a citizen of the United States. She resided at The Pearl apartments in Salt Lake County, Utah, from approximately March 2022 until April 29, 2023. Plaintiff's minor son, a multiracial child, referred to herein by his initials T.J., resided with Plaintiff at The Pearl throughout her tenancy and was evicted with her. He has a diagnosed disability, which Plaintiff disclosed to Defendants in writing on March 15, 2023. He was enrolled in kindergarten at the time of the eviction in April 2023 and is now missing his fourth year of school. Plaintiff brings this action in her own name and on her own behalf; she pleads the harm to her son as an element of her own damages, described below, and does not assert separate claims on his behalf in this Complaint.

**18.** Defendant The Pearl is the entity that owned and/or operated the residential apartment property at 4647 West South Jordan Parkway, South Jordan, Utah, where Plaintiff resided, and that sued Plaintiff for unlawful detainer in The Pearl v. Blackwell, Civil No. 230401251, Third Judicial District Court, Salt Lake County, Utah.

**19.** Defendant VP CW Pearl Property, LP is, on information and belief, the owner of the property. The UALD Determination names VP CW Pearl Property, LP as a respondent and, in summarizing the complaint, describes it "as owner of the subject property known as “The Pearl,” located at 4647 West South Jordan Parkway in South Jordan, Utah, acting by and through its agents and/or employees," Greystar Management Services, LP and Kairoi Management, LLC. (UALD Determination at 2.) No entity is registered with the Utah Division of Corporations under that name. Its general partner, CW Pearl GP, LLC, a Delaware limited liability company, registered in Utah on August 14, 2026, lists as its manager "VP CW PEARL, LP," at 610 North 800 West, Centerville, Utah 84014, and designates Cole West Entity Services, LLC, at the same address, as its registered agent. (Utah Division of Corporations, Entity No. 14726162-0161.) Plaintiff therefore names the owner as VP CW Pearl Property, LP, also known as VP CW Pearl, LP, and will serve it through its general partner. To the extent neither The Pearl nor that partnership is the entity that held title to the property during the relevant period, the title-holding owner entity, whose identity is not presently known to Plaintiff, is named as one of the Doe Defendants. The property was developed by CW Urban, a Cole West brand, and the owner entity may operate under or be affiliated with that or a successor name.

**20.** Defendants Greystar Real Estate Partners, LLC; Greystar Management Services, LLC, formerly Greystar Management Services, LP; and GREP Southwest, LLC, doing business as Greystar Property Management (collectively "Greystar") managed the property from the inception of Plaintiff's tenancy until Kairoi assumed management in March 2023. Plaintiff's administrative complaint named the manager as Greystar Management Services, LP, and the UALD Determination identifies that entity as a respondent. (UALD Determination at 2.) Utah's business registry shows that the Greystar entity registered to do business in Utah is GREP Southwest, LLC, a Delaware limited liability company registered in Utah since July 5,

2013, whose members are Greystar Management Services LLC and Greystar Investment Group LLC, and which holds the Utah assumed name "Greystar Property Management." (Utah Division of Corporations, Entity Nos. 8731680-0161, 14153321-0151.) In a 2025 federal enforcement action, the Federal Trade Commission alleged that Greystar Management Services, LLC previously operated as Greystar Management Services, LP. (See paragraph 145.) Plaintiff names each of these entities because the records available to her do not establish which Greystar entity employed the managers who dealt with her, and will dismiss any Greystar entity shown in discovery to have had no role. Greystar is the largest apartment management company in the United States. Greystar charged the fees at issue; assessed and reinstated the late fees that its own managers told the state agency were a "glitch"; issued the December 6, 2022 pay-or-vacate notice and the January 30, 2023 notice to vacate; and initiated the nonrenewal that led to the eviction. Greystar's property manager at The Pearl was Jackson Rutherford, who had worked for Greystar since November 2020 and became The Pearl's manager in November 2022. (Trial Tr. 46:5–18.)

**21.** Defendant Kairoi Management, LLC ("Kairoi"), a Texas limited liability company headquartered in San Antonio, Texas, with registered agent C T Corporation System, assumed management of the property in March 2023 and managed it thereafter, including when Defendants refused Plaintiff's April rent, when the eviction was prosecuted, and when Plaintiff vacated on April 29, 2023 under the stipulated order of restitution. Plaintiff understands the transfer occurred on or about March 7 or 8, 2023, the same day she filed her race discrimination complaint with the Utah Antidiscrimination and Labor Division; Kairoi's manager testified it was "towards the end of March" 2023. (Trial Tr. 169:4–11.) Kairoi continued the course of conduct Greystar began. Kairoi also declined Plaintiff a positive reference and participated in her removal. Kairoi's property manager, Brennan McIff, testified that when Kairoi took over it learned "there was a notice to non-renew," given "[f]or

delinquent payments." (Trial Tr. 170:16–20.) Asked whether "you guys took over and decided to continue to deny my lease renewal," he answered, "Yes, because there was a delinquent payment," meaning the same disputed fees. (Trial Tr. 174:9–12.) He did not call any of Plaintiff's references. (Trial Tr. 174:7–8.) Asked what policy he followed in choosing not to renew the lease of a tenant who was disputing "a small set of fees," he answered, "The lease agreement itself and fair housing," and, asked "What about fair housing?", answered, "That I followed it." (Trial Tr. 176:1–8.) He testified that Kairoi would have extended Plaintiff's tenancy to June 30 "as long as the delinquency was paid in full." (Trial Tr. 176:13–16.) The "lease agreement" he relied on is the lease that was produced in the summary-judgment record only as 14 pages of a 40-page document, together with the unsigned Utility and Services Addendum that created the disputed fees. Kairoi thus continued, after Plaintiff had filed her discrimination complaint, the nonrenewal Greystar had initiated over the same disputed charges, which produced the holdover status on which the unlawful detainer and treble-damages judgment rested. The UALD determination names both Greystar and Kairoi as respondents.

**22.** The Pearl, VP CW Pearl Property, LP, its general partner, any other owner entity, each Greystar entity, and Kairoi acted in concert and as agents or principals of one another with respect to the conduct alleged, and each is liable for the discriminatory and retaliatory course of conduct directed at Plaintiff's tenancy. Their eviction action against Plaintiff was prosecuted throughout by the same counsel, the Law Offices of Kirk A. Cullimore, now operating as Titan Legal.

**23.** Does 1 through 10 are persons or entities whose identities and roles are not presently known to Plaintiff and who participated in the conduct alleged, including any owner entity described in paragraph 19. Plaintiff will amend to name them when identified.

## RELATED PROCEEDINGS AND CITATION CONVENTIONS

**24.** The conduct alleged in this Complaint was the subject of the following prior proceedings, none of which adjudicated the claims asserted here:

a. The Pearl v. Blackwell, Civil No. 230401251, Third Judicial District Court, Salt Lake County, State of Utah (West Jordan Department), the Honorable James D. Gardner. Summary judgment on the eviction claim entered April 2, 2024; findings, conclusions, and judgment on counterclaims entered January 22, 2025. A motion for attorney fees (Docket No. 241) and a motion to forfeit appeal bond (Docket No. 242) remain pending; a hearing is set for January 7, 2027.

b. The Pearl v. Blackwell, No. 20250324-CA, Utah Court of Appeals. Decision entered by order May 5, 2026 (not designated for publication; no precedential effect under Utah R. App. P. 30(e)); rehearing denied June 3, 2026.

c. The Pearl v. Blackwell, No. 20260871-SC, Utah Supreme Court. Petition for certiorari denied August 24, 2026.

d. Blackwell v. Greystar Management Services, LP, et al., Utah Antidiscrimination and Labor Division Case No. 23H0033, dual-filed with the U.S. Department of Housing and Urban Development as HUD No. 08-23-6448-8. Determination issued on or about September 1, 2023; Plaintiff requested de novo review on September 25, 2023 (paragraph 158); UALD entered a closure in HUD's case system on September 1, 2023, the day the Determination issued, and HUD's records show the dual-filed case closed with a no-cause determination on July 18, 2024. (UALD Case History, entry of Sept. 1, 2023; HUD case records.)

Plaintiff never received a closure letter from HUD; UALD directed her to district court.

**25.** Citations in this Complaint use the following conventions. "R." refers to the appellate record in Utah Court of Appeals No. 20250324-CA, by page number. "Trial Tr." refers to the transcript of the December 13, 2024 bench trial in Civil No. 230401251, by page and line. "MSJ Hrg. Tr." refers to the transcript of the March 13, 2024 summary judgment hearing in Civil No. 230401251. "Apr. 25, 2023 Hr'g Tr." refers to the transcript of the April 25, 2023 immediate occupancy hearing in Civil No. 230401251. "Def. Tr. Ex." refers to Plaintiff's trial exhibits (designated as defendant's exhibits in the state proceeding, where Plaintiff was the defendant) admitted at the December 13, 2024 trial; "Pl. Tr. Ex." refers to The Pearl's trial exhibits. "Apr. 2, 2024 Order" refers to the district court's Order on (1) Motions for Summary Judgment and (2) Motion to Continue Trial (R. 346–52). "Findings" refers to the district court's Findings of Fact, Conclusions of Law, and Order entered January 22, 2025 (R. 643–55). "May 12, 2025 Order" refers to the district court's order staying the writ of garnishment pending appeal. "Ct. App. Order" refers to the Utah Court of Appeals' decision entered by order on May 5, 2026, by page and footnote. "Pet. for Reh'g" refers to Plaintiff's petition for rehearing filed May 19, 2026 in No. 20250324-CA. "Pet. for Cert." refers to Plaintiff's petition for writ of certiorari filed July 6, 2026 in the Utah Supreme Court. "Counterclaim" refers to Plaintiff's Answer and Counterclaim filed April 13, 2023 in Civil No. 230401251. "Appellee's Brief" refers to the brief filed by The Pearl in No. 20250324-CA, "Appellant's Opening Br." to Plaintiff's opening brief dated August 20, 2025, and "Appellant's Reply Br." to Plaintiff's reply brief filed October 17, 2025, each by page number. "Opposition" refers to Plaintiff's Opposition to Motion for Attorney Fees and Motion to Forfeit Bond, filed July 8, 2026 in Civil No. 230401251. "Reply" refers to The Pearl's Reply Memorandum in Support of Motion for Attorney Fees and Motion to Forfeit Bond, dated and served August 27,

2026 in Civil No. 230401251. "UALD Determination" or "Determination" refers to the written determination in UALD Case No. 23H0033, by page number.

**26.** Every document cited in this Complaint is part of the record of the proceedings identified in paragraph 24, all of which are public and identified by case number, or is correspondence in UALD Case No. 23H0033. Plaintiff possesses copies of each and will produce any of them in discovery or upon the Court's request.

## FACTUAL ALLEGATIONS

### A. Plaintiff's tenancy and perfect payment record

**27.** Plaintiff and her minor son began renting an apartment at The Pearl in or about March 2022. Plaintiff is a single mother; her son has special needs.

**28.** Plaintiff's disclosed monthly obligation was $2,690, consisting of $2,550 in rent and $140 in disclosed fees.

**29.** Plaintiff paid the full disclosed amount, on time, every month of her tenancy through March 2023, and tendered April 2023 rent, which Defendants refused. She never missed a rent payment.

**30.** The Utah Antidiscrimination and Labor Division ("UALD") recorded in its Determination Plaintiff's account that she is "an ideal tenant in good standing that has always paid her rent on time." (UALD Determination, Case No. 23H0033, at 2.)

**31.** Plaintiff was the only Black tenant in her building. The Utah Antidiscrimination and Labor Division accepted this in its determination, noting that Plaintiff "was the only Black tenant residing at Respondent Pearl Property, and thus all other tenants were not of Complainant's race," and Defendants did not dispute it. (UALD Determination, Case No. 23H0033, at 17.) The building was approximately half vacant, with roughly twenty vacant units.

**32.** Defendants were aware that Plaintiff is Black.

**B. Defendants charged undisclosed fees and repeatedly acknowledged they were erroneous**

**33.** Beginning in or about July 2022, Defendants charged Plaintiff fees that had not been disclosed at the outset of the tenancy. No such fees had been charged in March, April, May, or June 2022.

**34.** Plaintiff objected. Defendants' accounting personnel removed the fees. This pattern repeated.

**35.** Community manager Stephanie Page told UALD that "in July, August, September, and October 2022, she removed Complainant's late fees and explained to Complainant that Respondent charged her a late fee because of a 'glitch' in the system." Page also told UALD that she had not told Plaintiff she would remove the increased utility charges. Regional manager Perry told UALD that Defendants' policy was to charge a late fee only once a past-due balance reached a threshold, that Plaintiff's balance in those months did not require a late fee, and that "the 'system' charging a late fee was a 'glitch.'" (UALD Determination at 7.) By their own managers' account, Defendants repeatedly assessed late fees of $255 against Plaintiff that their own policy did not require, removed them when she objected, and then reinstated them.

**36.** Stephanie Page, the community manager who signed Plaintiff's lease, wrote to Plaintiff in September 2022: "This has been fixed, it was a setting issue. I apologize for the inconvenience." (Def. Tr. Ex. F; R. 605.)

**37.** Defendants submitted their other tenants' ledgers to UALD. Those ledgers "show that other tenants also received late fees including some tenants with a $0 balance, and Respondents reversed those tenants' late fees also." (UALD Determination at 7.)

**38.** Rutherford told UALD that he placed pay-or-vacate notices on "three to four other tenants' doors in December 2022, and in total placed ten to twelve notices to pay or vacate on tenants' doors during his time managing" the property, and that "he does not remember the race of those tenants." (UALD Determination at 8.) Other tenants therefore carried past-due balances and received notices. Rutherford also stated that he "did not non-renew any other tenant's lease" during his tenure. (UALD Determination at 9.) Plaintiff was the only tenant whose lease was not renewed.

**39.** The determination elsewhere states that Plaintiff "was the only tenant of Respondent Pearl Property to maintain a past due balance." (UALD Determination at 13.) That statement cannot be reconciled with Rutherford's own account that he placed ten to twelve pay-or-vacate notices on tenants' doors during his time managing the property. (Id. at 8.) Nor does it account for Plaintiff's ledger as UALD itself recorded it: on November 29, 2022, after Defendants' regional manager issued a $500 credit, Plaintiff's account showed a credit of $173.57, and Plaintiff then paid $2,190 toward December, which together with the $500 credit equaled her full $2,690 monthly obligation. (Id. at 7; Trial Tr. 120:5–121:4.) Whatever balance Defendants' ledger carried after that consisted of charges other than her base rent, including late fees of the kind Defendants' own managers had been removing as a "glitch." (UALD Determination at 7.)

**40.** Defendants' property manager Jackson Rutherford testified at trial: "I've talked to a lot of residents that have had those issues." (Trial Tr. 111:5-6.)

**41.** In November 2022, Defendants' regional manager issued Plaintiff a $500 credit, leaving her ledger at a credit balance of $173.57. As of November 29, 2022, Defendants owed Plaintiff money on their own books. (R. 239; UALD Determination at 7.)

**42.** On December 6, 2022, one week after Defendants' own ledger showed Plaintiff in credit, Rutherford issued a three-day notice stating that she owed $326.43 "for rent for the

period ending December 2022" and $255 in late fees. (UALD Determination at 7; R. 95 ¶ 34; R. 532 ¶ 20.) Plaintiff had paid $2,190 toward December, which together with the $500 credit equaled her full disclosed $2,690 monthly obligation. (UALD Determination at 7; Trial Tr. 120:5–121:4.) By Defendants' own later account, when a balance went unpaid in December 2022, Defendants "chose to not file for eviction." (R. 532 ¶¶ 25–26, as quoted in Pet. for Cert. 4, 18, The Pearl v. Blackwell, No. 20260871-SC (Utah).) In their answers to the state agency's request for information, declared true under criminal penalty, Defendants likewise stated that after the December notice expired they "could have proceeded with filing an unlawful detainer action for non-payment, yet they opted rather to simply non-renew" Plaintiff's lease. (Respondents' Responses to UALD Request for Information, Response No. 9, Apr. 4, 2023.) No discrimination complaint existed at that time.

**43.** Plaintiff never received that December 6, 2022 notice. Rutherford testified at trial that he "affixed it to her door, after knocking, with tape." (Trial Tr. 115:7–8.) Plaintiff objected on the record: "I never received it. I'd like to see proof that this was affixed to my door, because I never received this notice and my first time seeing this document." (Trial Tr. 116:11–14.) Defendants' counsel told the court the notice was "not one of the (Unintelligible) exhibits" and that he "wasn't planning on introducing it," though it "had been previously disclosed to her," and moved it into evidence "based on her asking about it." (Trial Tr. 115:13–21.) The court received it over Plaintiff's objection. (Trial Tr. 116:21–117:1.) Defendants offered no proof of posting beyond Rutherford's word. Plaintiff also pointed out on the record that the notice was issued in "the same month I received that $500 credit," and asked why, if she owed the amount claimed, the credit had not been applied to it. (Trial Tr. 116:15–20.) The December 6 notice, which UALD later treated as evidence that Plaintiff "maintain[ed] a past due balance," was thus a document Plaintiff never saw, issued one week after Defendants' own books showed her in credit, and introduced at trial only after Plaintiff questioned its existence.

**44.** The reversal was abrupt. On November 29, 2022, Plaintiff's account stood at a $173.57 credit; Defendants owed her. By January 2023, Defendants were asserting that she owed approximately $800 in addition to her rent, built from charges other than her rent, including late fees of the kind their managers had called a "glitch" and removed month after month. Plaintiff discovered this on January 28, 2023, when she logged into the online portal to pay her February rent and found she was "being charged $800.00 in addition to her rent." (UALD Determination at 2 (recording Plaintiff's account).) A tenant who was owed money at the end of November was, within weeks and without any change in her payment of rent, presented with an $800 balance.

**45.** This reversal occurred during the same days in which Plaintiff was seeking maintenance she was not promptly receiving. On January 3, 2023, Plaintiff submitted a work order reporting that her furnace was shutting off after heating; Defendants did not complete the repair until January 10. (UALD Determination at 8.) On January 4, 2023, Plaintiff requested snow removal. (Id.) In the same window, on January 4, 2023, Defendants added a $255 late fee that brought Plaintiff's asserted balance to $854.42. (Id.) When Plaintiff logged into the portal on January 28, 2023 to pay her February rent, she found roughly $800 in reinstated fees rather than any resolution of the conditions she had reported. When she questioned the fees, she received a notice to vacate rather than a conversation. Plaintiff does not plead the maintenance delays as independent discrimination claims. She pleads them as context: in the same days Defendants reinstated fees their own manager had called a "glitch," Plaintiff's furnace was malfunctioning in winter and her account was being loaded with late charges, and Defendants' response to her objection was a notice on her door.

**C. The comparator: a White tenant who questioned the same fees kept his home**

**46.** Adam Shelton, a White tenant of the same property, disputed the same category of fees.

**47.** Mr. Shelton met with Defendants' manager to discuss the fees, received no notice to vacate, and kept his home under a renewed lease. (Appellee's Brief at 32 (citing R. 1021–22); Findings ¶ 32 n.9.) Defendants' witness testified that Mr. Shelton did not receive a notice to vacate because "[h]e didn't have an outstanding balance." (Trial Tr. 113:6–12.)

**48.** Defendants have admitted the comparison. In their appellate brief they stated that "Mr. Shelton came down to the office and had a conversation with The Pearl's witness about whether he owed the same fees that Ms. Blackwell had disputed," and that "after such discussion, Mr. Shelton paid those fees." (Appellee's Brief at 32; R. 1021-22.) Defendants' own account thus establishes that a White tenant who disputed the identical fees was given a conversation, and that his payment followed that conversation. Plaintiff was given no conversation. She was given a notice on her door two days after she raised the same dispute. Defendants' asserted distinction, that he paid and she did not, arises only after the point at which the two tenants had already been treated differently.

**49.** Plaintiff, who disputed the same fees, received a notice to vacate on her door two days after she raised her objection, with no meeting, no telephone call, and no discussion.

**50.** Rutherford testified at trial that he had processed "[m]any" eviction notices, and answered "No" when asked whether "anyone that you (Unintelligible) in the past been kicked out for asking questions." (Trial Tr. 68:6–12.)

**51.** Rutherford was asked: "is it typically ethical to put a notice to vacate on someone's door if they inquire about fees on their rent, and not even have a conversation with them about it, Jackson? Would you consider that ethical? Yes or no." He answered: "I would not consider that action ethical." (Trial Tr. 66:19–24.) That is what was done to Plaintiff: Rutherford testified that he "responded to -- your email and then posted a notice," without a conversation. (Trial Tr. 68:16–23.) The trial court credited Rutherford's testimony that he posted the notice after Plaintiff sent an email he understood to mean she would not pay the disputed fees and

which alleged fraud. (Findings ¶ 40.) Rutherford also testified that he had talked to "a lot of residents that have had those issues" (Trial Tr. 111:5–6), meaning other tenants raised the same kind of fee questions and were not evicted for them. Plaintiff, the only Black tenant, was.

**52.** Plaintiff stated the disparity on the trial record: "he was able to go and ask questions on the fees and was not kicked out, as a young, white male. I am a middle-aged Black woman and was kicked out for asking." (Trial Tr. 164:14–17.)

**D. The fees were unsupported and Defendants abandoned them**

**53.** The two categories of disputed charges were each unsupported, in two different ways, established by two different sources. As to the late fees, Defendants' own managers told the state agency that the late fees were a "glitch" that Defendants' own policy did not require. As to pest control, Defendants' own witness had no documentation at trial that the service was performed, could not say it had been provided to anyone's apartment, and agreed it is not normal to charge tenants for services that were not rendered.

**54.** As to the late fees, the Utah Antidiscrimination and Labor Division recorded the statement of Defendants' regional manager that "Complainant had a past due balance, but the amount past due did not require the charging of a late fee in July, August, September, or October 2022; thus, the 'system' charging a late fee was a 'glitch.'" (UALD Determination at 7.) Defendants' community manager told UALD she removed the late fees each month and attributed them to a "glitch." (Id.) Defendants' own tenant ledgers "show that other tenants also received late fees including some tenants with a $0 balance, and Respondents reversed those tenants' late fees also." (Id.) After Defendants issued Plaintiff a $500 credit in November 2022, her ledger showed a credit balance of $173.57. (Id.)

**55.** As to pest control, Rutherford had no documentation to offer. Asked for "documentation of any pest control services provided," he answered, "I do not have any on me currently." (Trial Tr. 80:10–12.) Asked whether he could prove that the pest control company

"came out to anyone's apartment" during Plaintiff's tenancy, he answered, "I would not, right now." (Trial Tr. 81:6–10.) Rutherford maintained that pest control was applied monthly to "the entirety of the property" and the exterior of units, and that the vendor "kept a log" (Trial Tr. 83:12–17; 100:5–12), but no such log or other record of service was offered at trial.

**56.** He could not say that pest control had been provided to Plaintiff's apartment: asked how many times the company had entered it, he answered, "I -- I'm unsure." (Trial Tr. 81:1–5.)

**57.** He agreed that it is not "normal to charge tenants for services where there's no services rendered," and that he would not pay for a service where none was rendered. (Trial Tr. 81:14–19.)

**58.** Defendants abandoned the fees in the state-court litigation. At the March 13, 2024 summary-judgment hearing, Defendants' counsel told the court that Defendants "would forego pursuing the other amounts previously owed that we originally sought," and confirmed that they did not intend to seek additional amounts related to the fees. (MSJ Hrg. Tr. 8:18–9:2; 9:19–23.) The Pearl later represented that it "is no longer seeking judgment for the contested past due amounts of $883.59 as sought in its Complaint." (Findings ¶ 12 n.2 (quoting The Pearl's Rule 54 Motion at 3).)

**E. The fee addendum was unsigned, and the lease copy was incomplete**

**59.** The lease copy Defendants filed with their eviction complaint was a partial, unauthenticated scan: 14 pages of what a RENTCafe eSignature page represented to be a 40-page signed document, produced as a scan of a paper printout rather than the native digital file. (R. 6-19.)

**60.** Defendants' verified complaint did not identify those 14 pages as the rental agreement; it stated only that "This action is based on a residential rental agreement." (R. 5 ¶ 4.)

**61.** The "Utility and Services Addendum" is unsigned. (R. 15.) That addendum is not a peripheral document. It is the sole instrument that purports to create the fees and surcharges Plaintiff disputed, and those fees are what Defendants told the state agency were the reason for the eviction. On April 3, 2023, Defendants' counsel represented to the state civil rights agency that the notice to vacate was served "because of unpaid utilities billed pursuant to the lease agreement between the parties." (R. 621 (as cited in Pet. for Reh'g 4); UALD's copy is the one-page position statement dated Apr. 3, 2023.) The next day, in answers to the agency's request for information that counsel declared true "under criminal penalty of the State of Utah," Defendants attributed the December 2022 notice to Plaintiff's "failure to pay her account in full" and stated that "management did not waive the actual utility charges." (Respondents' Responses to UALD Request for Information, Response No. 9, Apr. 4, 2023.) The unsigned addendum is the only source of any obligation to pay those utility charges. If it is unsigned and unauthenticated, there was no proven agreement to pay the charges, and therefore no proven basis for the reason Defendants gave for the eviction.

**62.** At trial, Defendants did not substantiate the charges the addendum purported to authorize. Their witness had no documentation at trial that the billed pest control services were performed, could not say they had been provided to Plaintiff's unit, and agreed it is not normal to charge tenants for services not rendered. (Trial Tr. 80:10–81:19.) Asked for proof of Plaintiff's usage supporting the "trash rebill" charged on top of the $25 door-to-door trash fee, he answered, "I do not have proof on me right now; no." (Trial Tr. 72:3–73:4.) On redirect, he testified that the pest control vendor "kept a log" and came monthly. (Trial Tr. 100:5–12.) No log was offered at trial. Defendants' own managers separately told the state agency the late fees were a "glitch." (UALD Determination at 7.) The reason Defendants gave for the eviction, unpaid charges owed under the lease, thus rested on an unsigned addendum and on charges their own witness could not document.

**63.** Plaintiff disputed the addendum in writing at the time. On January 30, 2023, the day the notice to vacate was posted, she wrote to Defendants: "I never signed the utility addendum and it was received -- it was received if not at least a month after I moved in. It was two to three months after. I did not sign it, so if someone else did, it's forgery. If you guys are saying I signed one, I know 100 percent I did not." (Pl. Tr. Ex. H (Jan. 30, 2023 email), read into the record at Trial Tr. 107:7–13.) At trial she testified that she did not remember the addendum being part of the lease she received. (Findings ¶ 25.) Plaintiff's position that she never signed the fee addendum was therefore stated to Defendants contemporaneously, before any litigation, and no witness with personal knowledge of the signing testified otherwise.

**64.** Defendants produced no witness with personal knowledge of the lease's formation. The affiant was not employed when the lease was signed. (R. 314-16.) Defendants did not call Stephanie Page, the community manager who signed the lease, who was their only percipient witness on formation. (R. 236; R. 640-55.)

**65.** Defendants' own account records did not agree with one another. The figures for Plaintiff's account in Defendants' summary-judgment motion did not match Defendants' ledger or the welcome letter, and Defendants' ledger did not match the ledger Plaintiff downloaded from Defendants' resident portal. (Trial Tr. 85:15–17; 86:2–15; Def. Tr. Ex. D (Dkt. 155 at 45).) The trial court recognized that Plaintiff "correctly noted that some of the numbers related to the disputed fees in The Pearl's original summary judgment motion did not match the numbers listed in The Pearl's ledger (which was received as Plaintiff's exhibit B) or the welcome letter," and that Rutherford then testified "it appear[ed] that something was left off, ultimately," although the court found she had not established that The Pearl listed the wrong fees intentionally. (Findings ¶ 29 n.7.) Asked to explain the differences, Defendants' manager answered, "I'm not sure what numbers you're referring to," "I'm not sure," and "I'm not sure. I was not involved in this." (Trial Tr. 135:17–18; 142:19–21; 143:19–23.) A landlord that cannot

produce a consistent account of what a tenant owes, and whose own witness cannot explain the inconsistencies, has not established that the tenant owed the disputed charges.

**66.** On information and belief, the charges Defendants assessed against Plaintiff included fees for amenities that did not exist or had not been provided. Plaintiff was billed for a fitness facility that was never built during her tenancy, and for a smart-home technology package that was not installed in her unit until several months into her tenancy. A tenant cannot lawfully be charged for the use of amenities that do not yet exist. These charges, like the pest control, trash, and miscellaneous fees described above, were part of the body of charges Defendants did not document and later abandoned. Plaintiff will establish the specifics of these charges through the ledgers, fee schedules, and account records in discovery.

**67.** Defendants charged Plaintiff a monthly pest control fee that, as their counsel's question put it and their witness confirmed, "isn't necessarily pest control for Ms. Blackwell's specific unit, but pest control for the property as a whole." (Trial Tr. 99:23–100:4.) Defendants also charged Plaintiff for two separate trash services, a dumpster service and a $25-per-month door-to-door pickup, which Plaintiff contends duplicated each other. (Trial Tr. 99:5–22.) Defendants also assessed miscellaneous fees against Plaintiff's account, and the fees charged varied from month to month with no consistent basis tied to any service actually provided to her unit. A charge that changes in amount and composition from one month to the next, that bills a tenant for services performed elsewhere on the property, and that a landlord's own witness cannot document, is not a charge the landlord has shown the tenant owed.

**68.** The lease was submitted as a scan of selected pages rather than as the complete electronic record. Defendants' own electronic-signature pages, attached to their complaint, describe the signed document as forty pages long, and Defendants filed fourteen pages, those signature pages among them. (R. 6–19.) Possession was decided on summary judgment on that fourteen-page exhibit; a longer version of the lease first appeared at trial, as Defendants'

Exhibit A, after possession had been decided. (Pl. Tr. Ex. A, reproduced in the addendum to Appellant's Opening Br.) No witness with personal knowledge testified to what the forty-page document contained when it was presented for signature. (R. 314–15.) Among the pages missing from the summary-judgment record are (a) a "Valet Waste Resident Lease Addendum" stating that "[t]he cost for trash collection is $ 25.00 per month in addition to your monthly rent," whose resident signature lines are blank, and (b) a seven-page "Community Policies/Master Lease Addendum" whose closing fee summary lists a single monthly charge, a "Pest Control Monthly Fee $ 2.00," above blank resident signature lines. (See Trial Tr. 72:15–19 (Defendants' manager referring at trial to "[t]he door-to-door pickup trash addendum" that "disclosed the $25"); the same pages appear at pp. 19–25 and 39 of the packet Defendants produced to UALD in April 2023.) The Utility and Services Addendum that Defendants did file separately provides that trash bills "will be billed by the service provider to us and then allocated to you based on the following formula: 10." (R. 13.) Plaintiff's ledger accordingly shows two trash charges each month from mid-2022, a flat $25.00 "Trash Rebill" and a separately allocated "Trash Rebill" for prior periods, under two instruments, only one of which was before the court when it awarded Defendants possession. (Respondents' Tenant Ledger produced to UALD.) The ledger also shows a $40.00 "Miscellaneous Income" charge every month from June 2022 through February 2023, nine charges totaling $360, that no page of the forty-page packet states and that the welcome letter does not separately identify. (Id.; Pl. Tr. Ex. K.) The lease Defendants filed provides that it "is the entire agreement between you and us" and that "[a]ny modifications to the Lease must be in writing and signed by all parties." (R. 12.) The Utility and Services Addendum provides that a resident may "begin receiving a bill for additional utilities and services" only "upon thirty (30) days prior written notice from Owner to you." (R. 15.) Plaintiff received no written notice identifying a $40 monthly charge or any service it paid for, and signed no writing adding one.

**69.** Plaintiff's payment never changed; Defendants changed what they called it. Plaintiff paid $2,690 every month. (UALD Determination at 6.) Through May 2022, Defendants' ledger recorded that payment as $2,550 in base rent and a $140.00 "Cable Rebill," although the Utility and Services Addendum sets internet at $130 per month. (Respondents' Tenant Ledger produced to UALD; UALD Determination at 5.) In June 2022, the ledger divided the same $140 into a $75.00 "Cable Rebill," a $25.00 "Trash Rebill," and $40.00 of "Miscellaneous Income," so that the new trash and miscellaneous charges were paid out of money Plaintiff was already paying. (Respondents' Tenant Ledger.) Beginning in July 2022, Defendants added further allocated charges on top, leaving Plaintiff between $8.74 and $27.07 short of each month's total. (UALD Determination at 6–8, 10.) The welcome letter Plaintiff received before moving in, which Defendants' counsel described at trial as outlining "all of the charges that you'll be charged moving forward," showed rent of $2,550 and "$140 fees," a total of $2,690, without separating those fees. (Trial Tr. 25:5–12; Pl. Tr. Ex. K.)

**70.** By Defendants' own figures as UALD recorded them, the "past due balance" on which Defendants based the non-renewal consisted almost entirely of late fees. Apart from late fees, the disputed charges Defendants claimed from Plaintiff when they posted the notice to vacate on January 30, 2023 came to $89.42, and on February 1, 2023 to $98.16: less than $100, accumulated over eight months in which she paid $2,690 every month. Her total balance on February 1, 2023 was $863.16. (UALD Determination at 8, 10.) Of that, $765 was three $255 late fees charged in November 2022, December 2022, and January 2023, and $98.16 was the total by which eight months of charges, July 2022 through February 2023, exceeded the $2,690 Plaintiff paid each month. (Id. at 6–8, 10.) Defendants' regional manager told UALD that Defendants' policy was to charge a late fee only once a tenant's past-due balance reached a threshold, and that Plaintiff's balances from July through October 2022, which ranged from $27.07 to $62.33, "did not require the charging of a late fee." (Id. at 6–7.) The November late

fee was then charged on a balance of $71.43 and was not reversed. (Id. at 6.) The manager could not recall what the threshold was, and UALD never determined it. (Id. at 7.) The same manager also told UALD that the charges were for utilities that Plaintiff was responsible for paying (id.), and Defendants' manager said he understood Plaintiff's January 30, 2023 email to mean she would not pay amounts above $2,690 (id. at 9). UALD nonetheless accepted the "past due balance" as Defendants' reason without separating the late fees from the charges. (Id. at 12–13.) Each of those monthly overages, between $8.74 and $27.07, was smaller than the $40.00 "Miscellaneous Income" charge that no lease document states. Without that $40 charge, Plaintiff's $2,690 payment would have covered every remaining charge in every month, and there would have been no past-due balance on which to assess a late fee. (Respondents' Tenant Ledger; UALD Determination at 6–10.)

**71.** Plaintiff has been held to the terms of an unsigned fee addendum and an unauthenticated partial lease copy. The Utility and Services Addendum that created the charges Defendants cited as the reason for ending her tenancy has blank signature lines (R. 15), and the lease itself was produced in the summary-judgment record only as a partial 14-of-40-page scan that no witness with personal knowledge ever authenticated (R. 6–19; R. 314–15). A tenant lost her home, and was then made to pay three times a month's rent for the holdover that followed, after being served a notice to vacate over charges the landlord told the state agency justified the eviction but for which its own witness had no documentation at trial.

**F. The retaliation sequence**

**72.** On January 28, 2023, Plaintiff emailed Rutherford disputing the fees on her account. (Def. Tr. Ex. A.)

**73.** On January 30, 2023, two days later, Defendants posted a three-day notice to vacate on Plaintiff's door for nonpayment of the disputed fees. (Def. Tr. Ex. C; R. 20.)

**74.** Defendants have since characterized that notice differently. In their appellate brief they stated that "[e]ven though The Pearl was entitled to charge these amounts, and could have proceeded with eviction for nonpayment under Utah Code 78B-6-802(1)(c), they elected not to do so and waived the fees as a one-time courtesy to Ms. Blackwell," and that The Pearl later "elected to serve Ms. Blackwell with a notice to vacate on 1/30/2023 that required her to vacate no later than 3/31/2023 pursuant to Utah Code 78B-6-802(1)(b)(i)." (Appellee's Brief at 13.) Section 78B-6-802(1)(b)(i) is the provision for terminating a periodic tenancy by notice; it does not require any default. By Defendants' own account, therefore, they chose not to pursue eviction for nonpayment, and instead exercised a discretionary decision to end Plaintiff's tenancy. The only question is why they exercised that discretion on January 30, 2023, two days after Plaintiff disputed the fees in writing, and not before.

**75.** Plaintiff immediately offered to pay any legitimately owed rent. Defendants refused. Plaintiff responded that she would file a discrimination complaint. (R. 20; R. 182; R. 241-56.) Defendants' reply directed her to their lawyers regarding "the case you plan on bringing." (R. 183.)

**76.** In the weeks that followed, Plaintiff sought a rental reference from Defendants in order to secure new housing. Defendants did not provide one. On April 4, 2023, Defendants offered to "provide a positive reference" as one of the terms of a proposal expressly conditioned on Plaintiff dismissing her discrimination complaint. (Def. Tr. Ex. G; R. 602-03.) Defendants thus treated a rental reference as a benefit to be exchanged for withdrawal of a civil rights complaint.

**77.** On March 8, 2023, Plaintiff filed a race-discrimination complaint with UALD, Case No. 23H0033. (R. 233-57.) UALD is a HUD Fair Housing Assistance Program agency, and the complaint was dual-filed with HUD.

**78.** In March 2023, Plaintiff wrote to Defendants requesting to remain through June 30, 2023, stating "I will continue to pay the $2690 in rent," and asked for a response by March 28. Defendants did not respond. (Def. Tr. Ex. G.)

**79.** On March 31, 2023, having received no response, Plaintiff emailed Defendants' agent Brennan McIff: "Since I haven't heard back regarding my tenancy, and still do not have a guarantee of a positive reference, I am assuming it is ok to pay the rent today for the month of April for $2690." Plaintiff states that Defendants did not respond to that email until April 4, 2023, when they sent a settlement offer, and that Defendants declined to accept her April rent. (UALD Determination at 3, 10 (recording Plaintiff's account); R. 603; R. 242.) McIff gave a different account at trial: he testified that he met with Plaintiff in the office about the balance and told her Defendants would extend her stay "as long as the delinquency was paid in full." (Trial Tr. 174:16–19; 175:19–20; 176:13–22.) Plaintiff disputed that account at trial. (Trial Tr. 175:21; 178:2–6.) That email is contemporaneous documentary evidence of Defendants' conduct, written by Plaintiff in real time and before any litigation. In her own words, it records that Defendants had left her without an answer on whether she could keep her home and without the reference she needed to obtain another, and that she was attempting to pay her rent anyway. Plaintiff did not withhold her rent. Defendants withheld the responses that would have let her either stay or leave, and then refused the rent she tried to pay.

**80.** Defendants refused the tender. (MSJ Hrg. Tr. 38:3–20.)

**81.** On April 3, 2023, Defendants' counsel told UALD that the notice to vacate was served "because of unpaid utilities billed pursuant to the lease agreement." (R. 621.)

**82.** On April 4, 2023, one day later, Defendants' counsel, Trevor Adkins, communicated a settlement proposal to Plaintiff's then-acting attorney, who relayed it to Plaintiff in writing the same day. The written communication states, in relevant part: "Trevor called me in a last attempt to resolve the matter. They have the paperwork drafted and will file

the eviction tomorrow after 4:00 p.m. Here's the latest offer: 1. Dismiss all fees and costs to date - although they said there may be more in April and May and June ie they claim there are about $24 per month in addition to the rent and regular fees. He claims these fees are assessed to all tenants. 2. They would allow you to stay through June with you paying regular rent, fees and those noted in #1. 3. They will not file an eviction, which will harm your rental history. They will give you a positive reference. 4. You will move out by June 30, 2023. This in return for you dismissing your Discrimination Claim." (Def. Tr. Ex. G (Dkt. 155 at 37) (email from Kristine J. Maxwell, Esq. to Plaintiff, Apr. 4, 2023); R. 602–03; R. 640–41; R. 243.) The same exhibit, at page 36, contains Plaintiff's March 15, 2023 email asking to stay through June 30, 2023 so that her son could finish the school year, and, at page 37, her March 31, 2023 email to McIff attempting to pay April rent.

**83.** Defendants' own offer thus contains three admissions: that the fees at issue were "assessed to all tenants," confirming Plaintiff was not uniquely delinquent; that Defendants understood an eviction "would harm [Plaintiff's] rental history," confirming knowledge of the consequence they then inflicted; and that every benefit offered, including continued housing, was expressly conditioned on dismissal of the discrimination complaint.

**84.** Plaintiff promptly reported the April 4 offer to the state agency, which recorded her account that Defendants offered to "drop everything" if she agreed to withdraw her discrimination complaint. (UALD Determination at 3.)

**85.** The April 4 offer was not a return to the status quo. By the time it arrived, Plaintiff had already incurred substantial attorney's fees defending against the eviction Defendants had manufactured by refusing her rent. The offer did not restore what Plaintiff had lost; it asked her to absorb those costs, vacate by June 30, and additionally surrender her discrimination complaint, all in exchange for keeping housing she was already entitled to keep and had

attempted to pay for. The "waiver" of fees Defendants themselves had created, conditioned on dismissal of a civil-rights complaint, was not a concession but a further demand.

**86.** Plaintiff declined to trade her civil-rights complaint for her housing.

**87.** On April 10, 2023, ten days after Plaintiff attempted to pay April rent, Defendants sued Plaintiff for unlawful detainer, citing "unpaid rent," meaning the rent Plaintiff had tendered and Defendants had refused, and seeking treble damages on it. (R. 1-2.)

**88.** Defendants' counsel later explained on the record why the tender was refused: "that offer to pay was when the case was still pending, Your Honor, and we didn't want to take a settlement agreement for a payment that would have voided our (Unintelligible), essentially. My client was interested in seeing a vacate date and being able to obtain that portion of the relief under the unlawful detainer act . . . ." (MSJ Hrg. Tr. 38:9–15.)

**89.** Rutherford confirmed he would have been willing not to proceed with the eviction had Plaintiff paid the outstanding balance. (R. 652 ¶ 40.)

**G. The default was manufactured, and the sequence was deliberate**

**90.** In January 2023, before Plaintiff raised discrimination, Defendants were willing to work with her. Rutherford wrote that he was "willing to forgo eviction proceedings and allow you to pay your outstanding charges for previous months over the next month," and offered to waive January's late fee. (UALD Determination at 9.) That willingness ended on January 30, 2023, two days after Plaintiff disputed the fees in writing; the same day, she stated that she would file a discrimination complaint. (R. 20; R. 182; R. 183.)

**91.** On March 15, 2023, Plaintiff wrote to Defendants requesting to remain through June 30, 2023 so that her son, who has a diagnosed disability, could finish the school year. Defendants replied that "the non-renewal is still in standing and we are still going to proceed with the non-renewal and for a move out date of 3/31/23." (UALD Determination at 10.) The request to stay through June was refused.

**92.** On March 31, 2023, the last day before April rent came due, Plaintiff emailed Defendants' agent McIff and then went in person to their office to pay April rent of $2,690. UALD recorded Plaintiff's account that Defendants "did not respond to her email until April 4, 2023, when it sent her a settlement offer," and that Defendants "declined to accept her April 2023 rent payment." (UALD Determination at 10, 3.)

**93.** Defendants' silence was itself a component of the trap. Plaintiff sought a definite answer about her tenancy, whether she could remain, on what terms, and whether she would receive the rental reference she needed to secure another home, in time to arrange an orderly departure if the answer was no. Defendants did not respond to her March 15 request by the date she asked, did not respond to her March 31 payment attempt, and did not engage when she came to the office in person. Defendants' first response came on April 4, 2023, and it was not an answer but a demand: they would let her stay and give her a reference only if she dismissed her discrimination complaint. By withholding any response until April 4, Defendants deprived Plaintiff of the ability to leave on her own terms before the holdover period accrued, while the treble-damages clock ran against her. A tenant cannot arrange to vacate, or to rent elsewhere, when her landlord will neither accept her rent, nor tell her whether she may stay, nor provide the reference a new landlord will require. Defendants' refusal to respond was not neglect; it kept Plaintiff in a holdover posture she could not escape, so that the eviction and the treble judgment could proceed.

**94.** Defendants allowed April 1, 2023 to pass without accepting the tendered rent, so that a nonpayment default and holdover would exist on paper. Defendants' counsel later explained that Defendants "didn't want to take a settlement agreement for a payment that would have voided our (Unintelligible)," that "[m]y client was interested in seeing a vacate date and being able to obtain that portion of the relief under the unlawful detainer act," and that taking an April payment without a settlement in place "would have voided (Unintelligible)

and we would have essentially had to start all over." (MSJ Hrg. Tr. 38:9–20.) Defendants' own property manager testified they would have been willing not to proceed with the eviction had Plaintiff paid the outstanding balance. (Findings ¶ 40 (R. 652).)

**95.** Defendants have acknowledged that payment would have preserved the tenancy. Their appellate brief states that The Pearl's witness "even testified that Ms. Blackwell could have remained under a new lease agreement if she had just paid the balance owing." (Appellee's Brief at 32 (citing R. 1012); see Trial Tr. 103:10–13 (Rutherford, answering "Correct" when asked whether he would "have been willing to not proceed with an eviction against Ms. Blackwell if she had paid the outstanding balance").) Plaintiff attempted to pay. Defendants refused the payment, and their counsel explained that the refusal was deliberate. Defendants' position is therefore that Plaintiff could have kept her home by paying, and that they would not let her pay.

**96.** On April 3, 2023, Defendants' counsel, Kirk A. Cullimore, submitted a position statement to UALD asserting the eviction was for "unpaid utilities billed pursuant to the lease agreement." (R. 621.) On April 4, 2023, Defendants offered to let Plaintiff remain through June 30, 2023, the precise relief they had refused on March 15, together with waiver of all fees and a positive reference, on the sole condition that she dismiss her discrimination complaint. (Def. Tr. Ex. G; R. 602-03.) The offer stated that Defendants "have the paperwork drafted and will file the eviction tomorrow after 4:00 p.m."

**97.** The sequence establishes that Defendants: (i) refused Plaintiff's request to stay when she had no default; (ii) refused her rent so that a default would form; (iii) waited until the default existed; and (iv) then offered her the same stay they had refused, now priced at her civil rights complaint. What Defendants were selling on April 4 was the default they had created on March 31 and April 1. The only consideration they sought was withdrawal of the

complaint. Plaintiff declined, and on April 10, 2023, Defendants sued her for the rent they had refused to accept, and later recovered three times it.

**98.** The treble-damages judgment did not arise from any ordinary nonpayment. It was the product of a sequence Defendants controlled at every step, and it is worth setting out how the number came to be.

**99.** Under Utah's unlawful detainer statute, Utah Code Ann. § 78B-6-811, a holdover tenant is liable for damages, and the court may treble them. Those damages accrue for each day the tenant remains in possession after the notice period expires. The practical effect is a meter: once a notice to vacate is in place and the tenant has not left, every additional day in the unit multiplies the eventual exposure by three.

**100.** Defendants set that meter running, and then made sure Plaintiff could not stop it. First, they refused to accept Plaintiff's tendered April rent. Plaintiff tried to pay, by email on March 31, 2023 and in person, and Defendants did not respond to her payment attempt until April 4, 2023, and then only with a settlement offer rather than acceptance of the rent. Their counsel later admitted the refusal was deliberate, to preserve the unlawful detainer claim: accepting the payment "would have voided" it. A tenant who tenders rent and is refused cannot cure the default; the meter keeps running because the landlord will not let her stop it.

**101.** Second, Defendants held Plaintiff's ability to secure her next home hostage. In the ordinary course, a prospective landlord contacts the applicant's current landlord for a reference before renting to her. Plaintiff needed a positive reference from Defendants to obtain replacement housing. Defendants offered a positive reference only as one term of the April 4, 2023 proposal, expressly conditioned on Plaintiff dismissing her race discrimination complaint. Defendants thus placed Plaintiff in an impossible position: they were removing her from her home while withholding, as a bargaining chip for her civil rights complaint, the one thing she needed to find another. She could not stay, because they were evicting her, and she

could not easily leave for a new rental, because the reference a new landlord would seek was being conditioned on her silence.

**102.** Third, Defendants' requests for more time in the parallel administrative process compounded the trap. Plaintiff had filed her discrimination complaint with the Utah Antidiscrimination and Labor Division on March 8, 2023. Defendants' counsel asked for and received a one-week extension of the deadline to respond to the agency, to March 24, 2023. The agency's case log records no response and no further request by that date. On March 29, 2023, five days after the extended deadline, the log records counsel "asking for a few more days," and the agency set a new deadline of April 7, 2023, while telling Plaintiff the response was due "on or before April 3, 2023." (UALD Case History, entries of Mar. 17 and Mar. 29, 2023; Email from R. McNair to Plaintiff, Mar. 29, 2023.) Plaintiff objected in writing that same day: "Why do they get to delay their position statement & not adhere to the deadline, but will be able to charge us $300 a day each day we stay here beyond 3/31?" (Email from Plaintiff to R. McNair, Mar. 29, 2023.) On March 31, 2023, Plaintiff asked the new property manager whether she could pay rent. She was told she had to go through Defendants' counsel; she forwarded her request to counsel and received no response. (Email from Plaintiff to R. McNair, Apr. 3, 2023.) Defendants' position statement, dated April 3, 2023, was emailed to the agency on April 4, 2023, the same day as the settlement offer and six days before they filed the eviction. (UALD Case History, entry of Apr. 4, 2023; Email from R. McClure to R. McNair, Apr. 4, 2023.) By the time the agency had Defendants' account, April 1 had passed with Plaintiff's rent refused. The position statement, a one-page letter signed "/s/ Kirk A. Cullimore" as Defendants' counsel, asserted that the notice to vacate was served "because of unpaid utilities billed pursuant to the lease agreement between the parties," the very charges for which their witness had no documentation at trial and which they later abandoned. (Position Statement, Apr. 3, 2023 (R. 621); UALD GRAMA production, Respondent Evidence

D1.) Defendants' agency filing and their eviction filing came within days of each other, so that the discrimination complaint and the eviction moved in lockstep.

**103.** The result of this sequence is the judgment. Defendants refused Plaintiff's rent so a default would exist, kept the treble meter running by refusing to let her cure, conditioned the reference she needed to leave on abandonment of her complaint, and then sued. The judgment of $7,395 represents April 2023 rent of $85 per day for 29 days, trebled. It is not compensation for rent Plaintiff withheld. It is a charge for the 29 days it took Plaintiff to decline to trade her civil rights complaint for her housing, on rent Defendants themselves refused to accept.

**104.** The refused tender defeats the premise of the judgment. Plaintiff repeatedly attempted to pay her April 2023 rent of $2,690: in writing on March 15, 2023, again by email on March 31, 2023, and in person at Defendants' office. Defendants did not respond to or accept any of these tenders, and instead, on April 4, 2023, offered acceptance only in exchange for dismissal of her discrimination complaint. Ten days after her payment attempt, Defendants sued for "unpaid rent," meaning the rent she had tried to pay. As Plaintiff's counsel argued on appeal, a non-breaching party may recover only damages its counterparty's breach proximately caused; where the claimed injury was caused by the plaintiff's own conduct rather than the defendant's, there is no causation. The holdover status and the treble damages Defendants recovered were caused not by any failure of Plaintiff to pay, but by Defendants' own refusal to accept her payment. Plaintiff pleads this because it exposes the judgment for what it was: not compensation for a loss Plaintiff caused, but a penalty Defendants manufactured by refusing the very payment that would have prevented it, in order to preserve an eviction they had already decided to pursue for reasons of race and retaliation.

**105.** Plaintiff vacated on April 29, 2023, under the stipulated order of restitution described in paragraph 106. (Findings ¶ 5; Ct. App. Order at 2.)

**H. How the state judgment was obtained**

**106.** On April 25, 2023, at the immediate occupancy hearing before Judge Paul B. Parker, the parties stated an agreement that Plaintiff would vacate by April 30, 2023. In stating the agreement on the record, a speaker identified in the transcript only as "A VOICE," in context Plaintiff's then-counsel, told the court: "We have an agreement, Your Honor, that Ms. Blackwell is going to be out by the end of the month; that would be Sunday, April 30. Just so Your Honor knows, she offered to pay that up front. This is a different kind of eviction. But she also reserves all issues because she also has a counterclaim and a UALD claim." The court asked, "Okay. So all those are being reserved. Is that correct?" and was told, "That's correct, Your Honor." The court then asked Defendants' counsel, "Mr. Todd, is that right?" and he answered, "Yes. Yes, that's right, Your Honor." The court responded, "Okay. That'll be the order," and confirmed with Plaintiff that she was agreeing to move out on the 30th. (Apr. 25, 2023 Hr'g Tr. 4:6–19.) The district court's later findings likewise record that "the parties stipulated that Ms. Blackwell would vacate the property by April 30, 2023," and that "Judge Parker reserved the rest of the issues for this Court's decision." (Findings ¶ 5.)

**107.** Defendants first moved for summary judgment on October 11, 2023, and withdrew that motion at a hearing on December 4, 2023. (Findings ¶ 6; Apr. 2, 2024 Order at 4 n.6 (R. 349).) Defendants' appellate brief explains that The Pearl "abandoned this motion for summary judgment upon acknowledgement that the dispute regarding the fees would preclude summary judgment." (Appellee's Brief at 15.) On January 23, 2024, Defendants moved again, this time only on the unlawful detainer claim. (Findings ¶ 8.) That motion did not attach a signed lease or an authenticated addendum, and its supporting declaration, from a manager who was not employed when the lease was signed, did not state that the document filed with the complaint was the actual lease. (R. 314–15; Pet. for Reh'g 3.)

**108.** By then Plaintiff was proceeding pro se because she could no longer afford her trial counsel's fees of thousands of dollars per week after the eviction left her homeless. She opposed the motion on the ground that she never agreed to the fees, and she challenged the authenticity of the lease Defendants proffered. (R. 171; R. 320–37; R. 586–88.) The district court granted summary judgment on April 2, 2024. It found that Plaintiff "did not come forward with admissible material in the record to contest Plaintiff's undisputed material facts" and, alternatively, that Defendants' statement of facts "was not properly controverted by Defendant pursuant to Rule 56(a)(2) of the Utah Rules of Civil Procedure and is deemed admitted on this basis," because her opposition did not include "a verbatim restatement of each of the moving party's facts that is disputed." (Apr. 2, 2024 Order at 3 n.4 (R. 348).) On that basis the court concluded that The Pearl "has provided uncontroverted evidence" of each element and "has established that Defendant is liable to Plaintiff for unlawful detainer." (Id. at 3–4 (R. 348–49).) Under Utah law, a movant "who seeks summary judgment on a claim on which it will bear the burden of persuasion at trial cannot seek summary judgment without producing affirmative evidence in support of the essential elements of its claim," Salo v. Tyler, 2018 UT 7, ¶ 26, 417 P.3d 581, 587 (quoted in Ct. App. Order at 1), and a court must determine whether the movant's own papers demonstrate its entitlement to judgment even when the motion is unopposed, Pepperwood Homeowners Ass'n v. Mitchell, 2015 UT App 137, ¶ 6, 351 P.3d 844. "Uncontroverted" here meant uncontested in the required form by a pro se opponent, not proven by authenticated evidence: no witness with personal knowledge authenticated the lease on which every element of the claim depended, namely its term, its automatic-renewal clause, and its 60-day notice provision. (R. 6–19; R. 5 ¶ 4; R. 314–15; Pet. for Reh'g 3.)

**109.** Plaintiff left her home under the April 25, 2023 stipulation, with every other issue reserved. Nearly a year later, the eviction claim was decided against her on summary

judgment, without a trial, while she was unrepresented. The court found Defendants' facts uncontroverted because Plaintiff "did not come forward with admissible material in the record to contest" them and, alternatively, because her opposition did not restate them verbatim as Utah R. Civ. P. 56(a)(2) requires. (R. 348 & n.4.) No witness with personal knowledge authenticated the lease on which every element of the claim depended. That judgment is the basis of the treble damages, the attorney fees, the garnishment, and the eviction on Plaintiff's record. As Plaintiff's appellate counsel put it, "[a]n erroneously granted summary judgment is not an evidentiary error; it is a structural error that denies the right to trial on the merits." (Pet. for Reh'g 6.) Plaintiff pleads this as a fact bearing on whether she had a full and fair opportunity to litigate, not as a request that this Court review the summary judgment.

**110.** Plaintiff's counterclaims proceeded to a bench trial on December 13, 2024, at which Plaintiff appeared remotely and represented herself. (Findings at 1; Trial Tr. 7:25–8:19.) Nine months earlier, at the March 13, 2024 hearing, while encouraging the parties to consider settlement, the court had told them that under Utah Rule of Evidence 408, "if one of you make an offer or a counter-offer, those sort of things, don't believe that it's going to come into evidence. It's not." (MSJ Hrg. Tr. 43:22–44:8.) Neither of Defendants' witnesses worked at The Pearl when the lease was signed. (Trial Tr. 46:5–18; 169:4–11.) Before any litigation, Plaintiff had told Defendants in writing that she never signed the fee addendum (paragraph 63), and at trial she testified that she did not remember the addendum being part of the lease she received (Findings ¶ 25).

**111.** The trial was conducted remotely. Before swearing Plaintiff in, the court asked her to turn on her camera and said, "That's perfect. I could definitely see you." (Trial Tr. 7:25–8:19.) Minutes into her testimony, after an internet lag, the court directed Plaintiff to "turn off your camera for a minute while you're testifying." (Trial Tr. 13:22–14:2.) Nothing in the record shows the camera was turned back on. The court then found that Plaintiff "failed to

prove that the Addendum was fabricated and/or was not part of the Lease" and that her "testimony on this issue was not credible," and it found credible "the evidence presented by The Pearl related to these issues." (Findings ¶¶ 27, 31.) The testimony the court rejected was given after the camera went off. (Findings ¶ 25 (citing testimony at 9:36:38 A.M.); Trial Tr. 3:2 (trial called at 9:00 a.m.); Trial Tr. 13:22–14:2 (camera instruction).) Plaintiff was the only witness with firsthand knowledge of how the lease and addendum came to be signed; neither of Defendants' witnesses worked at The Pearl when the lease was signed. (Trial Tr. 46:5–18; 169:4–11.) The court also relied on documents, finding that the lease was signed by Plaintiff and included the addendum, and that the welcome letter put her on notice of the "Utilities" charges. (Findings ¶¶ 23, 26, 28.) The court thus disbelieved the only witness with firsthand knowledge of the disputed document after directing her to turn off her camera, with nothing in the record showing it came back on. As Plaintiff's appellate counsel put it, "No credibility finding can supply a signature where none exists." (Pet. for Reh'g 9.) A credibility determination made in these circumstances does not reflect the full and fair adjudication that preclusion requires.

**112.** The Utah Court of Appeals affirmed that credibility determination. It stated that the district court "reviewed the lease agreement and addenda, the welcome letter, and other documents, and it had the opportunity to 'view[] the witnesses firsthand,' 'assess their demeanor,' and 'consider their testimonies in the context of the proceedings as a whole.'" (Ct. App. Order at 3 (quoting Staszkiewicz v. Thomas, 2024 UT App 183, ¶ 19, 562 P.3d 723, 730 (cleaned up)).) But the trial judge did not view Plaintiff during the testimony he rejected, so far as the record shows. The United States Supreme Court has explained that credibility findings receive heightened deference because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). The

same passage cautions that a trial judge may not "insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness," and that "[d]ocuments or objective evidence may contradict the witness' story." Id. Here the judge could not see Plaintiff while she gave the testimony he rejected, so far as the record shows, and the audio he had was poor enough that the official transcript repeatedly marks passages "(Unintelligible)." In those circumstances the factfinder's vantage point was no better than that of "an appellate court that has access only to the cold record." Richins v. Weldon, 2023 UT App 147, ¶ 65, 541 P.3d 274, 287 (quoting Henshaw v. Henshaw, 2012 UT App 56, ¶ 12, 271 P.3d 837). The Court of Appeals nonetheless deferred to the finding on the ground that the trial court had the opportunity to view the witnesses firsthand.

**113.** The deference standard the panel applied came from Staszkiewicz v. Thomas, 2024 UT App 183, an opinion authored by Judge Oliver, who also sat on the panel that decided Plaintiff's appeal (Judges Orme, Mortensen, and Oliver) and signed its decision. (Ct. App. Order at 1, 5.) Staszkiewicz states that "trial courts have the benefit of viewing the witnesses firsthand, to assess their demeanor," 2024 UT App 183, ¶ 19, 562 P.3d at 730 (quoting Richins v. Weldon, 2023 UT App 147, ¶ 65, 541 P.3d 274), language that by its own terms rests the deference on the trial court's opportunity to view the witness. In Plaintiff's case the trial court had directed her to turn off her camera, and nothing in the record shows it came back on. The panel nonetheless applied Staszkiewicz's deference standard to affirm the credibility finding against her.

**114.** On January 22, 2025, the court entered findings, conclusions, and an order dismissing Plaintiff's counterclaims, and judgment was entered for Defendants in the total amount of $7,395. (R. 643–55; R. 657–59 (see Appellee's Brief at 39, 41 (citing R. 657, 659)).) The court found that Plaintiff was not "qualified" to rent based on "her nonpayment of

fees under Lease" (Findings ¶ 32), and that her dispute of the fees was not protected activity because she had not cited authority "suggesting that disputing lawfully assessed fees is a protected activity under the FHA" (id. ¶ 38). In the alternative, the court found that even if Plaintiff had made a prima facie case, The Pearl had a "legitimate, nondiscriminatory rationale" for the notice to vacate (id. ¶ 32 n.8; ¶ 43 n.10 (quoting Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003))), and that Plaintiff had not proved that discrimination or retaliation "was the real reason" (id.). The court analyzed retaliation only as to the January 30, 2023 notice to vacate. (Id. ¶¶ 33–43.) The findings did not analyze Plaintiff's March 8, 2023 discrimination complaint as protected activity, did not mention the April 4, 2023 offer, and did not mention Plaintiff's security-deposit claim.

**115.** The judgment was not served on Plaintiff when it was entered; her name did not appear on the certificate of service. (Appellee's Brief at 39.) Plaintiff learned of the judgment through her own efforts, and on February 7, 2025, sixteen days after entry, she moved pro se to vacate it under Rule 60(b), citing "[n]o notice of judgment" and "[d]ue process violations." (R. 685–89; Ct. App. Order at 4.) The same day, Defendants mailed her a notice of judgment and a copy of the judgment. (Appellee's Brief at 39 (citing R. 667).) On February 20, 2025, a writ of garnishment issued. (May 12, 2025 Order at 4–5.) The district court denied the motion to vacate. (R. 839–43.) According to Defendants, the court reasoned that Plaintiff's arguments did "not provide any factual or legal analysis" and were "not adequately briefed." (Appellee's Brief at 40 (citing R. 841).)

**116.** Plaintiff argued on appeal, through counsel, that a judgment entered without the notice due process requires is void, see Judson v. Wheeler RV Las Vegas, L.L.C., 2012 UT 6, ¶ 18, 270 P.3d 456, 461 (a judgment is void under Rule 60(b)(4) if the rendering court lacked jurisdiction or the judgment "was entered without the notice required by due process"); Appellant's Opening Br. 14, 18, 22; Appellant's Reply Br. 21, and that actual notice obtained

through her own efforts did not cure the defect. (Appellant's Reply Br. 21–22.) Defendants argued that she had actual notice and that voidness under Rule 60(b)(4) is narrow, citing Migliore v. Livingston Financial, LLC, 2015 UT 9, 347 P.3d 394. (Appellee's Brief at 37–39.) No court decided the question on its merits. Plaintiff does not ask this Court to decide whether the judgment is void. She pleads these facts as part of the full-and-fair-opportunity analysis below and as a fact bearing on equitable tolling.

**117.** On appeal, the Utah Court of Appeals did not decide whether the judgment was void for lack of notice. It held the issue unpreserved because Plaintiff's pro se motion "consisted of little more than a handful of bullet points" and she "d[id] not provide any factual or legal analysis regarding [her] arguments," reasoning that "parties who represent themselves will be held to the same standard of knowledge and practice as any qualified member of the bar." (Ct. App. Order at 4 (quoting Jones v. State, 2020 UT App 125, ¶ 19, 473 P.3d 1190, 1196 (quoting Allen v. Friel, 2008 UT 56, ¶ 11, 194 P.3d 903) (cleaned up)).) It applied the same preservation rule to Plaintiff's security-deposit claim, holding that it "was only ever raised in passing" and "was never squarely presented to the district court." (Id. at 5.) No court has decided whether the judgment was validly entered, or whether Plaintiff is owed her deposit.

**118.** Plaintiff raised the lack-of-notice issue in her February 7, 2025 motion, and raised it again in a later filing in the district court. In a footnote, the Court of Appeals stated that Plaintiff's assertions about that later filing "are not supported by citation to the record, see Utah R. App. P. 24(e)(1), nor have we been able to locate any such motion or denial in the record before us." (Ct. App. Order at 4–5 n.4.) In the very next footnote, the same court accepted Defendants' statement at oral argument that Plaintiff's security deposit had been credited toward the judgment, although that fact was, in the court's words, "not reflected in the record." (Id. at 5 n.5.) The record rule was thus applied to set aside Plaintiff's account and relaxed to accept Defendants'. A lawyer's unrecorded word was enough to go into the order.

Plaintiff, without a lawyer, was held to "the same standard of knowledge and practice as any qualified member of the bar" (Ct. App. Order at 4), and under that standard her arguments were set aside as "not supported by citation to the record" and "raised in passing." (Id. at 4–5 n.4, 5.) Defendants could put a fact before the court by simply saying it; Plaintiff could not prove a fact set down in writing the day it happened, the April 4 offer, which no court analyzed. (Id. at 4, 5 n.5; Def. Tr. Ex. G.) The burden ran in one direction. Defendants were excused from proving the charges their eviction rested on, from producing the instrument they sued on, and from calling the one witness who was present when it was signed. Plaintiff was required to contest, in the form the rules prescribe, the authenticity of a document no witness with knowledge of its signing ever authenticated; to prove every element of her counterclaims; and then, against the deference owed a judge who had told her to turn off her camera, to prove that she had told the truth. (Ct. App. Order at 2, 3; Apr. 2, 2024 Order at 3–4; Findings ¶¶ 27, 31; R. 236, 314–15, 640–41.) Plaintiff pleads this not as error for this Court to correct, but because a proceeding that applied one rule to the party with counsel and the opposite rule to the party without did not give her the full and fair opportunity to litigate that preclusion requires.

**119.** The consequence is that the threshold question whether Plaintiff was ever lawfully notified of the judgment against her, a due process question, was resolved against her not on its merits but on the ground that her pro se filing lacked the analytical rigor expected of a licensed attorney. Plaintiff was pro se not by choice: it is extremely difficult to find a civil rights or fair housing attorney in Utah; her trial attorney charged up to thousands of dollars per week; and the eviction had rendered her homeless and forced her to spend her limited resources on temporary housing. The eviction is what stripped her of the means to defend against it; the dispossession she challenges is what left her unable to defend against it. The opposing party was represented by a law firm that, on information and belief, files more

evictions than any other in the state, and that had previously been reversed for the same evidentiary failure at issue in Plaintiff's case. See Pepperwood Homeowners Ass'n v. Mitchell, 2015 UT App 137, 351 P.3d 844, ¶¶ 6, 10–11. Plaintiff does not contend that the pro se standard is improper as a general matter. She pleads these facts because the application of that standard here, to foreclose review of whether the judgment was even validly entered, is among the reasons she was denied the full and fair opportunity to litigate that preclusion requires. A party held to the licensed-attorney standard while unrepresented, homeless, and opposed by the state's highest-volume eviction firm, on a judgment that was not served on her when entered, did not receive the kind of adjudication to which preclusive effect attaches.

**I. Continuing harm and ongoing enforcement**

**120.** Defendants obtained a judgment of $7,395, representing April rent at $85 per day for 29 days, trebled.

**121.** Defendants have enforced that judgment against Plaintiff and have collected on it. Defendants have garnished approximately $4,000 from Plaintiff's wages and other funds. Plaintiff is homeless and without steady income, and the garnishment has taken money she needed for basic subsistence for herself and her child.

**122.** Defendants presently seek attorney fees ($15,330 as originally requested; $15,225 after conceding an arithmetic error) and move to forfeit the appeal bond posted on Plaintiff's behalf. (Docket Nos. 241, 242; Reply.) Both motions are fully briefed. Defendants' reply is dated and was served August 27, 2026, and requested a ruling.

**123.** Since the judgment, debt collectors have contacted members of Plaintiff's family who were never parties to the lease. On information and belief, they are attempting to collect the judgment Defendants obtained. The lease Defendants rely on provides that if obligations under it "are assigned to a licensed collection agency or attorney, a collection fee of forty percent (40%) of the debt/obligation assigned shall be added to the amount owed pursuant to

the terms hereof and as allowed by law." (Lease ¶ 33, at 5; Pl. Tr. Ex. A at 5 (reproduced in the addendum to Appellant's Opening Br.); R. 6–19.) The appellate fees Defendants seek have not been awarded; their amount is set for hearing on January 7, 2027. Federal law generally bars a debt collector from discussing a consumer's debt with third parties, with limited exceptions such as obtaining location information, 15 U.S.C. §§ 1692b, 1692c(b), and bars "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law," id. § 1692f(1). Plaintiff pleads these contacts as part of the continuing course of conduct described in paragraph 223, and reserves the right to amend to assert claims against any debt collector once identified.

**124.** Plaintiff's counsel opposed the fee motion on the ground, among others, that Defendants had not allocated their claimed fees between the eviction claim and the defense of Plaintiff's federal fair housing counterclaim. The opposition explained that the appeal "presented two independent questions: whether The Pearl met its summary-judgment burden on the unlawful detainer claim, and whether the district court applied the correct legal standard to Ms. Blackwell's fair-housing retaliation counterclaim under 42 U.S.C. § 3617"; that "[t]he lease's fee clause and Utah Code Ann. § 78B-6-811 authorize fees for the unlawful detainer claim" but "[n]either provides a basis for recovering fees The Pearl incurred in defending against a federal fair-housing counterclaim"; and that under Utah law a fee applicant must allocate among claims, and a court "can 'deny fees altogether for failure to allocate.'" (Opposition at 7, quoting Foote v. Clark, 962 P.2d 52, 55 (Utah 1998); Valcarce v. Fitzgerald, 961 P.2d 305, 318 (Utah 1998); Burdick v. Hornor Townsend & Kent, Inc., 2015 UT 8, ¶ 59.) "The Pearl made no attempt to allocate." (Id. at 7.)

**125.** Defendants' reply did not allocate. It asserted instead that the Court of Appeals had remanded for "The Pearl's reasonable appellate attorney fees" and "did not parse out any

attorney fees" The Pearl would not be entitled to, and that "the lease agreement provides for an award of attorney fees too." On that basis Defendants "reaffirm[ed] [their] request for the entry of [their] full attorney fees incurred on appeal." (Reply at 2.) In the same reply, Defendants conceded that 43.5 hours at $350 per hour "equates to $15,225 rather than $15,330," conceded that four time entries were misdated, and, as to whether their $350 hourly rate was reasonable, stated only that they "will defer to the Court." (Id. at 1–2.)

**126.** Defendants' reply is significant to this action in three respects.

a. Defendants seek to recover from Plaintiff the fees they incurred defending against her federal fair housing claim. Imposing on a tenant the cost of the landlord's defense against her civil rights claim, where no statute authorizes it and no court has found the claim frivolous, is a further act of retaliation for the assertion of fair housing rights, and a further instance of the practice alleged throughout this Complaint: that asserting a right against these Defendants results in a bill.

b. The only authority Defendants assert for recovering fair-housing-defense fees is "the lease agreement." That is the lease produced in the summary-judgment record as a partial 14-of-40-page scan, whose fee addendum is unsigned, and which no witness with personal knowledge ever authenticated. Defendants' reply is therefore a post-judgment assertion, in a court filing, that the lease remains the operative contract under which they are entitled to collect from Plaintiff the cost of defending against her civil rights claim.

c. Defendants cite no statutory basis for fair-housing-defense fees. The only conceivable one, 42 U.S.C. § 3613(c)(2), permits fees to a prevailing party in the court's discretion, and under the standard governing prevailing defendants in

civil rights actions, Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421–22 (1978), a defendant may recover only where the plaintiff's claim was frivolous, unreasonable, or without foundation. No court has so found. The state civil rights agency found that Plaintiff established a prima facie case of retaliation. (UALD Determination at 20.) The trial judge, in staying the garnishment pending appeal, found that the case presents "serious issues on the merits that warrant appellate review," while also determining that Plaintiff had not demonstrated a likelihood of success. (May 12, 2025 Order at 4.) The Court of Appeals declined to reach Plaintiff's challenge to the protected-activity standard. (Ct. App. Order at 3 n.3.) A claim that a government agency found sufficient to make a prima facie case, and that the trial judge found presented serious issues warranting appellate review, is not frivolous. Defendants' attempt to recover fees for defending it, without invoking the statute or meeting its standard, confirms that the request is not a fee-shifting claim at all. It is a penalty for having asserted the right.

**127.** Plaintiff and her minor son have been consistently without stable housing for years.

**128.** The eviction record continues to impair Plaintiff's ability to obtain housing.

**129.** Defendants have profited, and continue to profit, from the conduct alleged in this Complaint. The judgment of $7,395 is three times a month's rent that Defendants deliberately refused to accept; their refusal converted a tender into a default and the default into a treble recovery. The fees they now seek are more than double that judgment, and a substantial portion was incurred defending against Plaintiff's assertion of her fair housing rights. The $4,037.62 appeal bond they seek to forfeit was posted so that Plaintiff could exercise her right to appeal. At every stage, Defendants' response to Plaintiff's assertion of a civil right has been

to increase the amount she owes them: the notice to vacate after she questioned the fees, the refused rent after she filed her complaint, the treble judgment after she declined to withdraw it, the fee motion after she appealed, and the bond forfeiture after she petitioned for review. The financial consequence of asserting fair housing rights against these Defendants, as executed in this case, is that the tenant is billed for having done so, and the landlord collects.

**130.** That structure is not incidental to the retaliation; it is the retaliation's mechanism and its reward. A landlord that can refuse rent, recover three times the refused amount, and then recover its attorney fees for defending the tenant's civil rights claim has been paid for retaliating. Defendants' pending motions seek to complete that payment. Plaintiff pleads these facts as evidence of the continuing course of retaliatory conduct, as the measure of her financial injury, and as the reason punitive damages are warranted: conduct that is profitable will be repeated unless it is made costly.

**J. Defendants' stated reason for the eviction is pretextual**

**131.** Defendants have given shifting and irreconcilable accounts of why Plaintiff was evicted.

**132.** Each of the admissions set forth in this Complaint is Defendants' own: that Defendants did not take Plaintiff's rent because, in their counsel's words, "[m]y client was interested in seeing a vacate date" and a payment "would have voided our (Unintelligible)"; that Defendants' manager "would not consider" it ethical to post a notice to vacate on a tenant who inquired about fees without a conversation; that no one whose eviction notice he processed had been "kicked out for asking questions"; that Defendants had no documentation at trial for the pest control services charged; that Defendants abandoned their first summary-judgment motion "upon acknowledgement that the dispute regarding the fees would preclude summary judgment"; and that Kairoi's manager did not call any of Plaintiff's references before continuing the nonrenewal. Most of these admissions were elicited from Defendants' own

witnesses at trial, under oath, by Plaintiff appearing pro se and without the assistance of counsel. That Plaintiff, unrepresented and homeless, obtained them from Defendants' own agents confirms the strength of her claims.

**133.** Defendants have also given different explanations for why they removed the disputed charges from Plaintiff's account during her tenancy. Their community manager told UALD it was a "glitch." (Determination at 7.) Their regional manager told UALD the late fees were not required under Defendants' own threshold policy. (Id.) Their appellate brief described the waiver as "a one-time courtesy." (Appellee's Brief at 13.) A charge that is simultaneously a system error, a policy violation, and a courtesy is not a charge the landlord itself understood to be owed.

**134.** On April 3, 2023, Defendants told UALD that the notice to vacate issued "because of unpaid utilities billed pursuant to the lease agreement." (R. 621.)

**135.** One day later, Defendants offered to waive those same fees entirely if Plaintiff dismissed her discrimination complaint. (Def. Tr. Ex. G; R. 602-03.)

**136.** Defendants then abandoned the fees in the litigation. (MSJ Hrg. Tr. 8:18–9:2; Findings ¶ 12 n.2.)

**137.** Defendants have acknowledged, in their own appellate brief, why they abandoned their first summary-judgment motion: The Pearl "abandoned this motion for summary judgment upon acknowledgement that the dispute regarding the fees would preclude summary judgment." (Appellee's Brief at 15.) That is an acknowledgment that the fees were genuinely disputed, that there existed a real factual dispute about whether Plaintiff owed them sufficient to defeat summary judgment. Defendants cannot reconcile that acknowledgment with their later position, and the district court's later finding, that Plaintiff was not "qualified" to rent because she did not pay those same fees. By Defendants' own account, whether Plaintiff owed the fees was a disputed question they chose to drop rather than litigate. A landlord that

abandons a fee claim because it concedes the claim is too disputed to resolve on summary judgment cannot simultaneously maintain that the tenant's nonpayment of those fees was the legitimate reason for ending her tenancy.

**138.** Defendants' own manager had already put in writing that the fees were "a setting issue" that "has been fixed." (Def. Tr. Ex. F; R. 605.)

**139.** At oral argument before the Utah Court of Appeals on February 19, 2026, Defendants' counsel made the following concessions on the record. Asked by the panel whether "at both stages the fact of the fees didn't matter really anymore because the Pearl had decided not to pursue a collection of those," counsel answered: "Correct. And that's true of both the summary judgment stage and at trial. Correct." Counsel stated that the disputed fees "really speak[] to the Pearl's breach of contract claim rather than the unlawful detainer claim," and that "the leasing agents said, hey, we want to keep a happy tenant here. We're willing to just waive those as a courtesy." Counsel further conceded that the "qualified to rent" criterion on which the trial court rejected Plaintiff's fair housing claims "is not established by the Fair Housing Act, it's not established by the court, that's a criteria that's established by the landlord." Defendants' appellate brief takes the same position: "Criteria that underscores whether a tenant is 'qualified to rent' is established by the owner rather than by law." (Appellee's Brief at 29 n.6.)

**140.** In the same argument, counsel asserted that the fee finding "is important . . . to the discrimination complaints." Defendants' own position is therefore that the fees were immaterial to the eviction and dispositive against Plaintiff's civil rights claims. Those positions cannot both be true. If the fees did not matter to the eviction, they cannot supply a legitimate nondiscriminatory reason for it.

**141.** A fee Defendants told the state agency was the reason for eviction, then offered to waive, then abandoned, for which their witness had no documentation at trial, that their own

manager had called a "setting issue," and that their counsel agreed at oral argument did not matter to the eviction, cannot be the true reason for the eviction. The true reason was Plaintiff's race and her assertion of her civil rights.

**142.** On May 12, 2025, the trial judge who had entered judgment against Plaintiff ruled on her motion to stay enforcement pending appeal under the prior version of Utah R. App. P. 8(b)(2). (May 12, 2025 Order at 4 & n.3.) The court determined that Plaintiff "has not demonstrated a likelihood of success on the merits." (Id. at 4.) It then described Plaintiff's contention that the case presents serious issues on the merits, which included "whether the record demonstrates that (1) witnesses for The Pearl made '[f]alse [s]tatements in [c]ourt,' (2) Ms. Blackwell provided prima facie evidence of discriminatory treatment under the Utah and/or Federal Fair Housing Acts, and/or (3) this Court denied Ms. Blackwell's 'motions based on technical grounds rather than substantive merits.'" (Id.) The court found: "While the Court determines that Ms. Blackwell has not demonstrated a likelihood of success on these issues, the Court finds that Ms. Blackwell has established that the case presents serious issues on the merits that warrant appellate review." (Id.) The court noted that The Pearl "does not substantively respond to Ms. Blackwell's arguments." (Id. at 4 n.4.) Based on Plaintiff's showing that she and her minor child were homeless and that the garnishment left her unable to meet basic necessities, the court found "that an extraordinary circumstance justifies issuing a stay of the writ of garnishment that was issued on February 20, 2025." (Id. at 4–5.)

**143.** The May 12, 2025 order is significant because the judge who rendered the judgment found, after entering it, that the case presented "serious issues on the merits that warrant appellate review," issues that included whether the record demonstrates that the prevailing party's witnesses "made '[f]alse [s]tatements in [c]ourt,'" even as he determined that Plaintiff had not shown a likelihood of success. A judgment its rendering judge regarded as presenting serious issues of that kind for appellate review, which the appellate court then

resolved in part on preservation grounds and in part by declining to reach them, is not the product of the settled, fully and fairly litigated adjudication to which preclusive effect ordinarily attaches.

**K. Defendants' conduct reflects a broader pattern**

**144.** Greystar is the largest apartment manager in the United States.

**145.** In January 2025, the Federal Trade Commission and the State of Colorado sued Greystar Real Estate Partners, LLC and affiliated entities, charging that they "participated in deceptive acts or practices . . . including by charging mandatory hidden fees." FTC v. Greystar Real Estate Partners, LLC, No. 1:25-cv-00165-CNS-STV, ECF No. 69, ¶ 2 (D. Colo. Dec. 12, 2025). The action was resolved by a stipulated order entered December 12, 2025, requiring payment of $24 million in monetary relief, in which the defendants "neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order." Id. ¶ 3; id. § IV.

**146.** The fee practices the FTC and the State of Colorado alleged were deceptive, which Greystar resolved by stipulated order for $24 million without admitting the allegations, are the same category of mandatory fees Defendants charged Plaintiff and cited as the reason for ending her tenancy.

**147.** The same method was used against Plaintiff a second time, at a different property, through the same law firm and the same form of lease. After her eviction from The Pearl, Plaintiff entered into a lease at a second rental property. That property used the same Cullimore-drafted lease form and was represented by the same law firm that had prosecuted her eviction. During that second tenancy, the landlord began adding additional fees partway through the lease term, never provided Plaintiff an itemized bill for the charges, and assessed amounts at its discretion. Plaintiff paid the charges. At the end of her lease term, the landlord refused to renew her lease. Plaintiff pleads this not as a claim against the Defendants in this

action for the acts of a different landlord, but as evidence that the method described in this Complaint is a repeatable one, propagated through a common law firm and a common lease instrument, and used against the same tenant twice. It is the reason Plaintiff and her son have been consistently without stable housing since September 2024: the same practice that took her first home was used to deny her a second.

**148.** Defendants' counsel had specific prior notice that the method used to obtain summary judgment against Plaintiff was improper, having been reversed for the same practice not once but twice. In Pepperwood Homeowners Ass'n v. Mitchell, 2015 UT App 137, 351 P.3d 844, the same law firm moved for summary judgment to collect amounts allegedly due under a governing instrument, supported the motion with a ledger and an agent's affidavit, and never produced the instrument itself. The Utah Court of Appeals reversed, holding that because there was "no evidence of an instrument obligating [the defendant] to pay," the motion "failed to demonstrate its entitlement to judgment as a matter of law," and it did so even though the defendant had not opposed the motion and the issue was unpreserved. Id. ¶¶ 10-11.

**149.** Three years later, the same firm was reversed again by the Utah Supreme Court on a closely related summary-judgment burden principle. In Gonzalez v. Cullimore, 2018 UT 9, 417 P.3d 129, the Law Offices of Kirk A. Cullimore obtained summary judgment supported by a client's ledger and an affidavit from one of its attorneys stating he had verified the debt on that ledger. The Utah Supreme Court reversed. It held that Cullimore, as the moving party, "bore the initial burden of showing that it did not engage in an act prohibited by the FDCPA," and that the district court had erred by never determining whether Cullimore met that initial burden. Id. ¶¶ 5, 33. And as to the firm's attempt to defend on the ground that its attorney had checked the ledger, the Court stated that the firm had likely waived the defense by not pleading it, and that even if it had been pleaded, the firm "merely submitted an affidavit stating that one of its attorneys, Mr. Bell, checked the Association's ledger," and "has made no

assertion, nor provided any evidence," that doing so was a policy reasonably adapted to avoid the error: "Because Cullimore bears the burden of proving its affirmative defense on summary judgment, and Cullimore failed to carry this burden, we cannot affirm the district court's dismissal of Ms. Gonzalez's § 1692e counterclaims under the bona fide error defense." Id. ¶ 37 & n.67. The Court did not hold that the firm's ledger-and-affidavit submission satisfied its summary-judgment burden; it reversed and remanded for the district court to decide that question in the first instance. Id. ¶¶ 39–40.

**150.** In this case, years after both decisions, the same firm obtained summary judgment against Plaintiff on a declaration, without an authenticated lease and without a signed fee addendum. A firm twice reversed, once by the Court of Appeals and once by the Utah Supreme Court, for obtaining summary judgment on a ledger and an affidavit without the underlying instrument, and which repeats that practice against a pro se tenant who had lost her counsel and her home, acts with knowledge that the practice is improper. That knowledge supports the inference of intent and the award of punitive damages.

**151.** Plaintiff's counsel described the method to the Utah Supreme Court in the petition for certiorari: "If a tenant forfeits fair-housing protection whenever the disputed fees are later found owed, the playbook writes itself: refuse the tender, price the eviction at the complaint, and collect treble rent when the tenant will not sell her claim." (Pet. for Cert. 19.) The Utah Supreme Court denied review. The sequence in this case is that playbook executed in full: undocumented fees assessed; a notice to vacate two days after the tenant questioned them; rent refused after she filed a discrimination complaint; the eviction offered for withdrawal of the complaint; suit filed when she declined; treble damages collected on the refused rent; and attorney fees and the appeal bond now sought on top. Each step was left undisturbed in Utah. On information and belief, Defendants' counsel operates as the highest-volume eviction firm in the state, representing over a thousand properties and supplying its landlord clients with

lease forms and addendums. The method demonstrated in this case is available to be repeated against any tenant in the state who asserts a fair housing right, and the appellate decision approving it was entered by order rather than opinion. Under Utah R. App. P. 30(e), an order "will not stand as precedent." (Ct. App. Order at 1 (quoting Utah R. App. P. 30(e)).) Under Rule 30(f)(1), an order is transmitted only to the parties and the lower court rather than published, and under Rule 30(g) it may be cited only "so long as all parties and the court are supplied with accurate copies at the time all such decisions are first cited." A future tenant or attorney who does not already have the decision has no practical means of finding it.

**152.** Reduced to its elements, the method this case validates is the following: A landlord may charge a tenant whatever fees it chooses. It need not document those fees, prove the services behind them, or produce a signed agreement authorizing them. When the tenant disputes the fees or refuses to pay them, the landlord serves a notice to vacate. If the tenant asserts a fair housing right, the landlord refuses her tendered rent so that a nonpayment default forms, offers to make the matter disappear if she abandons her civil rights complaint, and, when she refuses, evicts her and collects treble the rent it declined to accept, plus attorney fees, plus her appeal bond. At no point in that sequence is the landlord required to prove that the fees were owed, that a contract was signed, or that the tenant did anything other than assert her rights. That is not a hypothetical description. It is what happened to Plaintiff, step for step.

**153.** What makes the method a usable one, rather than an overreach a court would correct, is that the Utah courts left it undisturbed. The district court entered summary judgment for the landlord on an unauthenticated lease without requiring proof of the agreement, and entered a treble-damages judgment on rent the landlord had refused. The Utah Court of Appeals affirmed, declining to reach Plaintiff's challenge to the protected-activity standard and resting instead on the trial court's alternative finding that nonpayment of the same disputed fees was a legitimate reason for the notice to vacate. The Utah Supreme Court denied review.

At no stage was the landlord required to justify refusing the tenant's rent, and no court addressed the written offer trading the tenant's housing for her civil rights complaint. A landlord contemplating the same conduct against the next tenant now has the assurance that it has been done and left undisturbed through every level of review.

**154.** Because the method requires no proof, no signature, and no legitimate basis, and because it is profitable at every stage, it will be used again. A practice that costs the landlord nothing to invoke and pays it treble damages, fees, and a forfeited bond will be repeated against the next tenant who questions a charge or asserts a right, particularly a tenant who, like most, cannot afford counsel and cannot litigate the matter through four levels of review. Plaintiff pleads this not as speculation but as the reason the conduct is both a continuing violation and a proper subject of punitive damages: conduct that is profitable and repeatable will continue unless it is made costly.

**L. A state investigative agency examined this conduct and its written findings support Plaintiff**

**155.** Before this litigation, Plaintiff filed a race-discrimination and retaliation complaint with the Utah Antidiscrimination and Labor Division ("UALD"), Case No. 23H0033. UALD is a Fair Housing Assistance Program agency operating under a cooperative agreement with the U.S. Department of Housing and Urban Development, and the complaint was dual-filed with HUD.

**156.** UALD conducted an investigation, obtained Defendants' records including the ledgers of other tenants, and issued a written Determination containing, among other things, the following findings and recorded statements:

a. Plaintiff's account that she is "an ideal tenant in good standing that has always paid her rent on time" (Determination at 2);

b. that Plaintiff was the only Black tenant at the property and "all other tenants were not of Complainant's race" (Determination at 17);

c. that Defendants' community manager told UALD she removed Plaintiff's late fees in July, August, September, and October 2022 and attributed them to a "glitch," and that Defendants' regional manager told UALD those late fees were not required under Defendants' own threshold policy (Determination at 7);

d. that Defendants' other tenants' ledgers "show that other tenants also received late fees including some tenants with a $0 balance, and Respondents reversed those tenants' late fees also" (Determination at 7);

e. that Rutherford told UALD he placed ten to twelve pay-or-vacate notices on tenants' doors during his time managing the property, and did not non-renew any other tenant's lease (Determination at 8–9);

f. that Plaintiff engaged in protected activity on January 30, 2023, when she complained of discrimination, and on March 8, 2023, when she filed her complaint (Determination at 18);

g. that Defendants subjected Plaintiff to materially adverse actions on January 30, 2023, when they non-renewed her lease, and on April 10, 2023, when they filed the eviction (Determination at 18-19); and

h. that Plaintiff established a causal connection between her March 8, 2023 complaint and the April 10, 2023 eviction through temporal proximity, and thereby "establishes the third element of a claim of retaliation, and her prima facie case" (Determination at 20).

**157.** The Determination's ultimate "no cause" conclusion is a legal disposition by a state administrative agency. It is not a conciliation agreement, was not the product of any adjudicative hearing on the merits (see paragraph 158), and does not bind this Court. Plaintiff does not seek review of that disposition, and this action is not brought against UALD or HUD.

**158.** The Determination was the product of an informal investigation, not a hearing. Under Utah Code Ann. § 57-21-10(1)(a) and (2)(a), a party could obtain de novo review of the Determination by requesting a formal adjudicative hearing within 30 days, and any party could then elect to have that review take place in a civil action in the district court. (UALD letter dated Sept. 1, 2023 (citing Utah Code Ann. § 57-21-10(1)).) On September 25, 2023, twenty-four days after the Determination, Plaintiff submitted a written request for de novo review and a formal adjudicative hearing, and UALD acknowledged receipt the same day. (Plaintiff's Request for De Novo Review, Sept. 25, 2023; Email from W. Charlesworth, UALD, to Plaintiff, Sept. 25, 2023.) By letter of the same date, UALD's Director notified the parties that "[o]ne of the parties has submitted a timely request for review of the director's determination and order," and that the review would be conducted by the Labor Commission's Adjudication Division unless a party asked, within 20 days, to have it conducted in district court. (UALD Letter to the Parties, Sept. 25, 2023.) By a separate notice also dated September 25, 2023, UALD notified the parties that "a Judicial Election has been made." (UALD Notice of Judicial Election, Sept. 25, 2023.) The election was made by Defendants. (Email from J. Whitlock, Deputy Director, UALD, to Plaintiff, Nov. 6, 2023 ("your appeal request and the district court election by Respondents was completed").) Defendants had in fact made their election earlier. On September 1, 2023, the day the Determination issued, Plaintiff emailed the agency that she would request de novo review; that afternoon Defendants' counsel wrote that, if her email was accepted as a notice of appeal, "we would like to submit a judicial election to have the appeal heard in state district court." Defendants then sent a formal election letter on September 5,

2023, "[i]n response to Ms. Blackwell's appeal." (Emails of Sept. 1, 2023 (Plaintiff; T. Adkins); Email from R. McClure to R. McNair and G. Salazar, Sept. 5, 2023; Letter from K. Cullimore to UALD, Sept. 5, 2023.) No formal hearing was ever held.

**159.** Plaintiff pleads the Determination's factual findings because they are the product of an investigation by a government agency legally authorized to conduct it, and because they corroborate, from a source independent of Plaintiff, the central facts alleged in this Complaint: that Plaintiff always paid her rent, that the charges assessed against her were Defendants' own billing errors, that other tenants were assessed the same erroneous charges, and that the evidence of retaliation was sufficient to establish a prima facie case.

**160.** Plaintiff anticipates that Defendants will rely on the "no cause" disposition as though it were a finding that no discrimination or retaliation occurred. It is not, for the following reasons.

**161.** First, as a matter of statute, the disposition has no bearing on this action. The Fair Housing Act provides that an aggrieved person "may commence a civil action under this subsection whether or not a complaint has been filed under section 3610(a) of this title and without regard to the status of any such complaint." 42 U.S.C. § 3613(a)(2). A "no cause" determination is an administrative screening decision that the agency will not itself prosecute the matter. It is not an adjudication, it was reached without a hearing, without testimony, without cross-examination, and without the trial record that later developed, and Congress expressly preserved the right to sue regardless of it.

**162.** Second, the disposition contradicts the investigation beneath it. The same document that concludes "no cause" records Plaintiff's account that she is "an ideal tenant in good standing that has always paid her rent on time" (Determination at 2); proceeds on the premise that she "was the only Black tenant residing at" the property (id. at 17); records Defendants' own managers' statements that the late fees assessed against her were not required

under Defendants' policy and were removed as a "glitch"; records that other tenants received erroneous late fees and had them reversed; records Rutherford's statements that he placed ten to twelve pay-or-vacate notices on tenants' doors but non-renewed only Plaintiff; and finds that Plaintiff established a prima facie case of retaliation. The disposition also rests on evidence the agency declined to gather. Plaintiff asked the Division to interview other tenants to determine whether Defendants had terminated the leases of White tenants who questioned the same fees. The Division "did not interview other tenants as the evidence demonstrates that Respondent did not terminate Complainant's tenancy for inquiring about the increased fees," while stating that it "will assume that the other tenants also inquired about the increased fees." (Determination at 4 n.2.) The Division thus used its own conclusion as the reason not to gather the evidence that could have tested it. The agency's own case log shows that it emailed Plaintiff for "names and contact information for other tenants who also inquired about fees" on August 29, 2023, three days before it issued the Determination. (UALD Case History, entry of Aug. 29, 2023.) Before that, the Division had asked Defendants to list every tenant evicted or not renewed at the property in the six months before and after Plaintiff's eviction or non-renewal, along with each tenant's race, the decision-maker, and the reason. Defendants objected that the requests were "overly broad, unduly burdensome," and produced only other tenants' ledgers. (UALD Request for Information, Requests 10–11.) Under its own rules, "the Commission may issue subpoenas to compel production of necessary evidence." Utah Admin. Code R608-1-9(C). The Division did not subpoena the information. It then faulted Plaintiff for lacking comparator evidence that sat in Defendants' files. Plaintiff also offered the Division a White tenant witness, and a recording of him, showing that he questioned the same fees and was offered a renewal; the Division did not take that evidence. (Plaintiff's Request for De Novo Review, Sept. 25, 2023.) The Division then concluded that, "beyond her own assertions, Complainant fails to present any evidence that her race actually motivated Respondents'

decision." (Determination at 13.) An agency conclusion at odds with the agency's own findings is entitled to no weight as a conclusion. The findings are what the investigator found. The conclusion is what the agency decided to do about it.

**163.** Third, the reasoning by which the agency reached "no cause" replicates the same error the state courts later made, and that error is the subject of this action. The Determination found a prima facie case of retaliation and then accepted as Defendants' "legitimate, non-retaliatory reason" that Plaintiff "did not vacate" after the January 30, 2023 non-renewal. (Determination at 20.) But the January 30 non-renewal was issued the same day Plaintiff alleged discrimination, and the reason she "did not vacate" was that she was attempting to pay her rent and remain, and Defendants refused her rent so that a default would exist. The "legitimate reason" the agency accepted is the retaliation itself, described from the landlord's side. At the pretext step, the agency then stated that Plaintiff relied on temporal proximity alone and "points to no evidence that would indicate that Respondent's legitimate, non-retaliatory reasons are lacking in credibility." (Determination at 21.) Ten pages earlier, however, the same Determination recorded Defendants' April 4, 2023 offer to dismiss all fees and costs, let Plaintiff remain through the end of June 2023, forgo the eviction, and provide a positive rental reference "in exchange for Complainant dismissing the present complaint." (Id. at 11.) The agency included that offer over Defendants' objection because it "sheds light on the parties' history," while stating that it "does not consider settlement negotiations when investigating a case." (Id. at 11 n.3.) Its pretext analysis does not mention the offer. But an offer to drop the eviction if the tenant withdraws her discrimination complaint is not merely a negotiation over the amount in dispute. It is itself the conditioning of housing on abandonment of a fair housing complaint, the retaliatory conduct alleged, and it was in the agency's own record when the agency said there was no evidence. Likewise, the agency declined to treat Plaintiff's January 28, 2023 fee dispute as protected activity because she did not use the word

"discrimination" in it (Determination at 18), applying a rule that a tenant's good-faith opposition to a practice she reasonably believed unlawful is unprotected unless she labels it. That is the same merits-first reasoning, that the tenant's protection depends on whether she was right about the fees, that the Utah courts applied and that this Complaint challenges.

**164.** Fourth, the "no cause" label has already done harm it was never designed to do. It was carried into the state court proceeding and treated as though it resolved the discrimination question against Plaintiff (see Appellee's Brief at 14, 31), when the investigation underneath it had found a prima facie case of retaliation and recorded facts favorable to Plaintiff on the points that mattered. Plaintiff pleads the Determination in full precisely so that this Court has the findings and not only the label.

**165.** Finally, the Determination's factual findings are admissible under Fed. R. Evid. 803(8)(A)(iii) as factual findings from a legally authorized investigation. Its legal conclusion is not a factual finding and is not offered by Plaintiff for its truth. Should Defendants offer the "no cause" conclusion as evidence that no violation occurred, Plaintiff will object under Fed. R. Evid. 403 on the ground that a conclusion contradicted by its own supporting findings would mislead the factfinder.

**M. No prior adjudication of the Civil Rights Act of 1866 claims, and no court ever analyzed the April 4 offer under § 3617**

**166.** The April 4, 2023 written offer was never analyzed by any court under § 3617. At the March 13, 2024 hearing, while encouraging the parties to consider settlement, the district court told them that under Utah Rule of Evidence 408, "if one of you make an offer or a counter-offer, those sort of things, don't believe that it's going to come into evidence. It's not." (MSJ Hrg. Tr. 43:22–44:8.) Plaintiff's appellate counsel argued that this operated as a blanket exclusion of settlement communications, contrary to the purpose-based analysis Rule 408 requires, and that Utah R. Evid. 408(b)(1) "expressly permits admission 'for another purpose.'"

(Pet. for Reh'g 13–14.) Counsel relied on Small v. Small, 2024 UT App 173, 561 P.3d 701, decided fourteen days before the trial, which, as counsel described it, adopted the federal purpose-based analysis under which "'the admissibility of compromise [or settlement] evidence depend[s] on the purpose for which' the evidence is offered," id. ¶ 14 (quoting 23 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 5314 (2d ed.)), and "reverse[d] the district court's determination that rule 408 requires exclusion of all evidence regarding the settlement negotiations," id. ¶ 24. Counsel argued that the April 4 offer "was not offered to prove liability on the eviction claim; it was offered to establish § 3617 retaliatory motive—a separate federal civil-rights claim." (Pet. for Reh'g 14.) As counsel quoted the rule, Rule 408(a) bars compromise evidence offered "to prove or disprove liability for or the validity or amount of a disputed claim," and Rule 408(b)(1) "expressly permits admission 'for another purpose.'" (Pet. for Reh'g 13–14 (quoting Utah R. Evid. 408(a), (b)(1)).) The April 4 offer was not offered to prove Plaintiff's liability on any claim; it was itself the unlawful act, the coercion that § 3617 prohibits. Although the written offer is part of the trial exhibits (Def. Tr. Ex. G (Dkt. 155 at 37); Trial Tr. 172:6–173:23), the trial court's findings do not mention it, and they analyze retaliation only as to the January 30, 2023 notice to vacate. (Findings ¶¶ 33–43 (R. 651–52).)

**167.** The Utah Court of Appeals declined to reach Plaintiff's argument that the trial court applied the wrong standards for "qualified" and "protected activity," stating that it "need not reach this issue because the district court did address the burden shifting," and affirmed on the trial court's alternative finding that The Pearl had a "legitimate, nondiscriminatory rationale" for the January 30, 2023 notice. (Ct. App. Order at 3 n.3 (quoting Findings ¶ 32 n.8, ¶ 43 n.10).) The Utah Supreme Court denied review. No court at any level analyzed the April 4 offer under 42 U.S.C. § 3617 or any other provision of federal law.

**168.** The Court of Appeals entered its decision by order rather than by opinion. Under Utah R. App. P. 30(e), "[a]n order will not stand as precedent." (Ct. App. Order at 1 (quoting Utah R. App. P. 30(e)).) Under Rule 30(f)(1), an order is transmitted only to the parties and the lower court; only opinions and per curiam decisions are published on the courts' website under Rule 30(f)(2); and under Rule 30(g), such a decision may be cited only "so long as all parties and the court are supplied with accurate copies at the time all such decisions are first cited." The practical consequence is that the decision affirming the judgment against Plaintiff establishes no rule of law, is not published, and can be located and cited only by someone who already has it. Whatever the state courts decided about the enforceability of an unsigned lease, the protected-activity standard, or the treatment of the April 4 offer, they decided in a form that binds no one, guides no future court, and cannot be found by the next tenant to whom the same method is applied. Plaintiff pleads this not as a request that this Court review the order, but as evidence bearing on whether she had a full and fair opportunity to litigate.

**169.** The consequence is that settled law can be applied to one tenant and not another with no public record that it happened. Salo and Pepperwood remain the published law of Utah. A landlord who moves for summary judgment without authenticating the instrument it sues on is, under that published law, not entitled to judgment. That rule was applied for the defendant in Pepperwood, against the same law firm. It was not applied for Plaintiff. The decision declining to apply it was entered in a form that is not published. Two tenants in the same position can therefore receive opposite results under the same published rule, and the second will never know the first existed. That is not a system in which a rule of law is uniformly applied. It is one in which the benefit of the rule is extended case by case, in a form that leaves no trail.

**170.** Published precedent serves three functions that an unpublished order cannot. It gives notice, so that a party knows what rule will govern her before she acts. It permits

correction, because a published departure from settled law can be identified, criticized, distinguished, and reversed. And it enforces uniformity, because a court that must publish its reasoning must apply the same rule to the next litigant or explain why not. An order that stands as no precedent and is transmitted only to the parties performs none of those functions. The rule it departs from remains on the books, so the next tenant reads Salo and Pepperwood and reasonably believes she is protected. The departure is invisible, so she cannot learn that the protection was withheld from someone in her position. And because nothing was published, no court is ever required to reconcile the two outcomes.

**171.** The question that posture raises is who the law actually protects. A rule that is applied to one person and withheld from another, with no public record of the difference, is not a rule that governs everyone equally. It is a rule that can be extended or withheld at the decisionmaker's discretion, case by case, without accountability. If Salo and Pepperwood, which require a landlord to prove the agreement it sues on, are applied for one tenant and not for another, and the second outcome is never made public, then the protection those rules provide is not a right anyone can rely on. It is a benefit that may or may not be given. And when the tenant to whom it is not given is the only Black tenant in her building, while a White tenant who raised the same fees kept his home, the selective application of the law is not a neutral irregularity. It is the precise harm that 42 U.S.C. §§ 1981 and 1982 exist to remedy: the denial to a person of color of the "same right" to make and enforce contracts and to hold property that white citizens enjoy.

**172.** The ability to apply the law to some and not to others is the ability to decide who the law is for. The Civil Rights Act of 1866 was enacted to take that ability away, by guaranteeing that the same legal rights extend to all persons regardless of race. Plaintiff pleads this not to ask this Court to review any state decision, and not to attribute any motive to any judge, but because it bears on two questions in this case: whether Defendants, who invoked

that process, obtained the benefit of a rule that was not extended to Plaintiff, and whether the resulting judgment carries any presumption that the losing party had a full and fair opportunity to invoke the law that governed her case.

**173.** Plaintiff's counsel raised precisely this concern to the Utah Supreme Court, in the petition for certiorari, and the Court denied review. Counsel argued: "The unpublished posture makes review more important, not less. The order below 'will not stand as precedent,' Utah R. App. P. 30(e), so the reading of Salo it adopts will never surface in the reporters. It will simply be repeated, one unpublished order at a time, on a docket where few tenants can petition at all." Counsel further explained that "[t]he risk is acute on the high-volume eviction docket, where tenants frequently appear without counsel and cannot file technically perfect oppositions," and that Plaintiff's case "is precisely the Pepperwood posture, and it has now produced the same judgment twice." (Pet. for Cert. 14.) The deviation from settled law, and the mechanism that keeps that deviation out of the reporters, were thus placed squarely before the state's highest court, which left both undisturbed.

**174.** Plaintiff pursued every avenue available to her in the State of Utah, and none reached the merits of her claim under § 3617 as to the April 4 offer or her claims under §§ 1981 and 1982. She contacted HUD's Office of Fair Housing and Equal Opportunity by telephone on February 10, 2023, eleven days after the notice to vacate was posted and before she lost her home; no formal complaint was drafted from that contact. She filed with UALD, the HUD-funded state enforcement agency, whose investigation found she had established a prima facie case of retaliation and which then issued a "no cause" determination. She litigated her counterclaims pro se at trial, where the court analyzed retaliation only as to the January 30, 2023 notice. She appealed with pro bono counsel to the Utah Court of Appeals, which declined to reach her challenge to the protected-activity standard, noted that it was "not entirely clear" whether her unpleaded discrimination and retaliation counterclaims "were

brought under the Utah Fair Housing Act, the Federal Fair Housing Act, or both," and designated its decision unpublished. (Ct. App. Order at 2 n.2, 3 n.3.) She petitioned for rehearing, which was denied. She petitioned the Utah Supreme Court, which denied review.

**175.** At no point in that sequence did any Utah court apply 42 U.S.C. § 3617 to the April 4, 2023 offer or decide whether Defendants retaliated against Plaintiff for filing her March 8, 2023 discrimination complaint, and no agency or court applied 42 U.S.C. § 1981 or § 1982 to any of the conduct alleged. This Court is the first forum in which those questions will be decided.

**176.** Plaintiff's answer and counterclaim in the state proceeding, filed April 13, 2023 by counsel Plaintiff was later unable to afford, pleaded a single formal claim for relief, negligent misrepresentation. Discrimination and retaliation were alleged as facts within that pleading. No claim under 42 U.S.C. § 1981 or § 1982 was pleaded. No claim under the Fair Housing Act was pleaded as a separate count. The district court nonetheless treated discrimination and retaliation counterclaims as tried by consent and analyzed them under federal fair housing precedent. (Findings ¶¶ 18, 20 & n.4.) The Utah Court of Appeals later observed that, because those counterclaims were not formally pleaded, "it is not entirely clear whether they were brought under the Utah Fair Housing Act, the Federal Fair Housing Act, or both." (Ct. App. Order at 2 n.2.)

**177.** The claims asserted in this action are not barred by the state judgment. Under 28 U.S.C. § 1738 this Court gives the state judgment the preclusive effect Utah would give it, and "look[s] first to state preclusion law in determining the preclusive effects of a state court judgment." Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 380–81 (1985). Preclusion is subject to the requirement that it "does not apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the claim or issue," Kremer v. Chemical Constr. Corp., 456 U.S. 461, 480–81 (1982) (citing Allen

v. McCurry, 449 U.S. 90, 95 (1980)), although under § 1738 "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause," id. at 481. And claim preclusion "generally does not apply where '[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts.'" Marrese, 470 U.S. at 382 (quoting Restatement (Second) of Judgments § 26(1)(c) (1982)). Preclusion "does not apply where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court." Allen, 449 U.S. at 101; see Kremer v. Chemical Constr. Corp., 456 U.S. 461, 480-81 (1982). Plaintiff could not have obtained § 1981 or § 1982 damages in the summary possessory proceeding. Utah's claim preclusion test asks whether the parties are the same, whether the claim was presented or could and should have been raised in the first action, and whether the first action resulted in a final judgment on the merits. Mack v. Utah State Dep't of Commerce, 2009 UT 47, ¶ 29, 221 P.3d 194, 203. Claims are the same only "if they arise from the same operative facts, or in other words from the same transaction," id. ¶ 30, and "[a] claim is not the same claim, in terms of claim preclusion, if it could not have been brought in the first action," including where "[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts," id. ¶ 32 (quoting Restatement (Second) of Judgments § 26(1)(c)). Mack adds that for that jurisdictional exception to apply, "one of the fora used must have exclusive jurisdiction, not merely limited jurisdiction, over the claims alleged to be barred." Id. Res judicata "embraces two distinct branches: claim preclusion and issue preclusion." Mack, 2009 UT 47, ¶ 29 (quoting Macris & Assocs., Inc. v. Neways, Inc., 2000 UT 93, ¶ 19, 16 P.3d 1214). Issue preclusion applies only where "a court has decided an issue of fact or law necessary to its judgment," Allen, 449 U.S. at 94, and is likewise subject to the full-and-fair-opportunity

requirement. Id. at 95. No issue necessary to the state judgment is one that Plaintiff's federal claims require this Court to redecide, and the issues on which those claims turn, including the April 4, 2023 offer and whether Plaintiff's protected activity was the cause of Defendants' conduct, were never decided by any state court. The claims here are not barred, for at least the following reasons:

a. The claims asserted here were never pleaded as such, never adjudicated, and never decided. The state appellate court stated that it was "not entirely clear" whether Plaintiff's discrimination and retaliation counterclaims were brought under state or federal law (Ct. App. Order at 2 n.2), declined to reach her challenge to the protected-activity standard (id. at 3 n.3), and designated its decision unpublished. Plaintiff's counsel identified precisely this preclusion problem in the petition for rehearing and asked the court to resolve it. Counsel argued that "[t]he Footnote 2 ambiguity cannot work only one way": if the federal claims were before the court, its failure to engage them was reversible error, and if they were not before the court, "then they were never fully and fairly adjudicated and cannot serve as a bar to subsequent federal proceedings on principles of claim preclusion." (Pet. for Reh'g 14 & n.1.) The court was thus expressly warned that its disposition could not simultaneously avoid the federal claims and preclude them, and it denied rehearing without clarifying.

b. Plaintiff further made an on-the-record request, in the state proceeding itself, that no preclusive effect attach. Her petition for rehearing requested "that this Court's Order not be construed as a final adjudication on the merits of claims arising under 42 U.S.C. §§ 3604, 3613, and 3617 in any federal proceeding," and "expressly preserve[d] her claims under 42 U.S.C. § 1982, the Civil Rights Act

of 1866, which has never been analyzed by any court in these proceedings." (Pet. for Reh'g 15.) A party who reserves her federal claims on the record, and asks the rendering court to confirm its judgment is not a merits adjudication of them, has not had those claims fully and fairly litigated for preclusion purposes.

c. In any event, no preclusion can attach to conduct that postdates the state judgment. Defendants' 2026 motions for attorney fees and bond forfeiture, their August 27, 2026 reply asserting entitlement to fees for defending the fair housing claim under the lease, and their continuing enforcement of the judgment are acts that had not occurred when the state judgment was entered on January 22, 2025 and could not have been raised in any prior proceeding. Claims based on those acts are timely and unprecluded regardless of any effect the state judgment may have on earlier conduct.

d. The state action was a summary unlawful detainer proceeding under Utah Code Ann. § 78B-6-801 et seq., an expedited possessory remedy with a three-day answer period and its own restricted disclosure rules, Utah R. Civ. P. 26.03, not designed to adjudicate a tenant's federal civil rights claims, and one in which possession was resolved by stipulation and the possessory claim was decided on summary judgment without trial. A judgment in a summary possessory proceeding is given limited preclusive effect precisely because the proceeding is confined to the question of possession. It precludes a later claim only where the specific issue was fully and fairly litigated in the summary action; where it was not, no preclusion attaches. Vella v. Hudgins, 20 Cal. 3d 251, 255–58 (1977) (unlawful detainer judgment "usually has very limited res judicata effect" and did not bar a subsequent action where the record of the summary proceeding was

"virtually barren" as to the issue), distinguishing Wood v. Herson, 39 Cal. App. 3d 737, 742–43, 745 (1974) (applying preclusion where the unlawful detainer action "was not the customary unlawful detainer proceeding that is summary in nature," the "trial lasted several days," "extensive depositions were taken by all parties," and the losing parties had "had their day in court"). A possessory judgment does not bar a tenant's separate action for damages arising from a wrongful or discriminatory eviction. Here, the claims asserted in this action were not litigated in the possessory proceeding: no court analyzed the April 4 offer under § 3617 or any conduct under §§ 1981 and 1982, and the appellate court declined to reach Plaintiff's challenge to the protected-activity standard. This is the Vella situation, not the Wood situation. See Vella, 20 Cal. 3d at 257 ("In a summary proceeding such circumstances are uncommon."). Plaintiff did not choose that forum. Defendants chose it when they sued her there, in an expedited possessory action with a three-day answer period, and a tenant sued for eviction does not select the court in which her federal civil-rights claims will be heard. A party cannot be held to have elected to litigate her federal claims in a forum she was summoned to.

e. The claims asserted here were not compulsory counterclaims in the summary unlawful detainer proceeding and their omission does not bar them. Under Utah R. Civ. P. 13(a), a counterclaim is compulsory only if it arises from the transaction that is the subject matter of the opposing claim; the subject matter of an unlawful detainer action is the right to immediate possession, and a landlord who proceeds on a pay-or-quit notice recovers possession and is not required to litigate collateral claims, which may be brought separately. Plaintiff's claims for

race discrimination and retaliation damages did not bear on the right of possession, were permissive at most, and their omission does not preclude them.

f. Nor should the state judgment receive preclusive effect where Defendants procured it by manufacturing the very default on which it rests. Defendants refused Plaintiff's tendered rent because, as their counsel explained, "[m]y client was interested in seeing a vacate date" and a payment "would have voided our (Unintelligible)" (MSJ Hrg. Tr. 38:9–14), and then obtained a judgment on the holdover that followed. Preclusion presupposes that the party to be bound had a full and fair opportunity to litigate; a party that engineers the predicate for a summary judgment through its own deliberate conduct cannot invoke the resulting judgment to foreclose claims arising from that same conduct.

g. Plaintiff did not have a full and fair opportunity to litigate her federal claims in the state proceeding. She was forced to proceed pro se at summary judgment and trial because she could no longer afford her trial counsel, who charged thousands of dollars per week, after the eviction rendered her homeless and diverted her limited resources to temporary housing. The written April 4 offer, the most direct evidence of coercion and retaliation, was never analyzed under § 3617 by any court. The credibility finding on which the dismissal of her counterclaims rested in part was made against the only witness with firsthand knowledge of the disputed document, after the court directed her to turn off her camera, with nothing in the record showing it came back on, and was then affirmed on appeal under a demeanor-deference standard that by its own terms rests on the trial court's opportunity to view the witness. The judgment was not served on her when it was entered. And Plaintiff's appeal was decided by a panel two of whose

three members, Judges Oliver and Orme, were the subjects of a formal judicial misconduct complaint Plaintiff had filed with the Utah Judicial Conduct Commission on June 9, 2025. That complaint arose from those judges' conduct in a separate, unrelated proceeding and was filed more than eight months before this appeal was assigned a panel; it was not a tactical maneuver aimed at this case. (Emergency Mot. to Continue Oral Arg. & for Recusal ¶¶ 29–30.) The Commission never responded to the complaint, which remained pending and unresolved when the panel heard and decided the appeal. Through counsel, Plaintiff moved to recuse those judges by an Emergency Motion to Continue Oral Argument and for Recusal filed February 18, 2026, the day before argument, panel assignments not having been disclosed in the notice of oral argument; counsel expressly did not suggest that the judges harbored actual bias, relying instead on the appearance standard. (Id. ¶¶ 33–34.) The panel did not recuse, and Judge Oliver signed the decision affirming the judgment against Plaintiff. Plaintiff does not allege that any of these features, standing alone, would independently establish the absence of a full and fair opportunity, and she does not attribute any improper motive to any judge. She alleges that in combination, a pro se litigant rendered counsel-less by the eviction itself, whose central evidence of coercion was never analyzed, whose credibility was rejected after she was directed to turn off her camera and was affirmed on a demeanor rationale, whose judgment was not served on her, and whose appeal was heard over an unresolved recusal objection by judges she had reported for misconduct in an unrelated matter, did not receive the kind of full and fair adjudication to which preclusive effect attaches.

h. Plaintiff was the defendant in the state action. Any preclusive effect on her unasserted claims arises, if at all, under the compulsory counterclaim rule, Utah R. Civ. P. 13(a)(2)(A), under which the pleader "need not state the claim if . . . when the action was commenced, the claim was the subject of another pending action." Plaintiff's race discrimination and retaliation complaint was pending before UALD and HUD when the state action was filed on April 10, 2023.

i. The state courts resolved the case without engaging the governing Utah law that Plaintiff's counsel placed squarely before them, and did so in a decision designated unpublished. Plaintiff's counsel argued at every level that under Salo v. Tyler, 2018 UT 7, ¶ 26, 417 P.3d 581, a party moving for summary judgment on a claim on which it bears the burden of persuasion must produce affirmative evidence in support of each essential element, and that under Pepperwood Homeowners Ass'n v. Mitchell, 2015 UT App 137, ¶¶ 6, 10–11, 351 P.3d 844, a motion supported by a ledger and affidavit but no instrument cannot be granted even absent opposition. The Court of Appeals quoted Salo's rule (Ct. App. Order at 1) but did not discuss Pepperwood. It affirmed on the ground that whether Plaintiff was obligated to pay the disputed fees "was simply not an 'essential element[]'" of the eviction claim (id. at 2), while affirming the dismissal of her fair housing counterclaims on the trial court's alternative finding that nonpayment of the same fees was a "legitimate, nondiscriminatory rationale" for the notice to vacate (id. at 3 n.3). Plaintiff's counsel identified that contradiction in the petition for rehearing, stating that "[b]oth propositions cannot stand" and that "[t]hese two holdings are irreconcilable" (Pet. for Reh'g 10–11), and raised it again in the petition for certiorari (Pet. for Cert. 19). Neither court addressed it. Plaintiff does not ask this Court to correct any of that. She pleads it because a

judgment reached without engaging the controlling law the party invoked, resting on an internal contradiction the courts declined to resolve, and then entered by order so that it stands as no precedent and is not published, does not reflect the full and fair adjudication that preclusion requires.

j. The parties agreed on the record, and the court ordered, that when Plaintiff agreed to vacate, "all issues" were reserved "because she also has a counterclaim and a UALD claim," and Defendants' counsel confirmed, "Yes. Yes, that's right, Your Honor." (Apr. 25, 2023 Hr'g Tr. 4:6–19; paragraph 106.) A judgment does not bar a claim that the parties agreed to reserve and that the court, by its order, reserved. Restatement (Second) of Judgments § 26(1)(a)–(b) (1982) (no bar where "[t]he parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein," or where "[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action").

**178.** No court has ever decided whether Defendants retaliated against Plaintiff for filing her March 8, 2023 discrimination complaint, including by conditioning her housing on its withdrawal. The state courts addressed retaliation only as to the January 30, 2023 notice to vacate: the trial court found that Plaintiff's fee dispute was not protected activity and, alternatively, that Defendants had a legitimate, nondiscriminatory reason for the notice (Findings ¶ 38; ¶ 43 n.10), and the Court of Appeals affirmed on the alternative ground without reaching the protected-activity standard (Ct. App. Order at 3 n.3). At each stage, a rule that would have required closer examination of the evidence was not applied to Plaintiff's benefit: (a) the district court granted summary judgment to the landlord on its own claim on a statement of facts it deemed admitted, although Utah law requires a movant bearing the

burden of persuasion to produce affirmative evidence of each element (paragraph 108); (b) the April 4, 2023 offer was never analyzed under the purpose-based inquiry that Rule 408 requires, after the court told the parties before trial that settlement offers would not come into evidence (paragraph 166); and (c) the Court of Appeals affirmed a credibility finding on the ground that the trial court had the opportunity to view the witnesses firsthand, although the trial court had directed Plaintiff to turn off her camera (paragraphs 111–113). The Utah Supreme Court denied review. Plaintiff pleads these facts only as evidence that her claims were never adjudicated and that she lacked a full and fair opportunity to litigate them, not as a request that this Court correct any state ruling.

k. The accounting on which the eviction rested was never examined by any tribunal. The trial court found that Defendants had the right to charge the fees provided for in the Lease and the Utility and Services Addendum (Findings ¶¶ 30–31), but no tribunal examined the composition of the "past due balance": that roughly $765 of the $863.16 consisted of three late fees charged on underlying balances under $100, which Defendants' own regional manager had told the state agency did not call for a late fee under Defendants' policy; or that Plaintiff paid a $40.00 monthly "Miscellaneous Income" charge, $360 in all, that no page of the lease states, which exceeded every monthly overage. (See ¶¶ 69–70.) Defendants abandoned their claim to the disputed amounts before the court could test them (Findings ¶ 12 n.2), and the Court of Appeals held that the fees were not an essential element of the eviction claim (Ct. App. Order at 2), so Defendants were never required to prove them. The state agency, for its part, accepted the "past due balance" as Defendants' reason without separating the late fees from the charges. Plaintiff does not ask this Court to review the state courts' findings; she

pleads these facts because they show that the question whether she owed anything at all was never actually litigated.

l. The eviction and the $7,395 treble-damages award were decided on summary judgment on April 2, 2024, on the written record, more than eight months before any witness testified. (April 2024 Order at 3–4.) The court described Plaintiff's opposition as arguing that Defendants "violated multiple laws" and "sought to terminate the Lease in 'retaliation,'" and resolved the motion on the elements of possession without deciding that argument. (Id. at 3.) At the summary-judgment hearing, when the court raised Plaintiff's mitigation argument, including her offer to pay April's rent, it observed, "I'm not sure it's applicable to the damages that you're seeking." (MSJ Hrg. Tr. 38:3–8.) The bench trial that followed on December 13, 2024 was limited to Plaintiff's counterclaims; Defendants' own trial brief stated that "[t]he only remaining issue[s] to be tried are [Ms. Blackwell's] claims against [The Pearl] of discrimination and negligent misrepresentation." (Findings ¶ 14 (quoting The Pearl's Trial Brief at 1).) At that trial, the court addressed retaliation only as to the January 30, 2023 notice to vacate. (See ¶ 179.) The district court found that Plaintiff here "did not come forward with admissible material in the record to contest" The Pearl's statement of undisputed material facts (April 2024 Order at 3 n.4), and the Court of Appeals affirmed on the ground that the elements of possession were undisputed (Ct. App. Order at 2). Plaintiff does not ask this Court to revisit that ruling. She pleads these facts because the possession judgment did not decide whether Defendants' refusal of her April 2023 rent, or their April 4, 2023 offer, was retaliation for her discrimination complaint, and no later proceeding decided it either.

**179.** No court in any prior proceeding has analyzed, adjudicated, or decided any claim under 42 U.S.C. § 1981 or § 1982.

**180.** Plaintiff expressly preserved her claims under 42 U.S.C. § 1982 and the Civil Rights Act of 1866 in her Petition for Rehearing filed in the Utah Court of Appeals, which stated that those claims had "never been analyzed by any court in these proceedings." (Pet. for Reh'g 15.)

**181.** The Utah Court of Appeals stated that, because Plaintiff did not formally plead her discrimination and retaliation counterclaims, "it is not entirely clear whether they were brought under the Utah Fair Housing Act, the Federal Fair Housing Act, or both." (Ct. App. Order at 2 n.2.)

**182.** Plaintiff expressly requested that the state appellate disposition not be construed as an adjudication on the merits of her federal civil-rights claims. (Pet. for Reh'g 15.)

**N. This action does not seek review of the state judgment**

**183.** Plaintiff does not ask this Court to review, reverse, vacate, or modify any judgment or order of the Utah courts. She does not contend that the state courts erred in a manner this Court should correct. The state judgment stands, and Plaintiff has satisfied and will continue to satisfy it as the law requires.

**184.** This action seeks damages for Defendants' own conduct: charging fees for services their own witness could not show at trial had been provided to Plaintiff's unit, serving a notice to vacate two days after a Black tenant questioned those fees while a White tenant who did the same was given a meeting and a renewal, refusing her rent so that a default would form, offering her housing in exchange for surrender of a civil rights complaint, and terminating her tenancy. Those acts were complete before any state court ruled on anything. The injuries they caused, loss of housing, homelessness, loss of income, damage to Plaintiff's rental history, and emotional distress, flow from Defendants' conduct, not from any judicial

decision. That the same facts were later the subject of state litigation does not convert a claim for damages against a private party into an appeal. Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 293 (2005) (Rooker-Feldman does not bar an independent claim merely because it "denies a legal conclusion that a state court has reached in a case to which he was a party"; whether such a claim may proceed is a question of preclusion, not jurisdiction).

**185.** The Rooker-Feldman doctrine does not deprive this Court of jurisdiction. The doctrine is narrow. It is confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil, 544 U.S. at 284. The Tenth Circuit applies the doctrine "by asking whether the state-court judgment caused, actually and proximately, the injury for which the federal-court plaintiff seeks redress." Mo's Express, LLC v. Sopkin, 441 F.3d 1229, 1237 (10th Cir. 2006) (quoting Kenmen Eng'g v. City of Union, 314 F.3d 468, 476 (10th Cir. 2002)). The doctrine "does not bar federal-court claims that would be identical even had there been no state-court judgment; that is, claims that do not rest on any allegation concerning the state-court proceedings or judgment." Bolden v. City of Topeka, 441 F.3d 1129, 1145 (10th Cir. 2006). And "when the relief sought by the plaintiffs would not reverse or 'undo' the state-court judgment, Rooker-Feldman does not apply." Mo's Express, 441 F.3d at 1237.

**186.** Plaintiff's injuries were caused by Defendants' conduct, not by any state-court judgment. Defendants charged and reinstated undocumented fees, refused Plaintiff's tendered rent, conditioned her housing on abandonment of her civil rights complaint, and terminated her tenancy because of her race and in retaliation, before and independent of any judicial ruling. Plaintiff's § 1981 and § 1982 claims would be identical had there been no state-court judgment at all; they rest on Defendants' acts, not on any error by any court. The damages

Plaintiff seeks would not reverse or undo the state judgment, and this Court can award them without reexamining or rejecting that judgment. Rooker-Feldman therefore does not apply, and any preclusive effect of the state judgment is a question of preclusion, not jurisdiction, addressed above.

**187.** Courts have recognized that a tenant's independent federal claims survive a state eviction judgment. A federal damages claim for independent wrongs that does not require rejecting the state judgment may proceed; "[t]he injury must be caused by the judgment itself," and "claims that seek only damages for constitutional violations of third parties—not relief from the judgment of the state court—are permitted." Behr v. Campbell, 8 F.4th 1206, 1212, 1214 (11th Cir. 2021); see id. at 1210; Mayotte v. U.S. Bank Nat'l Ass'n, 880 F.3d 1169, 1176 (10th Cir. 2018). The Tenth Circuit has squarely held that Rooker-Feldman does not bar an independent federal claim brought by a plaintiff who litigated related matters in state court. In Bolden v. City of Topeka, 441 F.3d 1129 (10th Cir. 2006), a Black property owner brought federal civil-rights claims, including under 42 U.S.C. §§ 1981, 1982, 1983, and 1985 and the Fair Housing Act, arising from the demolition of his buildings, after losing a state-court suit to enjoin the demolition; the district court dismissed his claims relating to the demolition under Rooker-Feldman as "inextricably intertwined" with the state litigation. Id. at 1131, 1133, 1138. The Tenth Circuit disagreed, holding: "When the state-court judgment is not itself at issue, the doctrine does not prohibit federal suits regarding the same subject matter, or even the same claims, as those presented in the state-court action. The doctrine that governs litigation of the same subject matter or the same issues is res judicata." Id. at 1139. The court explained that where "the allegations underlying [the plaintiff's] federal-court claims are identical to what they would have been had there been no state-court proceeding," and no claim "rests on allegations that the state-court proceedings or judgment violated federal law, or that the judgment itself inflicted an injury," Rooker-Feldman does not apply and any bar is a matter of

preclusion. Id. at 1138. That is precisely Plaintiff's situation: her § 1981 and § 1982 claims arise from Defendants' conduct, would be identical had there been no state proceeding, and do not rest on any allegation that the state judgment injured her or violated federal law.

**188.** The Tenth Circuit reaffirmed this rule on facts closely resembling Plaintiff's in Mayotte v. U.S. Bank National Ass'n, 880 F.3d 1169 (10th Cir. 2018). There, a borrower alleged that her lender told her she had to miss payments to obtain a loan modification, then placed her in default rather than modifying the loan, and pursued a state foreclosure. She brought federal claims for damages. The Tenth Circuit held that Rooker-Feldman did not bar her suit: "to proceed on her federal-court claims for damages . . . [she] need not set aside, or challenge in any way, the [state] decision. All the facts she alleges in the Complaint to obtain such relief preexisted the [state] proceedings. She can prove her claims without any reference to the state-court proceedings." Id. at 1176. The court further held that this result does not depend on timing: "[e]ven if the federal suit had been brought after judgment was entered in the state litigation, the federal suit would not be barred by Rooker-Feldman unless 'an element of the claim [was] that the state court wrongfully entered its judgment.'" Id. (quoting Campbell v. City of Spencer, 682 F.3d 1278, 1283 (10th Cir. 2012)). In Campbell itself, the Tenth Circuit held that a plaintiff's claims challenging the search and seizure that preceded a state forfeiture judgment were not barred: she "could raise the same claims even if there had been no state-court proceedings," because "[t]he allegedly unconstitutional acts preceded any judgment by the state court," and any inconsistency with the state judgment "is a matter of preclusion doctrine, not Rooker-Feldman." 682 F.3d at 1285. The same court held that her due-process and excessive-fine claims were barred, because the deprivation and the bond she complained of "were . . . acts of the state court" and "the merits of this claim cannot be stated except in terms of the state-court judgment." Id. at 1284–85. Plaintiff's claims here are of the first kind. As in Mayotte, Plaintiff's claims arise from a manufactured default, all the operative facts

preexisted the state judgment, she can prove her claims without reference to the state proceedings, and no element of her claim is that the state court wrongfully entered its judgment. Rooker-Feldman does not bar this suit. Plaintiff's claims are of the same character as those the Tenth Circuit allowed to proceed in Bolden. She does not seek the return of her home or the undoing of the eviction; she seeks damages for Defendants' independent violations of her federal civil rights, which the state possession proceeding had no power to adjudicate and which this Court can redress without disturbing the state judgment.

**189.** To the extent Plaintiff pleads the amount of the state judgment, garnishment, or the pending fee and bond motions, she does so as evidence of the continuing course of retaliatory conduct and as a measure of the financial consequences of Defendants' discrimination, not as a request that this Court set aside any of those amounts. The Tenth Circuit's rule in Bolden and Mayotte applies with particular force to a plaintiff who did not choose the state forum: the party that selected the court is the party the federal statutes regulate, and that party cannot, by suing first, convert a tenant's federal claims into an appeal.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of 42 U.S.C. § 1981 (Civil Rights Act of 1866): Interference with the Right to Make and Enforce Contracts**

**190.** Plaintiff incorporates all preceding paragraphs.

**191.** Section 1981 guarantees to all persons within the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b).

**192.** To state a claim under § 1981, a plaintiff must allege that (1) she is a member of a protected class; (2) the defendant intended to discriminate against her on the basis of race; and (3) the discrimination interfered with a protected activity as defined in § 1981, here the making, performance, enforcement, and termination of a contract and the enjoyment of its benefits, privileges, terms, and conditions. Cruz v. Farmers Ins. Exch., 42 F.4th 1205, 1210 (10th Cir. 2022); Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1102 (10th Cir. 2001). Section 1981 reaches private conduct. Runyon v. McCrary, 427 U.S. 160, 168, 173 (1976) (§ 1981 "prohibits racial discrimination in the making and enforcement of private contracts" and, "like § 1982, reaches private conduct"). Each element is pleaded below with supporting facts.

**193.** Plaintiff is a member of a racial minority. She is Black. (UALD Determination at 17; R. 233 at 2.)

**194.** Plaintiff had a contractual relationship with Defendants: her residential tenancy, a contract Defendants approved and under which she performed by paying $2,690 on time every month through March 2023. (R. 240-42; R. 530; R. 602; R. 1029.)

**195.** Defendants intentionally interfered with Plaintiff's right to the performance, enjoyment, benefits, privileges, terms, and conditions of that contractual relationship on the basis of her race, including by:

a. charging her fees that Defendants' own personnel had described as a "glitch" and a "setting issue";

b. issuing a notice to vacate two days after she questioned those fees, without meeting or discussion, while affording a similarly situated White tenant a meeting, a renewal, and no notice;

c. refusing to accept her tendered rent in order to manufacture a default;

d. terminating her tenancy; and

e. conditioning the continuation of her tenancy on the surrender of her race-discrimination complaint.

**196.** Defendants further interfered with Plaintiff's contractual rights by enforcing against her purported contractual terms in a fee addendum she never signed and that no witness with personal knowledge authenticated, and by ending her tenancy over her nonpayment of the charges that addendum created. Section 1981 guarantees the same right to make and enforce contracts as is enjoyed by white citizens. Holding a Black tenant to unsigned terms she never agreed to, while a White tenant who disputed the same terms was given a meeting and a renewal, is interference with the right to make and enforce contracts on the basis of race.

**197.** Defendants treated a similarly situated White tenant, Adam Shelton, more favorably in identical circumstances.

**198.** Section 1981 guarantees the "same right" to make and enforce contracts "as is enjoyed by white citizens." The statute is, by its terms, addressed to the existence of two classes of persons, one of whom receives the benefit of the law and one of whom does not. That is what the record here shows in a single building. A White tenant who disputed the fees was given a conversation and a renewal. The only Black tenant, who disputed the same fees, was given a notice on her door in two days, had her rent refused, was offered her home back for the price of her civil rights complaint, and was evicted after disputing charges created by an unsigned fee addendum, on an unauthenticated partial lease. The published law of Utah, had it been applied, would have required Defendants to prove the lease they sued on. It was applied for the defendant in Pepperwood. It was not applied for Plaintiff. The right to have the same rules applied is the right § 1981 protects, and Plaintiff did not receive it.

**199.** Defendants' intent to discriminate on the basis of race is pleaded through: (i) direct evidence, the April 4, 2023 written offer conditioning her housing on withdrawal of her race discrimination complaint; (ii) comparator evidence, the more favorable treatment of a White tenant who engaged in the same conduct; (iii) Defendants' knowledge of Plaintiff's race, established by in-person meetings with management in November 2022 and by her January 30, 2023 written statement that she would file a discrimination complaint, both before the adverse actions that followed (Counterclaim ¶¶ 8, 10; R. 20; R. 182); (iv) the fact that Plaintiff was the only Black tenant and the only tenant not renewed, though Rutherford placed ten to twelve pay-or-vacate notices on tenants' doors (UALD Determination at 8–9, 17); (v) the shifting and pretextual explanations for the eviction; and (vi) the temporal sequence of adverse actions following each assertion of her rights.

**200.** But for Plaintiff's race, Defendants would not have terminated her tenancy and would not have interfered with her contractual rights as they did.

**201.** Section 1981 also prohibits retaliation against a person for asserting rights protected by the statute. CBOCS West, Inc. v. Humphries, 553 U.S. 442, 128 S. Ct. 1951, 1954–55 (2008) ("The basic question before us is whether the provision encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract-related 'right.' We conclude that it does."). CBOCS rests on Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 234–35, 237 (1969), a case in which a white lessor was expelled from a community association for protesting its refusal, on racial grounds, to approve the assignment of his membership share to his Black tenant; "this Court has made clear that Sullivan stands for the proposition that § 1982 encompasses retaliation claims." CBOCS, 128 S. Ct. at 1955 (citing Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 176 (2005)). And "the Court has construed §§ 1981 and 1982 alike because it has recognized the sister statutes'

common language, origin, and purposes." Id. at 1956. Defendants retaliated against Plaintiff for opposing race discrimination in her tenancy and for filing a race discrimination complaint.

**202.** The April 4, 2023 written offer, conditioning Plaintiff's continued tenancy on dismissal of her race discrimination complaint, is direct evidence that Defendants' interference with Plaintiff's contractual rights was because of, and in retaliation for, her assertion of rights protected by § 1981. The offer is a statement by Defendants' agent, admissible against Defendants, and it proves discriminatory motive without inference. The Tenth Circuit has held that such direct evidence of racial motive in the termination of a contract precludes summary judgment on a § 1981 claim and takes the case outside the McDonnell Douglas framework. Cruz v. Farmers Ins. Exch., 42 F.4th 1205, 1210–11, 1216–17 (10th Cir. 2022); Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985) ("the McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination"). Under Comcast Corp. v. National Ass'n of African American-Owned Media, 589 U.S. 327, 140 S. Ct. 1009, 1019 (2020), a § 1981 plaintiff "must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." Plaintiff so pleads: but for her race and her race discrimination complaint, Defendants would not have refused her rent, offered to trade her housing for her complaint, or terminated her tenancy. Defendants' own written offer establishes that the complaint was the operative cause, because withdrawing the complaint was the stated price of keeping the home.

**203.** As a direct and proximate result, Plaintiff has suffered loss of housing, homelessness, financial loss including the treble judgment, garnishment, fees and bond forfeiture, damage to her credit and rental record, and severe emotional distress.

**204.** This claim is timely. Plaintiff's § 1981 claims arise from Defendants' conduct in the performance, modification, and termination of her tenancy and in retaliation for her assertion of § 1981 rights, all of which is conduct made actionable by the Civil Rights Act of

1991. Such claims are governed by the four-year limitations period of 28 U.S.C. § 1658, which applies to a § 1981 claim "if the plaintiff's claim against the defendant was made possible by a post-1990 enactment," including claims for wrongful termination and for the "benefits, privileges, terms, and conditions of the contractual relationship" that the Civil Rights Act of 1991 added to § 1981(b). Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382–83 (2004). In the alternative, to the extent any claim borrows a state limitations period, federal courts borrow the forum state's personal-injury limitations period, Wilson v. Garcia, 471 U.S. 261, 276–80 (1985), and, where a state has more than one, "the general or residual statute for personal injury actions," Owens v. Okure, 488 U.S. 235, 249–50 (1989). In Utah that is the four-year residual statute for an action "for relief not otherwise provided for by law," Utah Code Ann. § 78B-2-307(4) (formerly § 78-12-25(3), see Owens, 488 U.S. at 244 n.8), which the Tenth Circuit has applied to federal civil rights claims. Mismash v. Murray City, 730 F.2d 1366, 1367 (10th Cir. 1984) (en banc) (holding "that all section 1983 claims brought in federal court in Utah are subject to the four-year limitations period provided in Utah Code Ann. § 78-12-25"); Arnold v. Duchesne County, 26 F.3d 982, 985, 989 (10th Cir. 1994) (holding that Utah's later two-year statute specific to § 1983 actions could not be applied to them, because "neither Congress nor the Supreme Court has authorized states to create limitations periods specifically and exclusively applicable to section 1983 actions"). Under either period, this action, filed within four years of the April 29, 2023 eviction, is timely as to every act alleged. Defendants' 2026 motions for attorney fees and bond forfeiture are additionally discrete acts within any limitations period.

**COUNT II**

**Violation of 42 U.S.C. § 1982 (Civil Rights Act of 1866): Equal Rights in Property**

**205.** Plaintiff incorporates all preceding paragraphs.

**206.** Section 1982 provides that all citizens "shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property."

**207.** To state a claim under § 1982, a plaintiff must allege that (1) she is a member of a racial minority; (2) the defendant intended to discriminate against her on the basis of race; and (3) the discrimination concerned one of the property rights enumerated in the statute, here the right to lease and hold real property. The Supreme Court "has construed §§ 1981 and 1982 alike because it has recognized the sister statutes' common language, origin, and purposes." CBOCS West, Inc. v. Humphries, 553 U.S. 442, 128 S. Ct. 1951, 1956 (2008). Cf. Hampton, 247 F.3d at 1102 (elements of a § 1981 claim); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 420–21 (1968) (a Black citizen who "can be turned away simply because he is not white" from a home he wants to buy or rent does not enjoy "the same right . . . as is enjoyed by white citizens"). Each element is pleaded: Plaintiff is Black; Defendants' discriminatory intent is established by the facts set forth in paragraph 199, incorporated here; and the discrimination concerned Plaintiff's leasehold, which Defendants terminated, and her ability to lease other property, which the resulting eviction record impairs.

**208.** Section 1982 reaches private as well as public actors. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 413, 436–37 (1968) (holding "that § 1982 bars all racial discrimination, private as well as public, in the sale or rental of property"). It protects the right to lease, and it does so "against the actions of third parties, as well as against the actions of the immediate lessor." Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237 (1969). It therefore reaches Greystar, which managed the property and executed the conduct alleged, as well as the owner. A narrow construction of the language of § 1982 "would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866." Id.

**209.** Section 1982 prohibits retaliation against a person for opposing racial discrimination in connection with a lease. In Sullivan, a lessor protested an association's refusal, on racial grounds, to approve the assignment of a membership share to his Black tenant, and was expelled. The Supreme Court held: "If that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities protected by § 1982. Such a sanction would give impetus to the perpetuation of racial restrictions on property." 396 U.S. at 237. See Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 176 (2005) ("Thus, in Sullivan we interpreted a general prohibition on racial discrimination to cover retaliation against those who advocate the rights of groups protected by that prohibition."); id. at 180 ("Sullivan made clear that retaliation claims extend to those who oppose discrimination against others."). Plaintiff was punished, by a sanction backed by a state court judgment, for opposing racial discrimination in her own tenancy and for filing a race discrimination complaint. That is the conduct Sullivan holds § 1982 forbids.

**210.** Section 1982 is an independent remedy that the Fair Housing Act did not displace. In Sullivan, the Supreme Court reaffirmed what it had said in Jones: that the Fair Housing Act "in no way impaired the sanction of § 1982." 396 U.S. at 237 (citing Jones, 392 U.S. at 413–17). The Court also declined the suggestion that relief under § 1982 should await proceedings under the Fair Housing Act. Id. at 240. Damages for violation of § 1982 are recoverable, governed by federal standards under 42 U.S.C. § 1988, and this Court has jurisdiction over such claims under 28 U.S.C. § 1343(4). Id. at 238-40. A racially motivated refusal to rent, and a racially motivated termination of a lease, are each actionable under § 1982. Smith v. Sol D. Adler Realty Co., 436 F.2d 344, 349–50 (7th Cir. 1970) (under § 1982, "race is an impermissible factor in an apartment rental decision and . . . it cannot be brushed aside because it was neither the sole reason for discrimination nor the total factor of discrimination"); Walker v. Pointer, 304 F. Supp. 56, 61, 63 (N.D. Tex. 1969) (White tenants

evicted "in retaliation for the appearance of Negro guests"; "[t]he racially motivated termination of the lease violated section 1982 which expressly protects the right to 'lease' real property").

**211.** Defendants denied Plaintiff the same right to lease and hold real property as is enjoyed by white citizens, on the basis of her race, through the conduct described above.

**212.** A similarly situated White tenant who engaged in the same conduct, questioning the same fees, retained his leasehold; Plaintiff did not.

**213.** Section 1982 guarantees the "same right" to lease and hold real property "as is enjoyed by white citizens." A White tenant in Plaintiff's building held his leasehold through the same dispute. Plaintiff lost hers. The difference in outcome was not produced by a difference in conduct; both tenants questioned the same fees. It was produced by a difference in how Defendants responded to that conduct, and Defendants' response to Plaintiff was to end her tenancy the day she raised discrimination and to refuse the rent that would have preserved it. The right to hold property on the same terms as white citizens is the right § 1982 protects, and Plaintiff did not receive it.

**214.** Plaintiff's leasehold was terminated after she disputed charges created by an unsigned fee addendum, and the claim against her was decided on a partial 14-of-40-page lease copy that no witness with personal knowledge of its formation authenticated. Depriving a Black citizen of her leasehold on the strength of an unsigned, unauthenticated document, on terms not enforced against a White tenant who disputed them, denies her the same right to lease and hold real property as is enjoyed by white citizens.

**215.** As a direct and proximate result, Plaintiff has suffered the injuries described above.

**216.** This claim is timely. Section 1982 contains no limitations period of its own. Federal courts borrow the forum state's personal-injury limitations period, Wilson v. Garcia,

471 U.S. 261, 276–80 (1985), and where a state has more than one, "the general or residual statute for personal injury actions," Owens v. Okure, 488 U.S. 235, 249–50 (1989), which in Utah is the four-year residual statute for an action "for relief not otherwise provided for by law," Utah Code Ann. § 78B-2-307(4) (formerly § 78-12-25(3), see Owens, 488 U.S. at 244 n.8). Mismash v. Murray City, 730 F.2d 1366, 1367 (10th Cir. 1984) (en banc); Arnold v. Duchesne County, 26 F.3d 982, 985, 988 (10th Cir. 1994) (reaffirming the four-year residual statute for § 1983 actions and observing that "[c]ivil rights actions brought in Utah under other sections of the Civil Rights Acts are arguably still covered by the residual four-year statute held applicable by Mismash"). This action is filed within four years of the April 29, 2023 eviction and of every subsequent act alleged.

**COUNT III**

**Violation of the Fair Housing Act, 42 U.S.C. § 3604: Discrimination in the Terms, Conditions, and Privileges of Rental**

**217.** Plaintiff incorporates all preceding paragraphs.

**218.** Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her rental, and in the provision of services and facilities in connection therewith, because of race, in violation of 42 U.S.C. § 3604(b), including by:

a. assessing fees against her that Defendants' own records identified as erroneous;

b. serving a pay-or-vacate notice one week after Defendants' own ledger showed her account in credit;

c. serving a notice to vacate two days after she questioned the fees, while affording a White tenant who questioned the same fees a meeting and a renewal;

d. refusing to provide her a rental reference;

e. refusing to accept her tendered rent;

f. declining to renew her lease; and

g. evicting her.

**219.** Plaintiff was "qualified" to rent. Qualification turns on the landlord's general rental criteria at the outset of the tenancy. Defendants approved her tenancy, and she paid the full disclosed rent of $2,690 on time every month through March 2023. (R. 240-42; R. 530; R. 602; R. 1029.) A tenant does not become "unqualified" by disputing charges she reasonably believes were not part of her agreement, particularly where the landlord itself later abandoned those charges.

**220.** Defendants were on notice that a minor child resided in the unit. On March 15, 2023, Plaintiff wrote to Defendants requesting to remain through June 30, 2023 so that her son could finish the school year, and disclosed his disability. Defendants refused, insisting on a mid-school-year move-out, and three weeks later offered the identical June 30 stay in exchange for dismissal of the discrimination complaint. The displacement of Plaintiff's household, including her disabled child, in the middle of the school year is part of the injury Plaintiff suffered from Defendants' conduct.

**221.** This action is timely under 42 U.S.C. § 3613(a)(1)(A), which runs from "the occurrence or the termination of an alleged discriminatory housing practice . . . whichever occurs last," and § 3613(a)(1)(B), which excludes from the limitations period "any time during which an administrative proceeding under this subchapter was pending."

**222.** Plaintiff's administrative complaint was pending before UALD, and dual-filed with HUD as HUD No. 08-23-6448-8, from March 8, 2023. UALD issued its determination on or about September 1, 2023. On September 25, 2023, Plaintiff requested de novo review, and Defendants elected to have that review take place in district court (paragraph 158). HUD's

case records show the dual-filed complaint closed with a no-cause determination on July 18, 2024. (HUD case records.) Plaintiff never received a closure letter from HUD; the only guidance she received was UALD's direction to proceed in district court. The period from March 8, 2023 through July 18, 2024, during which that administrative proceeding was pending, is excluded from the limitations computation. 42 U.S.C. § 3613(a)(1)(B). HUD FHEO Region VIII also corresponded with Plaintiff about the complaint in August and September 2026.

**223.** Defendants' discriminatory and retaliatory practice did not terminate with the eviction. It has continued without interruption through the filing of this action, including through: enforcement of the judgment by garnishment; a motion filed in 2026 seeking attorney fees, a substantial portion of which Defendants seek for defending against Plaintiff's fair housing counterclaim, on the asserted authority of the fee clause in the lease; a motion filed in 2026 to forfeit the bond Plaintiff was required to post to appeal; and collection contacts with members of Plaintiff's family who were never parties to the lease (paragraph 123). Defendants filed their reply in support of those motions on August 27, 2026. Each of these acts is a further exercise of the same retaliatory course of conduct: penalizing Plaintiff financially for having asserted fair housing rights. Where a plaintiff challenges not a single incident but an unlawful practice that continues into the limitations period, the complaint is timely if filed within the statutory period of the last occurrence of that practice. Havens Realty Corp. v. Coleman, 455 U.S. 363, 380–81 (1982) ("where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice"). The last asserted occurrence was August 27, 2026.

**224.** In the further alternative, the limitations period on Plaintiff's Fair Housing Act claims is equitably tolled. Plaintiff pursued her rights with diligence at every stage: she

contacted HUD's Office of Fair Housing and Equal Opportunity on February 10, 2023, eleven days after the notice to vacate and before she lost her home, and no formal complaint was drafted from that contact; she filed with UALD on March 8, 2023; she requested de novo review of UALD's determination within twenty-four days, on September 25, 2023, and UALD acknowledged the request as timely (paragraph 158); on December 8, 2023, she sent UALD staff a request for her case file under the Government Records Access and Management Act, at their direction, and, although staff replied that day that they would "start working on your request right away," she never received the records (Emails between Plaintiff and G. Salazar, UALD, Dec. 8, 2023); she asserted discrimination and retaliation in her state-court answer and counterclaim; and she litigated her claims through trial, appeal, rehearing, and certiorari. Extraordinary circumstances stood in her way: she was forced to proceed pro se at summary judgment and trial when she could no longer afford counsel after the eviction rendered her homeless; she was rendered homeless by the eviction itself, has been homeless on and off since, and has been continuously homeless since September 2024; the state court's January 22, 2025 judgment was not served on her when entered, so that she learned of it only through her own efforts; and the federal agency she first contacted did not act on her report. A litigant who did everything the system asked of her, in the order it asked, while homeless, should not be deprived of a federal remedy because the institutions she went to did not act within the period the statute allots.

**225.** Plaintiff's Fair Housing Act claims are pleaded in the alternative to her claims under 42 U.S.C. §§ 1981 and 1982, and are independently supported by the same facts. To the extent any Fair Housing Act claim is found untimely or barred, Plaintiff's claims under §§ 1981 and 1982, which carry a four-year limitations period and were never pleaded or adjudicated in any prior proceeding, are unaffected.

**226.** The § 3617 claim in particular was never adjudicated in the state proceeding. No court analyzed the April 4, 2023 offer under § 3617, and the trial court's retaliation analysis addressed only the January 30, 2023 notice. (Findings ¶¶ 33–43.) The Utah Court of Appeals declined to reach Plaintiff's challenge to the protected-activity standard. (Ct. App. Order at 3 n.3.) An issue that was never reached was neither actually litigated nor necessarily decided, and no preclusion attaches to it.

**227.** No conciliation agreement was reached. The UALD no-cause determination is not a conciliation agreement.

**COUNT IV**

**Violation of the Fair Housing Act, 42 U.S.C. § 3617: Coercion, Intimidation, Threats, and Interference**

**228.** Plaintiff incorporates all preceding paragraphs.

**229.** Section 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected" by the Fair Housing Act.

**230.** Filing a race-discrimination complaint with UALD, a HUD Fair Housing Assistance Program agency, is protected activity. HUD's implementing regulations expressly prohibit "[r]etaliating against any person because that person has made a complaint . . . in a proceeding under the Fair Housing Act," 24 C.F.R. § 100.400(c)(5), and prohibit retaliation for reporting discrimination, 24 C.F.R. § 100.400(c)(6).

**231.** Whether activity is protected does not depend on whether the complainant ultimately prevails on the underlying grievance. It depends on the good-faith act of opposing a practice the complainant reasonably believed was discriminatory. Wyatt v. City of Boston, 35 F.3d 13, 15 (1st Cir. 1994); Brower v. Runyon, 178 F.3d 1002, 1006 (8th Cir. 1999); Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015–16 (10th Cir. 2004) ("A plaintiff need not convince

the jury that his employer had actually discriminated against him; he need only show that when he engaged in protected opposition, he had a reasonable good-faith belief that the opposed behavior was discriminatory."); see Appellant's Reply Br. 16 (citing Wyatt and Brower). The Tenth Circuit protects opposition "based on a mistaken good faith belief that Title VII has been violated," Crumpacker v. Kan. Dep't of Hum. Res., 338 F.3d 1163, 1171 (10th Cir. 2003) (quoting Love v. RE/MAX of Am., Inc., 738 F.2d 383, 385 (10th Cir. 1984)), and reaches retaliation "even when the underlying conduct may not constitute a violation of Title VII," id. at 1172. The United States has read § 3617 the same way: a § 3617 plaintiff "need only show that he had a reasonable belief that he was acting to protect fair housing rights," and is protected "even if he were mistaken." Statement of Interest of the United States at 5, Arnal v. Aspen View Condo. Ass'n, No. 1:15-cv-01044 (D. Colo. July 15, 2016), ECF No. 90. "[T]he challenged activity cannot defeat Plaintiffs' prima facie case." Treece v. Perrier Condo. Owners Ass'n, 593 F. Supp. 3d 422, 440 (E.D. La. 2022). A federal court in this Circuit has applied these principles directly. In Arnal v. Aspen View Condominium Ass'n, Inc., 226 F. Supp. 3d 1177 (D. Colo. 2016), the court held that "[a] violation of Section 3617 may be shown even absent other violations of the FHA," id. at 1188, and denied summary judgment on the plaintiff's retaliation claim, finding that "a reasonable jury could conclude that the imposition of these fines constitute coercion, intimidation, threats or interference," id. at 1188. The same principles apply here: Plaintiff's § 3617 claim does not depend on her prevailing on any underlying discrimination claim, and Defendants' imposition of charges, refusal of rent, and pursuit of fees against Plaintiff for having asserted her fair housing rights supports her claim of retaliation.

**232.** Plaintiff opposed the fees in good faith and with a reasonable belief that they were being discriminatorily enforced against her as the only Black tenant, a belief corroborated by Defendants' own managers' statements that the late fees were a "glitch," by their witness's lack

of documentation at trial for the pest control charges, and by the fact that a White tenant who disputed the same fees was not evicted.

**233.** Defendants' April 4, 2023 written offer, conditioning forgoing the eviction, the waiver of all fees, continued occupancy, and a positive reference on Plaintiff's dismissal of her discrimination complaint, constitutes coercion and interference under § 3617 on its face.

**234.** The April 4 offer is direct evidence of a § 3617 violation. The condition is stated in terms: housing "in return for you dismissing your Discrimination Claim." No inference is required. Where a plaintiff presents direct evidence, the McDonnell Douglas burden-shifting framework does not apply. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985). Plaintiff pleads this claim on direct evidence and, in the alternative, under the circumstantial framework.

**235.** An offer that conditions continued housing on abandonment of a pending fair housing complaint is not merely evidence about a violation. It is the violation. Section 3617 prohibits the conditioning itself, whether or not the tenant accepts. Requiring dismissal of a race discrimination complaint as a condition of continued housing is retaliation per se: it establishes, by its own terms, that the complaint was the reason for the adverse action. See Stackhouse v. DeSitter, 620 F. Supp. 208, 210–12 (N.D. Ill. 1985) (§ 3617 prohibits coercion "on account of the person's having exercised" fair housing rights); United States v. Hinesville Housing Authority, No. 4:23-cv-00288-LGW-CLR (S.D. Ga. Sept. 29, 2023) (consent order resolving the United States' allegation that a housing authority retaliated by issuing a non-renewal notice within five days of learning of the tenant's HUD complaint) (as cited in Appellant's Reply Br. 17). On appeal, The Pearl did not respond to Plaintiff's argument that conditioning continued housing on dismissal of a race-discrimination complaint is retaliation per se under § 3617; Plaintiff's counsel noted that "The Pearl fails to respond to this argument" and argued that the failure was itself a basis for reversal. (Appellant's Reply Br. 17 (citing

Broderick v. Apartment Mgmt. Consultants, LLC, 2012 UT 17, ¶¶ 19–20, 279 P.3d 391).) The Court of Appeals did not reach the argument.

**236.** The temporal sequence independently establishes retaliation: notice to vacate two days after Plaintiff's fee objection; refusal of tendered rent after her discrimination complaint; the conditional offer one day after Defendants' position statement to the agency; and suit filed six days after Plaintiff declined the offer. Protected conduct closely followed by adverse action supports an inference of retaliatory motive, and a period of roughly six weeks between the two may by itself establish causation. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). UALD applied that standard and found causation between Plaintiff's March 8, 2023 complaint and the April 10, 2023 eviction. (Determination at 20.)

**237.** Section 3617 does not require that the coercion succeed, and does not require a separate eviction action. It prohibits the conditioning itself.

**238.** Defendants further interfered with and retaliated against Plaintiff by issuing the notice to vacate two days after her fee objection, by refusing her tendered rent, and by prosecuting an eviction and treble-damages claim premised on the default their refusal created.

**239.** Defendants' retaliation did not end with the eviction and has continued into the present. Defendants have garnished Plaintiff's wages in enforcement of the judgment, and in 2026 moved for attorney fees, a substantial portion of which they seek for defending against Plaintiff's fair housing counterclaim, and moved to forfeit the bond Plaintiff was required to post to appeal. Seeking to impose on Plaintiff the cost of Defendants' defense against her own fair housing claim, where no statute authorizes it and no court has found her claim frivolous, is itself a further act of coercion and interference under § 3617. The request is also facially deficient: Defendants' own reply conceded an arithmetic error and four misdated entries, offered no evidence that the $350 rate is reasonable, and did not allocate between eviction work and fair-housing-defense work. (Reply at 1–2.) Plaintiff does not ask this Court to deny

or reduce the fees; that question is before the state court. She pleads the fee pursuit as evidence of the continuing retaliatory course of conduct and as an element of her damages. Each of these acts is a continuation of the same retaliatory course of conduct: penalizing Plaintiff financially for having asserted her fair housing rights. The most recent of these acts, Defendants' reply in support of the fee and bond motions, was dated and served on August 27, 2026.

**240.** This claim is timely on three independent grounds. First, Defendants' 2025 and 2026 acts, the garnishment that issued February 20, 2025 and the June 2026 motions for attorney fees and bond forfeiture, each occurred within two years of the filing of this action and are independently actionable under 42 U.S.C. § 3617 as coercion and interference on account of Plaintiff's having exercised her fair housing rights. Second, those acts are the most recent occurrences of a single retaliatory practice that began with the January 30, 2023 notice to vacate and has continued without interruption, so that the entire practice is timely under 42 U.S.C. § 3613(a)(1)(A) and the continuing-violation principle pleaded in paragraph 223, with the computation excluding the period the administrative proceeding was pending under § 3613(a)(1)(B), and subject in the alternative to the equitable tolling pleaded in paragraph 224. Third, and in any event, every act of retaliation alleged in this Count, including the refused rent, the April 4, 2023 written offer, and the eviction suit, is independently actionable under 42 U.S.C. §§ 1981 and 1982 (Counts I and II), which carry a four-year limitations period, so that no determination about the timeliness of this Count affects Plaintiff's right to recover for the same conduct under the Civil Rights Act of 1866.

**241.** The governing framework for circumstantial claims under 42 U.S.C. §§ 3604(b) and 3617 is the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973), under which the plaintiff's prima facie burden is not onerous, see Treece, 593 F. Supp. 3d at 439, and, once the defendant articulates a reason, the factfinder decides

intent, see id. at 441, including whether disbelief of the proffered reason, together with the prima facie case, permits an inference of unlawful motive. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) (as cited and described in Appellant's Opening Br. 36–37, 43). Qualification to rent focuses on the landlord's objective rental criteria, and a tenant who pays her rent does not become unqualified by disputing charges she reasonably believes were not part of her agreement. In the state proceeding, the trial court held that Plaintiff was not "qualified" because she did not pay the disputed fees and that her fee dispute was not protected activity; in the alternative, it found a legitimate, nondiscriminatory reason for the January 30, 2023 notice and no proof that discrimination or retaliation was the real reason. (Findings ¶¶ 32, 38 & nn.8, 10.) Plaintiff pleads those rulings only to show what was and was not decided. This action applies the governing federal framework, on a full record, to conduct the state courts did not address, including the April 4, 2023 offer and Defendants' conduct after Plaintiff's March 8, 2023 complaint.

**242.** No court has analyzed the April 4, 2023 offer under 42 U.S.C. § 3617.

**243.** The state investigative agency that examined this conduct found that Plaintiff established a prima facie case of retaliation. Applying the Tenth Circuit standard of O'Neal v. Ferguson Construction Co., 237 F.3d 1248, 1253 (10th Cir. 2001), the agency found that Plaintiff engaged in protected activity when she filed her discrimination complaint on March 8, 2023, that Defendants subjected her to a materially adverse action approximately five weeks later when they initiated eviction proceedings on April 10, 2023, and that the temporal proximity demonstrated a causal connection. The agency concluded, in its own words, that "Complainant has demonstrated a causal connection between her engaging in a protected activity on March 8, 2023, and Respondent subjecting her to an adverse action on April 10, 2023, through temporal proximity," and that "Complainant establishes the third element of a claim of retaliation, and her prima facie case." (UALD Determination at 20.) That the agency

nonetheless issued a "no cause" disposition does not diminish the finding: a government investigator, applying the governing federal standard, found Plaintiff had made a prima facie showing of retaliation on the same facts alleged here.

**COUNT V**

**Wrongful Retention of Security Deposit, Utah Code Ann. § 57-17-3 (Supplemental Jurisdiction)**

**244.** Plaintiff incorporates all preceding paragraphs.

**245.** Plaintiff paid Defendants a $500 security deposit at the commencement of her tenancy.

**246.** Utah Code Ann. § 57-17-3(2) requires that "[n]o later than 30 days after the day on which a renter vacates and returns possession of a rental property to the owner or the owner's agent, the owner or the owner's agent shall mail or deliver to the renter" "(a) the balance of any deposit; (b) the balance of any prepaid rent; and (c) if the owner or the owner's agent made any deductions from the deposit or prepaid rent, a written notice that itemizes and explains the reason for each deduction." The statute permits an owner, "[u]pon termination of a tenancy," to "apply property or money held as a deposit toward the payment of rent, damages to the premises beyond reasonable wear and tear, other costs and fees provided for in the contract, or cleaning of the unit," id. § 57-17-3(1), but any such application is a deduction that must be itemized and explained in writing within the 30 days, id. § 57-17-3(2)(c).

**247.** Defendants never returned Plaintiff's $500 deposit and never provided the statutorily required itemized accounting. The Court of Appeals recorded that, "[a]lthough not reflected in the record, The Pearl indicated at oral argument, without contradiction, that Blackwell's $500 security deposit was credited as a payment towards the judgment." (Ct. App. Order at 5 n.5.) Defendants thus applied Plaintiff's deposit to their own judgment against her, without the itemized written notice § 57-17-3(2)(c) requires, without her consent, and without

any entry in the record. Plaintiff vacated on April 29, 2023; no balance, prepaid rent, or itemized notice was mailed or delivered to her within 30 days of that date, or at any time since.

**248.** Plaintiff raised this claim in her answer and counterclaim in the state proceeding (R. 26) and testified to it at trial ("They stole my security deposit.") (Trial Tr. 17:22; R. 926). The state court's written findings did not mention the claim. On appeal, the Utah Court of Appeals held the claim unpreserved, stating it "was only ever raised in passing" and "was never squarely presented to the district court." (Ct. App. Order at 5.) No court has ever adjudicated it on the merits. A claim that the state appellate court itself characterized as never squarely presented, and that no court decided, was not actually litigated and is not barred by issue preclusion; and a procedural default on a claim never reached does not constitute a judgment on the merits for claim preclusion purposes.

**249.** Plaintiff did not serve the notice described in § 57-17-3(3) and therefore does not seek the civil penalty or fee-shifting provided by § 57-17-5. That section "does not preclude an owner or a renter from recovering other damages to which the owner or the renter is entitled." Utah Code Ann. § 57-17-5(4). Plaintiff seeks the return of her $500 deposit, with interest, as damages for Defendants' failure to return it or account for it within 30 days as § 57-17-3(2) and the lease required, and as an element of her damages under Counts I through IV, because the deposit was withheld and applied to a judgment obtained through the conduct alleged in this Complaint.

**COUNT VI**

**Damages**

**250.** Plaintiff incorporates all preceding paragraphs.

**251.** As a direct and proximate result of Defendants' conduct, Plaintiff has suffered the following injuries, in amounts to be proven at trial:

a. The month of rent Defendants refused and then recovered three times over. Defendants refused Plaintiff's tendered April 2023 rent, sued her for not paying it, and obtained a judgment of $7,395, April 2023 rent at $85 per day for 29 days, multiplied by three, for a month in which they would not accept her payment. The loss to Plaintiff is the amount she has paid and remains liable to pay on that judgment, which exists only because Defendants refused the rent that would have prevented it.

b. Amounts collected through garnishment, which Defendants have taken from Plaintiff's wages and other funds in enforcement of that judgment.

c. Amounts Defendants continue to pursue, including attorney fees ($15,330 as requested; $15,225 as corrected) and forfeiture of the $4,037.62 appeal bond Plaintiff was required to post.

d. The disputed fees, which Defendants charged, removed, reinstated, and later abandoned.

e. Loss of housing and the costs of displacement, including moving, storage, temporary lodging, and increased housing costs.

f. The loss of stable housing. Plaintiff and her minor son have been homeless on and off since the eviction in 2023 and continuously since September 2024, moving from place to place.

g. Loss of income and impairment of Plaintiff's ability to maintain employment. Plaintiff holds two master's degrees, in cybersecurity and in artificial intelligence. Work in those fields requires a stable residence, reliable

connectivity, and the ability to pass employment and background screening that an eviction judgment and an outstanding money judgment impair. Since the eviction, and while homeless, Plaintiff has been unable to maintain employment in her field, and the garnishment of what income she had (¶ 121) deepened the instability that prevents her from regaining it.

h. Damage to Plaintiff's credit and rental history. The eviction record continues to impair Plaintiff's ability to obtain housing and will continue to do so for years.

i. Emotional distress, including the distress of losing her home, of being displaced with a minor child with special needs, and of being told she could keep her home only if she surrendered her civil rights complaint.

**252.** Part of the harm Defendants inflicted on Plaintiff is the harm to her minor son, which she has borne and continues to bear as his mother: the loss of their home while he was in kindergarten; his removal from his school and community in the middle of the school year; the years of instability since, during which he is now missing his fourth year of school and has fallen behind his peers socially and developmentally; and the distress of raising a child in homelessness at an age when stability is foundational. Plaintiff pleads this as an element of her own damages. Plaintiff does not in this Complaint assert separate claims on her son's behalf, and reserves the right to seek leave to add such claims through counsel.

**253.** The cumulative character of Defendants' conduct establishes that it was not negligent or inadvertent but deliberate and in conscious disregard of Plaintiff's rights. Defendants charged Plaintiff fees their own managers called a "glitch" and a "setting issue"; credited her account to a positive balance and then, one week later, issued a three-day notice demanding past-due rent and a late fee; served her with a notice to vacate, without a conversation, in the manner their own manager testified he would not consider ethical; refused

her rent because, as their counsel explained, "[m]y client was interested in seeing a vacate date"; offered to forgo the eviction if she would surrender her civil rights complaint; sued her for the very rent they refused and recovered three times it; took her security deposit and applied it to their own judgment without the notice the law requires; garnished her wages while she and her child were homeless; and now seek attorney fees more than double the judgment and forfeiture of her appeal bond. Each of these acts was directed at a tenant who had paid her rent and questioned fees that other tenants questioned without consequence, and who was the only Black tenant in the building and the only tenant whose lease was not renewed. Defendants' own manager testified he would not consider that kind of notice ethical, a state agency found a prima facie case of retaliation, and the trial judge, in staying the garnishment pending appeal, concluded that the case presents "serious issues on the merits that warrant appellate review," while also determining that Plaintiff had not demonstrated a likelihood of success. Conduct of this character, sustained across years and directed at a person the law expressly protects, is the kind for which punitive damages exist.

**254.** Defendants' conduct was intentional, willful, malicious, and undertaken in gross disregard of Plaintiff's federally protected rights, warranting punitive damages. In the Tenth Circuit, "the standard for punitive damages for discrimination in violation of federal civil rights is that the discrimination must have been 'malicious, willful, and in gross disregard of [plaintiff's] rights.'" Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1115 (10th Cir. 2001) (quoting Jackson v. Pool Mortgage Co., 868 F.2d 1178, 1181 (10th Cir. 1989) (quoting EEOC v. Gaddis, 733 F.2d 1373, 1380 (10th Cir. 1984))). "Section 1981 does not have a statutory cap that limits punitive damages as does Title VII." Id. at 1117. And where, as here, the economic loss understates the gravity of the conduct, because "the injury is primarily personal, a greater ratio [than 10:1] may be appropriate." Id. (quoting Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1273 (10th Cir. 2000)). Defendants refused Plaintiff's rent to

manufacture a default, conditioned her housing on surrender of a civil rights complaint, enforced against her an instrument no one authenticated, and applied her security deposit to their own judgment off the record. That conduct warrants punitive damages sufficient to deter its repetition against other tenants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment that Defendants violated 42 U.S.C. §§ 1981, 1982, 3604, and 3617, and Utah Code Ann. § 57-17-3;

B. Award compensatory damages in an amount to be proven at trial, including damages for loss of housing, homelessness, out-of-pocket losses, damage to credit and rental history, and emotional distress;

C. Award punitive damages;

D. Enter a permanent injunction under 42 U.S.C. § 3613(c)(1) prohibiting Defendants, and all persons acting in concert with them, from retaliating against Plaintiff on account of her fair housing complaint or this action, and requiring Defendants to provide a neutral rental reference for Plaintiff and to cease reporting her tenancy to any tenant-screening or credit-reporting service as a nonpayment eviction;

E. Order the return of Plaintiff's $500 security deposit with interest from May 29, 2023;

F. Award declaratory relief stating that Defendants' conduct violated Plaintiff's federal civil rights;

G. Award costs, and attorney fees under 42 U.S.C. § 1988 and 42 U.S.C. § 3613(c)(2) in the event Plaintiff obtains counsel;

H. Award pre- and post-judgment interest; and

I. Grant such other relief as the Court deems just.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: November 17, 2026

/s/ Antonia Blackwell
Antonia Blackwell
Plaintiff, Pro Se
No mailing address (homeless). Please contact by email or telephone.
Phone: (385) 334-6113
Email: kranberry99@yahoo.com

## VERIFICATION

I, Antonia Blackwell, declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. § 1746, that I am the Plaintiff in this action, that I have read the foregoing First Amended Complaint, and that the factual allegations contained in it are true and correct to the best of my knowledge, information, and belief.

Executed on November 17, 2026.

/s/ Antonia Blackwell
Antonia Blackwell